ACCEPTED
06-14-00230-CR
SIXTH COURT OF APPEALS
TEXARKANA, TEXAS
4/30/2015 12:32:06 PM
DEBBIE AUTREY
CLERK

No. 06-14-00230-CR

_____

In the Texas Court of Appeals
Sixth Judicial District at Texarkana

FILED IN
6th COURT OF APPEALS
TEXARKANA, TEXAS
4/30/2015 12:32:06 PM
_____DEBBIE AUTREY
Clerk

_____

**Nick Nima Feizy,**

**Appellant,**

**v.**

**The State of Texas,**

**Appellee.**

_____

On Appeal from County Court at Law No. 4
Collin County, Texas
Cause No. 004-80265-2014

_____

**APPELLANT'S BRIEF AND APPENDIX**

_____

Charles "Chad" Baruch                Jim Burnham
Texas Bar Number 01864300            Texas Bar Number 03441000
THE LAW OFFICE OF CHAD BARUCH        JIM BURNHAM, ATTORNEY AT LAW
3201 Main Street                     6116 N. Central Expy., Ste. 515
Rowlett, Texas 75088                 Dallas, Texas 75206
Telephone: (972) 412-7192            Telephone: (214) 750-6616
Facsimile:  (972) 412-4028           Facsimile: (214) 750-6649
Email: baruchesq@aol.com             Email: jim@jburnhamlaw.com

*Counsel for Appellant*

## Identity of Parties and Counsel

**Appellant Nick Nima Feizy**

Appellate Counsel
Charles "Chad" Baruch
Texas Bar Number 01864300
THE LAW OFFICE OF CHAD BARUCH
3201 Main Street
Rowlett, Texas 75088

Trial and Appellate Counsel
Jim Burnham
Texas Bar Number 03441000
JIM BURNHAM, ATTORNEY AT LAW
6116 N. Central Expressway, Suite 515
Dallas, Texas 75206

**Appellee The State of Texas**

Appellate Counsel
John Rolater
Texas Bar Number 00791565
Assistant Criminal District Attorney
COLLIN COUNTY DISTRICT ATTORNEY
2100 Bloomdale Road, Suite 200
McKinney, Texas 75071

Trial Counsel
Rachel Tran
Texas Bar Number 24079478
Assistant Criminal District Attorney
COLLIN COUNTY DISTRICT ATTORNEY
2100 Bloomdale Road, Suite 200
McKinney, Texas 75071

**Table of Contents**

Identity of Parties and Counsel................................................................................. i

Table of Contents....................................................................................................... ii

Index of Authorities.................................................................................................. iii

Statement of the Case ...............................................................................................1

Statement Regarding Oral Argument .......................................................................1

Statement of Issues ...................................................................................................1

Statement of Facts ....................................................................................................1

Summary of the Argument .......................................................................................4

Argument: The Conviction Lacks Legally Sufficient Supporting Evidence.............5

Prayer......................................................................................................................10

Certificate of Compliance.......................................................................................10

Certificate of Service ..............................................................................................11

Appendix

  Tab 1:  Judgment

  Tab 2:  Charge of the Court

  Tab 3:  Certification of Defendant's Right of Appeal

# Index of Authorities

## Cases

*Benson v. State*,
   No. 12-06-00051-CR, 2008 WL 82225 (Tex. App.—Tyler Jan. 9, 2008, no pet.) (not designated for publication) .................................................. 8-9

*Breaux v. State*,
   16 S.W.3d 854 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd).................... 6

*Brooks v. State*,
   323 S.W.3d 893 (Tex. Crim. App. 2010) .......................................... 8, 9

*Cano v. State*,
   614 S.W.2d 578 (Tex. Crim. App. 1981) (en banc) ............................... 8

*Davis v. State*,
   No. 03-07-00085-CR, 2007 WL 1853361 (Tex. App.—Austin 2007, pet. ref'd) (mem. op., not designated for publication) .................................. 9

*Jackson v. Virginia*,
   443 U.S. 307 (1979) .............................................................. 8, 9

*In re M.C.L.*,
   110 S.W.3d 591, 600 (Tex. App. —Austin 2003, no pet.)................................... 7

*Lewis v. State*,
   530 S.W.2d 117 (Tex. Crim. App. 1975) ........................................... 8

*Marathon Corp. v. Pitzner*,
   106 S.W.3d 724 (Tex. 2003) ....................................................... 8

*Randolph v. State*,
   152 S.W.3d 764 (Tex. App.—Dallas 2004, no pet.) ............................... 9

*Salley v. State*,
   25 S.W.3d 878 (Tex. App.—Houston [14th Dist.] 2000, no pet.) ....................... 6

## Statutes and Rules

TEX. PEN. CODE ANN. § 1.07 (West 2011) ...................................................................6

TEX. PEN. CODE ANN. § 22.01 (West 2011) ................................................................6

## Statement of the Case

The State of Texas charged Nick Feizy with the misdemeanor offense of assault causing bodily injury to a family member.[1] A Collin County jury found Feizy guilty.[2] The trial court sentenced Feizy to 180 days of confinement in the county jail and a fine of $250, but suspended the confinement under a 12-month period of probation.[3] Feizy now appeals.[4]

## Statement Regarding Oral Argument

Appellant does not believe that oral argument would assist the Court. The issues are straightforward and can be decided based on the briefs.

## Statement of Issues

1.     Is the trial court's judgment supported by legally sufficient evidence of bodily injury?

## Statement of Facts

Nick and Lauren Feizy are the married parents of one child.[5] The State of Texas charged Nick with the misdemeanor offense of assault causing bodily injury to a family member.[6]

---

[1] C.R. 19.
[2] App. 2; C.R. 390-93.
[3] App. 1; C.R. 394-96.
[4] C.R. 408-09.
[5] 5 R.R. 59.
[6] C.R. 19.

At the time of trial, Nick and Lauren were in the midst of a divorce proceeding disputing the terms of custody over their son.[7] Lauren first contacted her divorce attorneys, The Parker Firm, on November 12, 2013—six days before the alleged assault.[8]

In the divorce proceeding, Lauren sought sole managing conservatorship to enable her to move the couple's child out of Texas without Nick's agreement.[9] A finding of family violence would prevent Nick from being named a joint managing conservator.[10] The Parker Firm's website contains what amounts to a "how-to" manual on using a finding of family violence to gain sole managing conservatorship in a custody battle.[11]

On November 18, 2013, a week after calling The Parker Firm, Lauren alleged that Nick assaulted her. According to Lauren's trial testimony, the assault consisted of Nick "pinching her" on her "stomach and side, [and] back."[12] When asked what Nick used to pinch her, Lauren replied: "His hands."[13] She also said that Nick poked her with the "blunt end" of "a dental tool."[14] The responding police officers testified that Lauren told them Nick

---

[7] 5 R.R. 60; 6 R.R. 55-56.
[8] 5 R.R. 86.
[9] 6 R.R. 14, 55.
[10] 6 R.R. 17, 56.
[11] 6 R.R. 60.
[12] 5 R.R. 66.
[13] 5 R.R. 67.
[14] 5 R.R. 66.

had been "probing her" in the side with the dental tool and pinching her with his fingers.[15]

Lauren did not seek medical treatment as a result of the alleged assault. Lauren admitted that the only visible marks on her body when police arrived were on her neck.[16] The officers testified that in addition to seeing this "light redness" on Lauren's neck, they also observed scratches on her right side and the right side of her back.[17] The State introduced photographs of these purported injuries.[18] The police never found any dental tool at the scene.[19]

Neither Lauren nor the officers testified about anything Nick did to Lauren's neck. In her opening statement, the prosecutor claimed Lauren would testify that Nick "grabs her neck and holds on to it until she finally lets go of their son.[20] But Lauren said nothing about Nick grabbing her neck. Indeed, the only time she even used the word "neck" was in referring to the redness on her neck—which she never explained.[21] Nick testified that he

---

[15] 5 R.R. 26-27.
[16] 5 R.R. 69.
[17] 5 R.R. 48, 54.
[18] 8 R.R. 5-11.
[19] 5 R.R. 45.
[20] 5 R.R. 19.
[21] 5 R.R. 69.

3

never touched Lauren's neck, but that their child had been "yanking" on Lauren's necklace during their argument.[22]

Finally, the sum total of Lauren's testimony concerning pain is as follows:

> Q:     When he pinched you and he used the dental
>         tool, did that cause you pain?
>
> A:     Yes.[23]

The jury found Feizy guilty.[24] The trial court sentenced Feizy to 180 days of confinement in the county jail and a fine of $250, but suspended the confinement under a 12-month period of probation.[25]

Feizy filed a motion for new trial based on legal sufficiency of the evidence, which the trial court denied.[26] After the trial court provided certification of his right to appeal,[27] Feizy filed notice of this appeal.[28]

## Summary of the Argument

The judgment lacks legally sufficient supporting evidence. An assault conviction requires evidence of bodily injury. The principal bodily injury presented by the State was redness on Lauren's neck. This was the only

---

[22] 6 R.R. 70-71, 83.
[23] 5 R.R. 68.
[24] App. 1; C.R. 393.
[25] App. 1; C.R. 394-96.
[26] C.R. 397-400.
[27] App. 3; C.R. 410.
[28] C.R. 408-09.

4

bodily injury supported by the testimony of all the State's witnesses. But no one testified that Nick did anything to Lauren's neck; the uncontroverted testimony was that he did not. Similarly, no one testified to anything Nick did that would account for the only other injury (the scratches on Lauren's back) observed by the officers. Neither pinching nor poking would explain the scratches. That leaves Lauren's unexplained, one-word answer that she suffered pain as the sole evidence supporting conviction. And it is not adequate to overcome the presumption of innocence.

### Argument:
### The Conviction Lacks Legally Sufficient Supporting Evidence.

Nick challenges the legal sufficiency of the evidence supporting his conviction. In evaluating legal sufficiency, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also Brooks v. State*, 323 S.W.3d 893, 902 (Tex. Crim. App. 2010).

*Jackson* replaces what formerly were separate legal and factual sufficiency standards with what now is the highest standard of review for sufficiency in our legal system:

> Legal sufficiency of the evidence is a test of adequacy, not mere quantity. Sufficient evidence is such evidence, in character, weight, or amount, as will legally justify the

5

judicial or official action demanded. In criminal cases, only that evidence which is sufficient in character, weight, and amount to justify a factfinder in concluding that every element of the offense has been proven beyond a reasonable doubt is adequate to support a conviction. There is no higher burden of proof in any trial, criminal or civil, and there is no higher standard of appellate review than the standard mandated by *Jackson*. All civil burdens of proof and standards of appellate review are lesser standards than that mandated by *Jackson*.

*Brooks*, 323 S.W.3d at 917 (Cochran, J., concurring, in which Womack, J., joined) (internal quotation marks and citations omitted).

The jury found Fiezy guilty of the misdemeanor offense of assault causing bodily injury to a family member *See* TEX. PEN. CODE ANN. § 22.01(a)(1) (West 2011). "Causation of bodily injury to another is an essential element of assault." *Breaux v. State*, 16 S.W.3d 854, 857 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd) (citations omitted).

"Bodily injury" means physical pain, illness, or any impairment of physical condition. *See* TEX. PEN. CODE ANN.§ 1.07(a)(8) (West 2011). The definition of "bodily injury" is purposefully broad, encompassing even relatively minor physical contacts "so long as they constitute more than mere offensive touching." *Salley v. State*, 25 S.W.3d 878, 881 (Tex. App.—Houston [14th Dist.] 2000, no pet.) (citations omitted).

The evidence in this case was insufficient to support the assault judgment due to absence of evidence establishing "bodily injury." Initially,

6

no testimony links the physical injuries testified to by the officers and Lauren, and depicted in the photographs, to any act by Nick. Lauren testified that the only injury she sustained was to her neck. The officers also testified that they observed redness on Lauren's neck. But neither Lauren nor anyone else testified that Nick ever did anything to Lauren's neck. Indeed, the uncontroverted evidence is that Nick never touched Lauren's neck, but that their child had been "yanking" on Lauren's necklace.[29]

Similarly, no testimony links any act by Nick to the other injuries the officers claimed to have seen—injuries that Lauren never even mentioned. The officers said they saw scratches on Lauren's right side and the right side of her back.[30] Again, though, neither Lauren nor anyone else testified about Nick scratching her. The sum total of the trial testimony was that Nick pinched Lauren with his fingers and poked he with the "blunt end" of a dental tool.[31] Neither act, even if true, would account for the injuries the officers saw—injuries Lauren neither mentioned nor attributed to Nick.

The Austin Court of Appeals held the evidence insufficient to support the element of bodily injury under similar circumstances in *In re M.C.L.*, 110 S.W.3d 591, 600 (Tex. App.—Austin 2003, no pet.). In that case, the

---

[29] 6 R.R. 70-71, 83.
[30] 5 R.R. 48, 54.
[31] 5 R.R. 26-27, 66-67.

7

court reversed a conviction where the evidence left uncertainty as to whether injuries actually were caused by the accused or were attributable to some other cause. *Id*. Of course, *In re M.C.L.* was decided under the now discarded theory of factual sufficiency. But its analysis concerning the linkage between injuries and acts by the accused applies to equal force under the *Jackson* standard requiring analysis of the adequacy and quality of the evidence supporting conviction.

The State's principal evidence of bodily injury—indeed, the only instance of bodily injury agreed upon by Lauren and the officers, and supported by the photographs—was the redness on Lauren's neck. And, inarguably, no evidence—***literally none***—links Nick to those injuries.

That leaves Lauren's testimony about pain as the sole evidence of bodily injury. But that evidence is so weak and conclusory that it cannot overcome the presumption of innocence. Her one-word answer, "yes," lacks any detail or explanation. Moreover, the statute requires "physical pain" for bodily injury. TEX. PEN. CODE ANN.§ 1.07(a)(8) (West 2011). And Lauren did not say that Nick caused her ***physical*** pain. The "pain" Lauren mentioned could just as easily, and just as likely (indeed, given the paucity of evidence of violence, perhaps more likely), referred to the emotional pain of being humiliated by her husband in front of their child.

Lauren's one-word answer, unexplained and open to multiple interpretations, is the essence of the type of "mere scintilla" held legally insufficient in civil cases. *See generally Marathon Corp. v. Pitzner*, 106 S.W.3d 724, 727 (Tex. 2003). And *Jackson* demands an even higher standard for reviewing evidence in criminal cases. *See Brooks*, 323 S.W.3d at 917 (Cochran, J., concurring in which Womack, J., joined).

This is not a case where circumstances surrounding the incident or other details would explain ***why*** Lauren suffered pain. *Cf. Lewis v. State*, 530 S.W.2d 117, 118 (Tex. Crim. App. 1975) (arm twisted); *Cano v. State*, 614 S.W.2d 578, 579 (Tex. Crim. App. 1981) (fall to pavement resulting in cut mouth); *Benson v. State*, No. 12-06-00051-CR, 2008 WL 82225, at *5-6 (Tex. App.—Tyler Jan. 9, 2008, no pet.) (not designated for publication) (lens popping out, breaking the skin, and necessitating stitches). Lauren's one-word answer provides no hint about why the probing and pinching would cause pain.

Of course, a jury may infer from the circumstances that a victim suffered physical pain. *Randolph v. State*, 152 S.W.3d 764, 774 (Tex. App.—Dallas 2004, no pet.). For example, a jury can reasonably infer that striking a woman with enough force to knock her to the ground would cause her pain. *Davis v. State*, No. 03-07-00085-CR, 2007 WL 1853361, at *2-3

(Tex. App.—Austin 2007, pet. ref'd) (mem. op., not designated for publication). But nothing in the record supports such an inference in this case. Lauren said nothing that would permit an inference that Nick's "probing" with the blunt end of a tool or his pinching with fingers would cause pain. She certainly said nothing that would make an inference of physical pain more likely than an inference of emotional pain.

*Jackson* requires sufficiency review of the "character, weight, and amount" of evidence supporting a criminal conviction. *Brooks*, 323 S.W.3d at 917 (Cochran, J., concurring in which Womack, J., joined) (internal quotation marks and citations omitted). Here, the evidence of bodily injury is so lacking in character, weight, and amount as to render the evidence insufficient and the conviction improper.

## Prayer

Because the conviction rests on legally insufficient supporting evidence, this Court should reverse the trial court's judgment and render a judgment of acquittal.

10

Respectfully submitted,

/s/Charles "Chad" Baruch
Texas Bar Number 01864300
THE LAW OFFICE OF CHAD BARUCH
3201 Main Street
Rowlett, Texas 75088
Telephone: (972) 412-7192
Facsimile: (972) 412-4028
Email: baruchesq@aol.com

*Counsel for Appellant*

## Certificate of Compliance

This brief was prepared using Microsoft Word for Mac. Relying on the word count function in that software, I certify that this brief contains 2,034 words (excluding the cover, tables, signature block, and certificates).

/s/Charles "Chad" Baruch

## Certificate of Service

The undersigned certifies that a true and correct copy of this instrument was served this 30th day of April, 2015, by efiling and email, upon the following counsel of record for appellees:

John Rolater
Texas Bar Number 00791565
Assistant Criminal District Attorney
OFFICE OF THE COLLIN COUNTY DISTRICT ATTORNEY
2100 Bloomdale Road, Suite 200
McKinney, Texas 75071
jrolater@co.collin.tx.us

/s/Charles "Chad" Baruch

1

THE STATE OF TEXAS

VS.

NICK N FEIZY

IN THE COUNTY COURT

AT LAW # 4

COLLIN COUNTY, TEXAS

## JUDGMENT - PLEA OF NOT GUILTY BEFORE JURY - FOUND GUILTY
## PUNISHMENT BY COURT – COMMUNITY SUPERVISION

The defendant has been charged by information with the misdemeanor offense of **Assault Causes Bodily Injury Family Member**. This case was called for trial; the State of Texas appeared; and the defendant appeared and either had counsel or waived counsel, any waiver having been voluntarily, knowingly, and intelligently made. Both parties announced ready for trial. The defendant was arraigned or waived arraignment and pleaded Not Guilty. A jury was duly selected, impaneled and sworn.

After hearing the Information read, the defendant's plea, and the evidence submitted, the jury was then duly charged according to the law to determine the guilt or innocence of the defendant. After hearing arguments of counsel, the jury retired in charge of the proper officer to consider its verdict. The jury returned a verdict of "Guilty."

It is therefore ORDERED, ADJUDGED and DECREED that the defendant is guilty of the misdemeanor offense of **Assault Causes Bodily Injury Family Member** committed **on this the 18th day of November, 2013**, as charged in the Information.

The defendant elected that the Court assess the punishment. After hearing the evidence and argument of counsel, the Court assessed a fine of **$250.00,** costs of the Court, and **180 days** confinement in the County Jail.

It is further ORDERED that the amount paid to the defendant's appointed counsel is taxed against the defendant as costs (only if the Court makes the determination that the defendant is no longer indigent) in an amount determined by the Court as well as a one $25.00 Time Payment Fee, if applicable. To correct a cost bill, the County Clerk is granted leave to amend it without further written order that any proper but omitted amount is due, even in cases where costs have been previously paid.

It is further ORDERED, ADJUDGED and DECREED that all writs, processes, commitments, and capiases may issue for enforcement of any fine, cost, and term-and-condition incarceration ordered as a condition of supervision.

It is therefore ORDERED, ADJUDGED, and DECREED that the defendant be remanded to the custody of the Sheriff of Collin County, Texas, to be confined until all such costs and fines are paid, and until the term of confinement has expired, with **2 days** credit for time already served in custody.

It is further ORDERED that the confinement be suspended and that the defendant be placed on community supervision for a period of **12 months** from the date of this order, the conditions of supervision being contained in the Court's separate order made a part of this judgment.

**SIGNED on this the 30th day of September, 2014.**

_____
I am the defendant who

received this judgment

and sentence assessed

on this date

David Rippel
Judge Presiding

| | |
|---|---|
| COURT COST: | $388.45 |
| FINE | $250.00 |
| FINE AND COST DUE | 30 days |

ODY
SCANNED

THE STATE OF TEXAS

VS.

NICK N FEIZY

IN THE COUNTY COURT

AT LAW # 4

COLLIN COUNTY, TEXAS

## ORDER PLACING DEFENDANT ON COMMUNITY SUPERVISION

Having suspended the imposition of punishment or having deferred adjudication of a finding in this case and having placed the defendant on community supervision in the above-entitled and numbered cause on the **on this the 30th day of September, 2014** for a period of **12 months** for the offense of **Assault Causes Bodily Injury Family Member** the Court makes the following orders concerning the terms and conditions of supervision. The defendant shall:

### General:
1. Commit no offense against the laws of this or any State, or the United States;
2. Report to a Supervision Officer as scheduled by the Supervision Officer;
3. Permit the Supervision Officer to visit you at home or elsewhere;
4. Report any change in address, change of employment, or arrest to the Supervision Officer within 48 hours;
5. Remain within the supervising county unless permitted to depart by the Supervision Officer;
6. Perform **40 hours** of community service work at the rate of 10 hours per month managed and facilitated by such agencies as the Supervision Officer directs and pay all costs associated therewith, as directed by the Supervision Officer;

### Employment/Education:
7. Work faithfully at suitable employment insofar as possible;

### Substance Abuse:
8. Not use marijuana, dangerous drugs, or any substance prohibited by the Texas Controlled Substances Act;
9. Submit a non-dilute random urine sample for testing and/or other approved medical test as directed by your supervision officer and pay for such testing. If directed by the Supervision Officer, call a designated number daily to determine the days that you shall submit a sample to determine the use of illicit drugs or alcohol;

### Special programs:
10. Participate in and successfully complete a Battering Intervention program and pay all costs as directed by the Supervision Officer;
11. No contact with the victim except for divorce and matters of the children;

### Waiver:
12. Waive the right to a post sentence investigation report;

### Financial:
13. Support his or her dependents;
14. Pay the following amounts as described below until the total amount is paid:
    a. Pay court cost of **$388.45** within 30 days to the County Clerk of Collin County, Texas;
    b. Pay restitution of **$-0-** within 30 days to the Director of the Community Supervision and Corrections Department of Collin County, Texas;
    c. Pay the fine assessed in the amount of **$250.00** within 30 days to the County Clerk of Collin County, Texas;
    d. To the Director of the Community Supervision and Corrections Department of Collin County, Texas, and by the 15th day of each month beginning the next month following being placed on supervision, pay a supervision fee of $50.00 per month and an additional $5.00 per month for offenses listed in the Penal Code to which the additional $5.00 fee is applicable. (Fees are inapplicable while the defendant is in jail or a residential treatment center, or while the defendant is being supervised out of state.);

If you contend that you are indigent and request permission to discharge supervision fees by performing community service, the Community Supervision and Corrections Department (CSCD) is authorized to assess credit per the approved CSCD community service policy or if you request permission to discharge fines and cost by performing community service, the Court Collections Unit (CCU) is authorized to assess credit per the approved CCU service policy.

The defendant is hereby given notice that under the laws of this State, the Court has determined and imposed the above terms and conditions of community supervision, and may at any time during this period of supervision alter or modify them. The Court also has the authority, at any time during the period of community supervision to revoke community supervision for any violation of the conditions of supervision set out above.

**SIGNED on this the 30th day of September, 2014.**

David Rippel
Judge Presiding

WITNESS:

Defendant

**2**


## IN THE COUNTY COURT AT LAW NO. 4
## OF COLLIN COUNTY, TEXAS
### Honorable David D. Rippel, Presiding

### Criminal Cause No.004-80265-2014

## STATE OF TEXAS

## VS.

## NICK N. FEIZY

## CHARGE OF THE COURT

LADIES AND GENTLEMEN OF THE JURY:

The defendant, **Nick N. Feizy**, stands charged by information with the misdemeanor offense of assault, family violence. The offense is alleged to have occurred in Collin County, Texas on or about November 18, 2013. The defendant has pleaded not guilty.

Our law provides that a person commits the offense of assault if the person intentionally, knowingly, or recklessly causes bodily injury to another.

The term "bodily injury," as used here, means physical pain, illness or any impairment of physical condition.

A person acts intentionally, or with intent, with respect to the result of his conduct when it is his conscious objective or desire to cause the result.

A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

A person acts recklessly, or is reckless, with respect to the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.

Now, if you find and believe from the evidence beyond a reasonable doubt that on or about November 18, 2013 in Collin County, Texas, **Nick N. Feizy**, did intentionally, knowingly or recklessly cause bodily injury to Lauren Feizy by grabbing, scratching or pinching Lauren Feizy with the defendant's hand, then you will find the defendant guilty.

Unless you so find beyond a reasonable doubt, or if you have a reasonable doubt thereof, you will find the defendant not guilty.

All persons are presumed to be innocent and no person may be convicted of an offense unless each element of the offense is proved beyond a reasonable doubt. The fact that a person has been arrested, confined, or charged with an offense gives rise to no inference of guilt at his trial.

The law does not require a defendant to prove his innocence or produce any evidence at all. The presumption of innocence alone is sufficient to acquit the defendant, unless the jurors are satisfied beyond a reasonable doubt of the defendant's guilt after careful and impartial consideration of all of the evidence in the case.

The prosecution has the burden of proving the defendant guilty, and it must do so by proving each and every element of the offense charged beyond a reasonable doubt, and if they fail to do so, you must acquit the defendant.

You are instructed that you are not to allow yourselves to be influenced in any degree whatsoever by what you may think or surmise the opinion of the Court to be. The Court has no right by any word or any act to indicate any opinion respecting any matter of fact involved in this case, nor to indicate any desire respecting its outcome. The Court has not intended to express any opinion upon any matter of fact in this case, and if you have observed anything which you have or may interpret as the Court's opinion upon any matter of fact in this case, you must wholly disregard it.

You are instructed that any statements of counsel made during the course of the trial or during argument not supported by the evidence, or statements of law made by counsel not in harmony with the law as stated to you by the Court in these instructions, are to be wholly disregarded.

You are further instructed that you should not question the Bailiff concerning the testimony or the law of the case, nor should you discuss the case in his presence. If you have any questions, you should reduce them to writing, to be signed by the presiding juror, and present them to the Court.

If the Jurors disagree as to the statement of any witness, they may, upon applying to the Court, have read to them from the Court Reporter's notes that portion of such witness' testimony, and only that portion, on the point in dispute.

You are instructed that the Information is the means whereby a defendant is brought to trial in a misdemeanor prosecution. It is not evidence, nor can it be considered as such when passing upon whether the defendant is guilty or not guilty.

You are further instructed not to let bias, sympathy or prejudice play any part in your deliberation.

During your deliberations in this case, you must not consider, discuss, nor relate any matters not in evidence before you. You should not consider nor mention any personal knowledge or information you may have about any fact or person connected with this case which is not shown by the evidence.

After you retire to the jury room, you shall select one of your members as your presiding juror. It is their duty to preside at your deliberations and vote with you. Your verdict must be unanimous and signed by the presiding juror.

You are the exclusive judges of the facts proved, of the credibility of the witnesses, and the weight to be given their testimony, but you must be governed by the law you receive in these written instructions.

Suitable forms for your verdict are attached hereto. Your verdict must be in writing and signed by your presiding juror. Your sole duty at this time is to determine whether the defendant is guilty or not guilty under the information in this cause and you are to restrict your deliberations to that issue.

Signed this the 30th day of September, 2014.

DAVID D. RIPPEL, Judge Presiding

# VERDICT

We, the Jury, find the defendant Not Guilty.

*(signature)* _____

*(printed name)* _____

**PRESIDING JUROR**

Or,

We, the Jury, find the defendant Guilty of assault as charged.

*(signature)* _____

*(printed name)* _Michael J Carey_

**PRESIDING JUROR**

3

No. 004-80265-2014

The State of Texas

*Nick N. Ferry*

v.

In the County Court at Law

of 4

Collin County, Texas

### Trial Court's Certification of Defendant's Right of Appeal*

I, judge of the trial court, certify this criminal case:

☑ is not a plea-bargain case, and the defendant has the right of appeal. [or]

☐ is a plea-bargain case, but matters were raised by written motion filed and ruled on before trial and not withdrawn or waived, and the defendant has the right of appeal. [or]

☐ is a plea-bargain case, but the trial court has given permission to appeal, and the defendant has the right of appeal. [or]

☐ is a plea-bargain case, and the defendant has NO right of appeal. [or]

☐ the defendant has waived the right of appeal.

Signed the 20 day of November 14.

_____
Judge Presiding

I have received a copy of this certification:

_____
Defendant
Mailing address:
Telephone number:
Fax number (if any):

*Jim Burnham*
_____
Defendant's Counsel
State Bar number: 03441000
Mailing address:
Telephone number:
Fax number (if any):

*A defendant in a criminal case has the right of appeal under these rules. The trial court shall enter a certification of the defendant's right to appeal in every case in which it enters a judgment of guilt or other appealable order. In a plea bargain case - that is, a case in which a defendant's plea was guilty or nolo contendere and the punishment did not exceed the punishment recommended by the prosecutor and agreed to by the defendant - a defendant may appeal only: (A) those matters that were raised by written motion filed and ruled on before trial, or (B) after getting the trial court's permission to appeal.
**(Texas Rule of Appellate Procedure 25.2(a)(2))**

ODY
SCANNED

410

§ 1.07. Definitions.

**Texas Statutes**

**Penal Code**

**Title 1. Introductory Provisions**

**Chapter 1. General Provisions**

*Current through the 2013 Regular and Special Sessions*

**§ 1.07. Definitions**

(a)    In this code:

    (1)    "Act" means a bodily movement, whether voluntary or involuntary, and includes speech.

    (2)    "Actor" means a person whose criminal responsibility is in issue in a criminal action. Whenever the term "suspect" is used in this code, it means "actor."

    (3)    "Agency" includes authority, board, bureau, commission, committee, council, department, district, division, and office.

    (4)    "Alcoholic beverage" has the meaning assigned by Section 1.04 , Alcoholic Beverage Code.

    (5)    "Another" means a person other than the actor.

    (6)    "Association" means a government or governmental subdivision or agency, trust, partnership, or two or more persons having a joint or common economic interest.

    (7)    "Benefit" means anything reasonably regarded as economic gain or advantage, including benefit to any other person in whose welfare the beneficiary is interested.

    (8)    "Bodily injury" means physical pain, illness, or any impairment of physical condition.

    (9)    "Coercion" means a threat, however communicated:

      (A)    to commit an offense;

      (B)    to inflict bodily injury in the future on the person threatened or another;

      (C)    to accuse a person of any offense;

      (D)    to expose a person to hatred, contempt, or ridicule;

(E) to harm the credit or business repute of any person; or

(F) to take or withhold action as a public servant, or to cause a public servant to take or withhold action.

(10) "Conduct" means an act or omission and its accompanying mental state.

(11) "Consent" means assent in fact, whether express or apparent.

(12) "Controlled substance" has the meaning assigned by Section 481.002 , Health and Safety Code.

(13) "Corporation" includes nonprofit corporations, professional associations created pursuant to statute, and joint stock companies.

(14) "Correctional facility" means a place designated by law for the confinement of a person arrested for, charged with, or convicted of a criminal offense. The term includes:

(A) a municipal or county jail;

(B) a confinement facility operated by the Texas Department of Criminal Justice;

(C) a confinement facility operated under contract with any division of the Texas Department of Criminal Justice; and

(D) a community corrections facility operated by a community supervision and corrections department.

(15) "Criminal negligence" is defined in Section 6.03 (Culpable Mental States).

(16) "Dangerous drug" has the meaning assigned by Section 483.001 , Health and Safety Code.

(17) "Deadly weapon" means:

(A) a firearm or anything manifestly designed, made, or adapted for the purpose of inflicting death or serious bodily injury; or

(B) anything that in the manner of its use or intended use is capable of causing death or serious bodily injury.

(18) "Drug" has the meaning assigned by Section 481.002 , Health and Safety Code.

(19) "Effective consent" includes consent by a person legally authorized to act for the owner. Consent is not effective if:

(A) induced by force, threat, or fraud;

      (B)   given by a person the actor knows is not legally authorized to act for the owner;

      (C)   given by a person who by reason of youth, mental disease or defect, or intoxication is known by the actor to be unable to make reasonable decisions; or

      (D)   given solely to detect the commission of an offense.

(20)   "Electric generating plant" means a facility that generates electric energy for distribution to the public.

(21)   "Electric utility substation" means a facility used to switch or change voltage in connection with the transmission of electric energy for distribution to the public.

(22)   "Element of offense" means:

      (A)   the forbidden conduct;

      (B)   the required culpability;

      (C)   any required result; and

      (D)   the negation of any exception to the offense.

(23)   "Felony" means an offense so designated by law or punishable by death or confinement in a penitentiary.

(24)   "Government" means:

      (A)   the state;

      (B)   a county, municipality, or political subdivision of the state; or

      (C)   any branch or agency of the state, a county, municipality, or political subdivision.

(25)   "Harm" means anything reasonably regarded as loss, disadvantage, or injury, including harm to another person in whose welfare the person affected is interested.

(26)   "Individual" means a human being who is alive, including an unborn child at every stage of gestation from fertilization until birth.

(27)   Repealed by Acts 2009, 81st Leg., R.S., Ch. 87, Sec. 25.144, eff. September 1, 2009.

(28)   "Intentional" is defined in Section 6.03 (Culpable Mental States).

(29) "Knowing" is defined in Section 6.03 (Culpable Mental States).

(30) "Law" means the constitution or a statute of this state or of the United States, a written opinion of a court of record, a municipal ordinance, an order of a county commissioners court, or a rule authorized by and lawfully adopted under a statute.

(31) "Misdemeanor" means an offense so designated by law or punishable by fine, by confinement in jail, or by both fine and confinement in jail.

(32) "Oath" includes affirmation.

(33) "Official proceeding" means any type of administrative, executive, legislative, or judicial proceeding that may be conducted before a public servant.

(34) "Omission" means failure to act.

(35) "Owner" means a person who:

   (A)   has title to the property, possession of the property, whether lawful or not, or a greater right to possession of the property than the actor; or

   (B)   is a holder in due course of a negotiable instrument.

(36) "Peace officer" means a person elected, employed, or appointed as a peace officer under Article 2.12, Code of Criminal Procedure, Section 51.212 or 51.214 , Education Code, or other law.

(37) "Penal institution" means a place designated by law for confinement of persons arrested for, charged with, or convicted of an offense.

(38) "Person" means an individual, corporation, or association.

(39) "Possession" means actual care, custody, control, or management.

(40) "Public place" means any place to which the public or a substantial group of the public has access and includes, but is not limited to, streets, highways, and the common areas of schools, hospitals, apartment houses, office buildings, transport facilities, and shops.

(41) "Public servant" means a person elected, selected, appointed, employed, or otherwise designated as one of the following, even if he has not yet qualified for office or assumed his duties:

   (A)   an officer, employee, or agent of government;

   (B)   a juror or grand juror; or

   (C)   an arbitrator, referee, or other person who is authorized by law or private written agreement to hear or determine a cause or controversy; or

  (D) an attorney at law or notary public when participating in the performance of a governmental function; or

  (E) a candidate for nomination or election to public office; or

  (F) a person who is performing a governmental function under a claim of right although he is not legally qualified to do so.

(42) "Reasonable belief" means a belief that would be held by an ordinary and prudent man in the same circumstances as the actor.

(43) "Reckless" is defined in Section 6.03 (Culpable Mental States).

(44) "Rule" includes regulation.

(45) "Secure correctional facility" means:

  (A) a municipal or county jail; or

  (B) a confinement facility operated by or under a contract with any division of the Texas Department of Criminal Justice.

(46) "Serious bodily injury" means bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ.

(46-a) "Sight order" means a written or electronic instruction to pay money that is authorized by the person giving the instruction and that is payable on demand or at a definite time by the person being instructed to pay. The term includes a check, an electronic debit, or an automatic bank draft.

(46-b) "Federal special investigator" means a person described by Article 2.122, Code of Criminal Procedure.

(47) "Swear" includes affirm.

(48) "Unlawful" means criminal or tortious or both and includes what would be criminal or tortious but for a defense not amounting to justification or privilege.

(49) "Death" includes, for an individual who is an unborn child, the failure to be born alive.

(b) The definition of a term in this code applies to each grammatical variation of the term.

**Cite as Tex. Pen. Code § 1.07**

**History.** Amended By Acts 2011, 82nd Leg., R.S., Ch. 839, Sec. 1, eff. September 1, 2011.

Amended By Acts 2009, 81st Leg., R.S., Ch. 87, Sec. 25.144, eff. September 1, 2009.

Amended By Acts 2009, 81st Leg., R.S., Ch. 421, Sec. 1, eff. September 1, 2009.

Amended By Acts 2003, 78th Leg., ch. 822, Sec. 2.01, eff. Sept. 1, 2003.

Amended By Acts 1993, 73rd Leg., ch. 900, Sec. 1.01, eff. Sept. 1, 1994

Amended By Acts 1991, 72nd Leg., ch. 543, Sec. 1, eff. Sept. 1, 1991

Amended By Acts 1989, 71st Leg., ch. 997, Sec. 1, eff. Aug. 28, 1989

Amended By Acts 1987, 70th Leg., ch. 167, Sec. 5.01(a)(43), eff. Sept. 1, 1987

Amended By Acts 1979, 66th Leg., p. 1520, ch. 655, Sec. 1, eff. Sept. 1, 1979

Amended By Acts 1979, 66th Leg., p. 1113, ch. 530, Sec. 1, eff. Aug. 27, 1979

Amended By Acts 1977, 65th Leg., p. 2123, ch. 848, Sec. 1, eff. Aug. 29, 1977

Amended by Acts 1975, 64th Leg., p. 912, ch. 342, Sec. 1, eff. Sept. 1, 1975

Acts 1973, 63rd Leg., p. 883, ch. 399, Sec. 1, eff. Jan. 1, 1974.

§ 22.01. Assault.

**Texas Statutes**

**Penal Code**

**Title 5. Offenses Against The Person**

**Chapter 22. Assaultive Offenses**

*Current through the 2013 Regular and Special Sessions*

**§ 22.01. Assault**

(a)   A person commits an offense if the person:

   (1)   intentionally, knowingly, or recklessly causes bodily injury to another, including the person's spouse;

   (2)   intentionally or knowingly threatens another with imminent bodily injury, including the person's spouse; or

   (3)   intentionally or knowingly causes physical contact with another when the person knows or should reasonably believe that the other will regard the contact as offensive or provocative.

(b)   An offense under Subsection (a)(1) is a Class A misdemeanor, except that the offense is a felony of the third degree if the offense is committed against:

   (1)   a person the actor knows is a public servant while the public servant is lawfully discharging an official duty, or in retaliation or on account of an exercise of official power or performance of an official duty as a public servant;

   (2)   a person whose relationship to or association with the defendant is described by Section 71.0021(b), 71.003, or 71.005, Family Code, if:

      (A)   it is shown on the trial of the offense that the defendant has been previously convicted of an offense under this chapter, Chapter 19, or Section 20.03, 20.04, 21.11, or 25.11 against a person whose relationship to or association with the defendant is described by Section 71.0021(b), 71.003, or 71.005, Family Code; or

      (B)   the offense is committed by intentionally, knowingly, or recklessly impeding the normal breathing or circulation of the blood of the person by applying pressure to the person's throat or neck or by blocking the person's nose or mouth;

(3)   a person who contracts with government to perform a service in a facility as defined by Section 1.07(a)(14) , Penal Code, or Section 51.02(13) or (14) , Family Code, or an employee of that person:

   (A)   while the person or employee is engaged in performing a service within the scope of the contract, if the actor knows the person or employee is authorized by government to provide the service; or

   (B)   in retaliation for or on account of the person's or employee's performance of a service within the scope of the contract;

(4)   a person the actor knows is a security officer while the officer is performing a duty as a security officer; or

(5)   a person the actor knows is emergency services personnel while the person is providing emergency services.

(b-1)   Notwithstanding Subsection (b)(2), an offense under Subsection (a)(1) is a felony of the second degree if:

   (1)   the offense is committed against a person whose relationship to or association with the defendant is described by Section 71.0021(b), 71.003, or 71.005, Family Code;

   (2)   it is shown on the trial of the offense that the defendant has been previously convicted of an offense under this chapter, Chapter 19, or Section 20.03, 20.04, or 21.11 against a person whose relationship to or association with the defendant is described by Section 71.0021(b), 71.003, or 71.005, Family Code; and

   (3)   the offense is committed by intentionally, knowingly, or recklessly impeding the normal breathing or circulation of the blood of the person by applying pressure to the person's throat or neck or by blocking the person's nose or mouth.

(c)   An offense under Subsection (a)(2) or (3) is a Class C misdemeanor, except that the offense is:

   (1)   a Class A misdemeanor if the offense is committed under Subsection (a)(3) against an elderly individual or disabled individual, as those terms are defined by Section 22.04; or

   (2)   a Class B misdemeanor if the offense is committed by a person who is not a sports participant against a person the actor knows is a sports participant either:

      (A)   while the participant is performing duties or responsibilities in the participant's capacity as a sports participant; or

      (B)   in retaliation for or on account of the participant's performance of a duty or responsibility within the participant's capacity as a sports participant.

(d)    For purposes of Subsection (b), the actor is presumed to have known the person assaulted was a public servant, a security officer, or emergency services personnel if the person was wearing a distinctive uniform or badge indicating the person's employment as a public servant or status as a security officer or emergency services personnel.

(e)    In this section:

    (1)    "Emergency services personnel" includes firefighters, emergency medical services personnel as defined by Section 773.003, Health and Safety Code, emergency room personnel, and other individuals who, in the course and scope of employment or as a volunteer, provide services for the benefit of the general public during emergency situations.

    (2)    Expired.

    (3)    "Security officer" means a commissioned security officer as defined by Section 1702.002 , Occupations Code, or a noncommissioned security officer registered under Section 1702.221 , Occupations Code.

    (4)    "Sports participant" means a person who participates in any official capacity with respect to an interscholastic, intercollegiate, or other organized amateur or professional athletic competition and includes an athlete, referee, umpire, linesman, coach, instructor, administrator, or staff member.

(f)    For the purposes of Subsections (b)(2)(A) and (b-1)(2):

    (1)    a defendant has been previously convicted of an offense listed in those subsections committed against a person whose relationship to or association with the defendant is described by Section 71.0021(b), 71.003, or 71.005, Family Code, if the defendant was adjudged guilty of the offense or entered a plea of guilty or nolo contendere in return for a grant of deferred adjudication, regardless of whether the sentence for the offense was ever imposed or whether the sentence was probated and the defendant was subsequently discharged from community supervision; and

    (2)    a conviction under the laws of another state for an offense containing elements that are substantially similar to the elements of an offense listed in those subsections is a conviction of the offense listed.

(g)    If conduct constituting an offense under this section also constitutes an offense under another section of this code, the actor may be prosecuted under either section or both sections.

**Cite as Tex. Pen. Code § 22.01**

**History.** Amended by Acts 2013, 83rd Leg. - Regular Session, ch. 875, Sec. 1, eff. 9/1/2013.

Amended By Acts 2009, 81st Leg., R.S., Ch. 427, Sec. 1, eff. September 1, 2009.

Amended By Acts 2009, 81st Leg., R.S., Ch. 665, Sec. 2, eff. September 1, 2009.

Amended By Acts 2007, 80th Leg., R.S., Ch. 623, Sec. 1, eff. September 1, 2007.

Amended By Acts 2007, 80th Leg., R.S., Ch. 623, Sec. 2, eff. September 1, 2007.

Amended By Acts 2005, 79th Leg., Ch. 728, Sec. 16.002, eff. September 1, 2005.

Amended By Acts 2005, 79th Leg., Ch. 788, Sec. 1, eff. September 1, 2005.

Amended By Acts 2005, 79th Leg., Ch. 788, Sec. 2, eff. September 1, 2005.

Amended By Acts 2005, 79th Leg., Ch. 788, Sec. 6, eff. September 1, 2005.

Amended By Acts 2003, 78th Leg., ch. 294, Sec. 1, eff. Sept. 1, 2003

Amended By Acts 2003, 78th Leg., ch. 1019, Sec. 1, 2, eff. Sept. 1, 2003

Amended By Acts 2003, 78th Leg., ch. 1028, Sec. 1, eff. Sept. 1, 2003.

Amended By Acts 1999, 76th Leg., ch. 62, Sec. 15.02(a), eff. Sept. 1, 1999

Amended By Acts 1999, 76th Leg., ch. 1158, Sec. 1, eff. Sept. 1, 1999

Amended By Acts 1997, 75th Leg., ch. 165, Sec. 27.01, eff. Sept. 1, 1997

Amended By Acts 1997, 75th Leg., ch. 165, Sec. 27.01, 31.01(68), eff. Sept. 1, 1997

Amended By Acts 1995, 74th Leg., ch. 318, Sec. 5, eff. Sept. 1, 1995

Amended By Acts 1995, 74th Leg., ch. 659, Sec. 1, eff. Sept. 1, 1995

Amended By Acts 1993, 73rd Leg., ch. 900, Sec. 1.01, eff. Sept. 1, 1994

Amended By Acts 1991, 72nd Leg., ch. 14, Sec. 284(23) to (26), eff. Sept. 1, 1991

Amended By Acts 1991, 72nd Leg., ch. 334, Sec. 1, eff. Sept. 1, 1991

Amended By Acts 1991, 72nd Leg., ch. 366, Sec. 1, eff. Sept. 1, 1991

Amended By Acts 1989, 71st Leg., ch. 739, Sec. 1 to 3, eff. Sept. 1, 1989

Amended By Acts 1987, 70th Leg., ch. 1052, Sec. 2.08, eff. Sept. 1, 1987

Amended By Acts 1983, 68th Leg., p. 5311, ch. 977, Sec. 1, eff. Sept. 1, 1983

Amended By Acts 1979, 66th Leg., p. 367, ch. 164, Sec. 2, eff. Sept. 1, 1979

Amended By Acts 1979, 66th Leg., p. 260, ch. 135, Sec. 1, 2, eff. Aug. 27, 1979

Amended by Acts 1977, 65th Leg., 1st C.S., p. 55, ch. 2, Sec. 12, 13, eff. July 22, 1977

Acts 1973, 63rd Leg., p. 883, ch. 399, Sec. 1, eff. Jan. 1, 1974.

Beason v. State, 010908 TXCA12, 12-06-00051

**DONALD CARL BEASON, APPELLANT**

**v.**

**THE STATE OF TEXAS, APPELLEE**

**No. 12-06-00051-CR**

**Court of Appeals of Texas, Twelfth District, Tyler**

**January 9, 2008**

DO NOT PUBLISH

APPEAL FROM THE 114TH JUDICIAL DISTRICT COURT OF SMITH COUNTY, TEXAS

Panel consisted of Worthen, C.J., Griffith, J., and Hoyle, J.

**OPINION**

JAMES T. WORTHEN, Chief Justice

Donald Carl Beason appeals his conviction for robbery, for which he was sentenced to community supervision for two years. Appellant raises five issues on appeal. We affirm.

*Background*

Appellant was admitted to East Texas Medical Center ("E'C") in Carthage, Texas ("E'C Carthage") for an apparent heart attack. Appellant was treated for a clot and was transferred by ambulance to E'C in Tyler, Texas ("E'C Tyler"). There, Appellant underwent a heart catheterization procedure and was subsequently told that he needed immediate open heart surgery.

Appellant later learned that the same doctor who performed the catheterization was also scheduled to perform Appellant's surgery the next morning. Upon receiving this information, Appellant requested a copy of his medical records.[1]

Appellant's request was denied at that time because the records department was not open and would not be open until the next morning. Appellant asked for his chart containing the original records. Thereafter, Appellant left the hospital with his original records to seek a second opinion elsewhere.

As Appellant and his wife made their way to the exit, Marilyn Renee Rolling, a hospital security guard, attempted to stop them and seize the bag Appellant was carrying. A scuffle ensued between Appellant and Rolling. Appellant and his wife left in their car, but were stopped by police. Appellant's wife told the police officer who stopped them that Appellant was having a heart attack. The officer directed Appellant's wife to drive to Trinity Mother Frances Hospital ("Trinity Mother Frances"). Appellant was examined at Trinity Mother Frances. Following Appellant's examination, the medical records that Appellant's wife gave to the Trinity Mother Frances staff were returned to Appellant's wife. Appellant's wife then turned over the records to law enforcement. Following his examination at Trinity Mother Frances, Appellant learned that he did not immediately require heart surgery.

Appellant was charged by indictment with robbery. Specifically, the indictment alleged that Appellant, while in the course of committing theft of property and with intent to obtain or maintain control of said property, intentionally, knowingly, or recklessly caused bodily injury to Rolling, by striking her with his hand. Appellant pleaded "not guilty," and the matter proceeded to jury trial.

Rolling testified as the State's first witness. Rolling stated that at around 2:00 am. on January

12, 2004, she received a call from a nurse who told her that a patient was leaving the hospital with some charts. Rolling further stated that she encountered Appellant, and reached unsuccessfully for his bag as Appellant continued walking. Rolling testified that she told Appellant, who still had an IV in his arm that he had not yet been released from the hospital and would need to return so he could have the IV removed and be discharged against medical advice. Rolling further testified that she stood in front of Appellant, grabbed Appellant, grabbed Appellant's shirt, and grabbed Appellant's arm, all in an attempt to thwart Appellant's exit, but Appellant continued his egress unabated. Rolling stated that when she reached the exit, Appellant struck her in the face, causing a lens to pop out of her glasses. Rolling further stated that she noticed she was bleeding after Appellant struck her. Rolling admitted to striking Appellant multiple times, including hitting Appellant in the chest. Rolling testified that eventually she and another security guard, Sam Wagner, realized they would not be able to physically restrain Appellant so they let him leave, but continued to verbally instruct Appellant not to leave. Rolling further testified that she received two stitches for the injury caused by Appellant's blow to her face.

Former E'C floor technician Jerry Jones testified as the State's next witness. Jones testified that on the night in question, he observed Appellant walking quickly past the cafeteria with a security guard pursuing him. Jones further testified that the two were talking back and forth to one another as they approached the exit. Jones stated that once Appellant was outside, the security guard reached for his bag and Appellant hit her, breaking her glasses. Jones further stated that the security guard then lunged at Appellant and hit him as the two scuffled. Jones testified that Appellant and his wife left following the altercation.

Sam Wagner testified next on the State's behalf. Wagner testified that he was also a security Guard for E'C and that he grabbed hold of Appellant during Appellant's attempt to leave the hospital. Wagner's testimony was largely consistent with Rolling's account. Wagner further testified that if, in fact, Appellant were suffering a heart attack, it would have been in his best interest to stay in the hospital. Wagner stated that patient safety was the "number one duty" and described his efforts to prevent Appellant's exit as "encouraging him not to leave."

ETM'C Release of Information Clerk Cynthia Woods testified as the State's next witness. Woods testified that the medical records department had care and control of the records at issue while ETM'C had custody of such records. Woods further testified that the value of the pages in Appellant's medical chart, based on the copy fee per page, was $38.31.

Tyler Police Department Officer Richard Strother testified next on the State's behalf. Strother testified that he arrived on the scene to find a fellow officer, whom he identified as Officer Leigeber, stopped behind a vehicle with its emergency flashers activated. Strother stated that he followed Leigeber to Trinity Mother Frances because one of the passengers in the stopped vehicle was complaining of chest pains. Strother further stated that once inside Trinity Mother Frances, he learned of the disturbance that had occurred at ETM'C Tyler and began to investigate. Strother testified that he spoke with Appellant's wife and a Tyler police sergeant spoke to Appellant. Strother further testified that he overheard Appellant say "he had knocked the hell out of two security guards." Strother stated that he noted a small scratch on the top of Appellant's right hand that had some blood on it. Strother further stated that he spoke to Appellant's wife, and asked her

if she had any documents belonging to ETM'C. Strother testified that Appellant's wife then turned over Appellant's medical records to him. Strother further testified that he encountered the two security guards who were earlier involved in the scuffle with Appellant and stated that they were still wearing their uniforms. Following Strother's testimony, the State rested. Appellant made a motion for instructed verdict, which was denied.

Appellant's wife, Mary Beason, testified first on Appellant's behalf. Beason testified that on January 8, 2004, she and Appellant were at their home when Appellant began complaining of chest pains and pains in his arm. Beason stated that she called 9-1-1 and that Appellant was taken to ETM'C Carthage by ambulance. Beason further stated that following treatment at ETM'C Carthage, Appellant was transferred to ETM'C Tyler for a heart catheterization, a procedure they were told would be performed by a specialist. Beason testified that though she met the physician who performed the heart catheterization, a surgeon never came by to meet with them, despite multiple requests. Beason further testified that she and her husband ultimately lost faith in the process at ETM'C and decided to leave. Beason stated that she and her husband requested copies of his medical records several times before leaving. Beason further stated that they were given a copy of Appellant's medical records to review, which she ultimately took with them. Beason also stated that as she and Appellant searched for the exit, a female security guard addressed Appellant, exclaiming, "Are the papers in the bag?" According to Beason, when Appellant responded "No," the security guard grabbed his arm, which still had an IV in it, and took the bag from him. Beason continued, stating that the security guard passed them and blocked their exit. Beason testified that as Appellant attempted to exit, the security guard again grabbed Appellant's arm in spite of Beason's pleas, "Don't touch him. He's a heart patient." Beason further testified that, once outside, Appellant continued in his attempt to break free from the security guard and fell into the flower bed.

Beason stated that she and her husband made their way to their car and left ETM'C Tyler for the University of Texas Health Center. Beason further stated that en route, they were stopped by a police officer. Beason testified that she told the officer her husband was having a heart attack and that the officer told her she had just passed Trinity Mother Frances. Beason further testified that she and Appellant drove to Trinity Mother Frances. Beason stated that she gave the medical records to Trinity Mother Frances personnel and later, after getting the records back, she gave them to a police officer. Beason further stated that during his conversation with a police officer, Appellant stated, "How would I take time out of having a heart attack to beat the hell out of two security guards." Beason testified that Appellant ultimately had open heart surgery in Arkansas. On cross examination, Beason further testified that she did not know whether Appellant struck the female security guard as they left ETM'C Tyler that night. Beason denied being told that she could not leave the hospital with Appellant's original medical records or that the records were the hospital's property. Rather, Beason stated that she was told by the nursing supervisor on the phone that "she would not take the medical records away from a heart patient." Beason further stated that she was not aware of federal law as it pertained to Appellant's medical records.

Appellant testified next on his own behalf. Appellant recounted the same events as had his wife, relating to his decision to leave ETM'C Tyler on the night in question. Appellant stated that he

was told he needed to have bypass surgery immediately. Appellant testified that he requested copies of his medical records several times, but was not given the copies he requested. Appellant testified that he believed the records were his. Appellant further testified regarding his struggle with the two security guards. Appellant stated that he was suffering chest pains during the struggle. Specifically, Appellant stated that he "felt like an elephant [was] sitting on [his] chest," and that this pain continued even following their arrival at Trinity Mother Frances. Appellant confirmed the accuracy of his wife's testimony that he stated to a police officer, "How would I take time out of having a heart attack to beat the hell out of two security guards." Appellant stated that he still believed the records to be his and that he thought it was necessary to take them for his personal health and welfare. On cross examination, Appellant denied telling a doctor at Trinity Mother Frances that he punched a security guard who had grabbed his arm. Appellant later testified that he did not have any knowledge of intentionally striking Rolling, and further denied striking Rolling or Wagner. Appellant stated that no one told him he could not take his medical records from ETM'C Tyler. Appellant further stated that he had bypass surgery at a Veterans Administration hospital in Little Rock, Arkansas approximately three weeks following the incident.

Kevin Jones, criminal investigator for the Panola County District Attorney, testified as Appellant's next witness. Jones testified that Appellant had a good reputation in his community for being a peaceable and law abiding citizen. Jones further testified that Appellant had a good reputation in his community for being a truthful person. Jones also stated that Beason had a good reputation in her community for being a truthful person.

Barry Washington testified next on Appellant's behalf. Washington testified that he spent twenty-three years in Panola County, Texas as a state trooper and was currently employed by Panola County at the adult district probation office. Washington testified that he had known Appellant for twenty-four years and that Appellant had a reputation in his community for being a peaceable, law abiding, and truthful person. Washington also stated that Beason had a reputation in the community for being a truthful person. Following Washington's testimony, Appellant rested.

In rebuttal, the State called ETM'C Tyler registered nurse Amber Moore. Moore testified that she was currently working in the cardiovascular intensive care unit. Moore further testified that at the time in question, she was working in the intermediate cardiac unit at ETM'C Tyler. Moore identified Appellant as a patient who was in her unit on the night in question. Moore recalled speaking to Appellant concerning his review of his medical records. Moore testified that when Appellant requested to take his medical records, she called Dianne Ohmes, the house supervisor, because she was not familiar with hospital policy in this regard. Moore further testified that after speaking to Ohmes, she informed Appellant that he would need to have someone in the medical records department make copies of the medical records. Moore stated that she informed him of this fact at least five times and further stated that she informed Appellant that the medical records department would not be able to make copies until it opened in the morning. Moore testified that Appellant took the records to his room while discussing a matter with the nursing supervisor. Moore further testified that Appellant spoke to the vice president of the hospital. Moore stated that Appellant and his wife subsequently left the room and that Appellant left an empty binder in which the medical records are ordinarily kept at the nurses' station. On cross examination, Moore

discussed the notes she had made on Appellant's chart.

ETM'C Tyler Administrative Chief Executive Officer Robert Evans testified as the State's next rebuttal witness. Evans testified that he recalled speaking to a patient on the phone in the early morning hours of January 12, 2004, but did not remember the patient's name. Evans further testified that the original medical records are the property of the hospital. Evans stated that in his twenty-five years of experience, he had never allowed a person to take any original records from the hospital. Evans was permitted to read the following passage from the ETM'C Tyler Administrative Manual:

...The patient's right of access in no way abrogates the hospital's property rights in its record and its right to establish reasonable procedures for access to the patient's record. East Texas Medical Center recognizes the patient or his authorized representative's right of access to his medical record for review and to request correction or amendment to the record, providing the following requirements are met. However, if a physician determines that access to the information could be harmful to the physical, mental, or emotional health of the patient, the physician may recommend that the medical record information not be disclosed to the patient ....Procedure, number one, the patient must complete an authorization and request form. Number two, the attending physicians may be notified that the patient has requested access to his medical record. Number three, a designated hospital employee will be present at all times during the review. Number four, prepayment of reasonable approved fees for copies, if requested, will be assessed. Number five, a reasonable period of time is required between request and review. The review will take place during regular working hours, Monday through Friday, 8:00 am. through 4:30 pm.

Evans testified that, to the best of his knowledge, what he read was the policy in effect on the date in question. On cross examination, Evans stated that in an emergency situation, if a hospital or another clinical practitioner wanted a copy of a record, the record would be sent to them immediately.

Ohmes testified as the State's next rebuttal witness. Ohmes testified that, on the night in question, she was employed by ETM'C Tyler as "House Supervisor." Ohmes further testified that she told Appellant he could not take any medical records, but that copies would be made available to him between 8:00 am. and 4:00 p.m. the next day. Ohmes stated that if another hospital or emergency room contacted them wanting medical records on a patient at 3:00 am., she would have gotten the records to them. Ohmes further stated that she, at no time, gave Appellant permission to leave the hospital with the medical records. At the conclusion of Ohmes's testimony, both the State and Appellant rested and closed.

Ultimately, the jury found Appellant guilty as charged. Following a trial on punishment, the jury assessed Appellant's punishment at confinement for two years, but recommended that Appellant's sentence be probated for two years. The trial court sentenced Appellant accordingly, and this appeal followed.

### Evidentiary Sufficiency

In his first issue, Appellant contends that the evidence was legally insufficient to support his conviction. In his fifth issue, Appellant contends that the evidence was factually insufficient to support his conviction.

### Legal Sufficiency

Legal sufficiency is the constitutional minimum required by the Due Process Clause of the Fourteenth Amendment to sustain a criminal conviction. *See Jackson v. Virginia*, 443 U.S. 307, 315–16, 99 S.Ct. 2781, 2786–87, 61 L.Ed.2d 560 (1979); *see also Escobedo v. State*, 6 S.W.3d 1, 6 (Tex. App.–San Antonio 1999, pet. ref'd). The standard for reviewing a legal sufficiency challenge is whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson*, 443 U.S. at 320, 99 S.Ct. at 2789; *see also Johnson v. State*, 871 S.W.2d 183, 186 (Tex. Crim. App. 1993). The evidence is examined in the light most favorable to the jury's verdict. *See Jackson*, 443 U.S. at 320, 99 S.Ct. at 2789; *Johnson*, 871 S.W.2d at 186. A successful legal sufficiency challenge will result in rendition of an acquittal by the reviewing court. *See Tibbs v. Florida*, 457 U.S. 31, 41–42, 102 S.Ct. 2211, 2217–18, 72 L.Ed.2d 652 (1982).

The sufficiency of the evidence is measured against the offense as defined by a hypothetically correct jury charge. *See Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). Such a charge would include one that "accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant is tried." *Id.*

To support a conviction for robbery, the evidence must support that the accused, in the course of committing theft and with intent to obtain or maintain control of the property, intentionally, knowingly, or recklessly caused bodily injury to another or intentionally or knowingly threatened or placed another in fear of imminent bodily injury or death. *See* Tex. Penal Code Ann. § 29.02(a) (Vernon 2003). Theft consists of the unlawful appropriation of property, i.e., without the owner's effective consent, with the intent to deprive the owner of the property. *See* Tex. Penal Code Ann. § 31.03(a) (Vernon Supp. 2007).

### Ownership

An "owner" of property includes a person who has possession of the property, whether lawful or not or a greater right to possession of the property than the actor. *See* Tex. Penal Code Ann. §1.07(a)(35)(A) (Vernon Supp. 2007). Appellant first argues that he had a superior right to possession of the records he took and, therefore, was the owner of those records. Appellant's contention is based on his interpretation of portions of the Health Insurance Portability and Accessibility Act of 1996 ("HIPAA"). Specifically, Appellant notes that (1) an entity covered by HIPPA is required to disclose health information to an individual when requested,[2] (2) an individual has a right of access to inspect and obtain a copy of protected health information about the individual in a designated record set,[3] and (3) the covered entity must, among other things, provide the access requested.[4] However, each of the code sections to which Appellant cites presupposes that the covered entity has a right to possess such health records. While the code sections speak to an individual's rights of disclosure and access, they do not make reference or otherwise create any superior right of possession such as is claimed by Appellant.

In the instant case, Woods testified that E'C had custody, care, and control of Appellant's original medical records. Furthermore, Evans testified that the original medical records are the

property of the hospital. Ohmes testified that she told Appellant he could not take any medical records, but that copies would be made available to him between 8:00 a.m. and 4:00 p.m. the next day. Ohmes also stated that she, at no time, gave Appellant permission to leave the hospital with the medical records. From the foregoing, we conclude that there was legally sufficient evidence that the hospital was the legal owner of the records. *See* Tex. Penal Code Ann. §1.07(a)(35)(A).

*Value*

Appellant next argues that the sole evidence regarding the value of the records was Woods's testimony that the value of the pages in Appellant's medical chart, based on the copy fee per page, was $38.31 and that there was no evidence of the actual value of the sheets of paper, which could not be separated from the information on them.

The value of property taken is either (1) the fair market value of the property at the time and place of the offense or (2) the cost of replacing the property within a reasonable time after the offense if its fair market value cannot be ascertained. *See* Tex. Penal Code Ann. § 31.08(a) (Vernon 2003). "Market value" as it relates to stolen property means the amount of money that the property would sell for in cash, giving a reasonable time for selling it. *See Johnson v. State*, 903 S.W.2d 496, 498 (Tex. App.–Fort Worth 1995, no pet.). The owner of property is competent to testify about the value of his own property in general and commonly understood terms. *Id.* When an owner testifies, the presumption must be that the owner is testifying to an estimation of the fair market value. *Id.* (citing *Sullivan v. State*, 701 S.W.2d 905, 909 (Tex. Crim. App. 1986)). Testimony of this nature is an offer of the witness's best knowledge of the value of his property and constitutes sufficient evidence for the trier of fact to make a determination about value based on the witness's credibility. *Id.* This is true even absent a specific statement about "market value." *Id.* If the defendant wishes to rebut the owner's opinion, he must offer controverting evidence about the value of the property.

In the case at hand, Woods testified that she worked at E'C Tyler as a release of information clerk. Woods testified that the medical records department in which she worked had care and control of the records at issue while E'C had custody of such records. Woods further testified that the value of the pages in Appellant's medical chart, based on the copy fee per page, was $38.31. We conclude that the aforementioned evidence adequately supports that the records at issue had a fair market value of $38.31 because they could be sold as copies for that amount. Therefore, we hold that there was legally sufficient evidence as to the records' fair market value.

*Use of Force*[5]

Appellant next argues that there was no evidence that the documents were obtained by force. Rather, Appellant argues that the evidence of force occurred after Appellant had taken the documents. However, the State was not required to prove that Appellant obtained the documents by use of force. Rather, to prove the offense of robbery, the State need only prove that the person's actions were committed in the course of committing a theft. *See* Tex. Penal Code Ann. § 29.02(a). The term "in the course of committing a theft" means conduct that occurs in an attempt to commit, during the commission, or in the immediate flight after an attempt or commission of a theft. *See* Tex. Penal Code Ann. § 29.01(1) (Vernon 2003).

In the case at hand, Rolling testified that when she reached the exit, Appellant struck her in

the face, causing a lens to pop out of her glasses. Jones also testified that when Appellant was outside, the security guard reached for his bag and Appellant hit her, breaking her glasses. Thus, we hold that there was legally sufficient evidence that Appellant, in the course of committing a theft, caused bodily injury[6] to another. Appellant's first issue is overruled.

**Factual Sufficiency**

Turning to Appellant's contention that the evidence is not factually sufficient to support his conviction, we must first assume that the evidence is legally sufficient under the *Jackson* standard. *See Clewis v. State*, 922 S.W.2d 126, 134 (Tex. Crim. App. 1996). We then consider all of the evidence weighed by the jury that tends to prove the existence of the elemental fact in dispute and compare it to the evidence that tends to disprove that fact. *See Santellan v. State*, 939 S.W.2d 155, 164 (Tex. Crim. App. 1997). Although we are authorized to disagree with the jury's determination, even if probative evidence exists that supports the verdict, *see Clewis*, 922 S.W.2d at 133, our evaluation should not substantially intrude upon the jury's role as the sole judge of the weight and credibility of witness testimony. *Santellan*, 939 S.W.2d at 164. Where there is conflicting evidence, the jury's verdict on such matters is generally regarded as conclusive. *See Van Zandt v. State*, 932 S.W.2d 88, 96 (Tex. App.–El Paso 1996, pet. ref'd). Ultimately, we must ask whether a neutral review of all the evidence, both for and against the finding, demonstrates that the proof of guilt is so obviously weak as to undermine our confidence in the jury's determination, or the proof of guilt, although adequate if taken alone, is greatly outweighed by contrary proof. *Johnson v. State*, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000); *see also Watson v. State*, 204 S.W.3d 404, 417 (Tex. Crim. App. 2006) (evidence is factually insufficient only when reviewing court objectively concludes that the great weight and preponderance of the evidence contradicts the jury's verdict).

Appellant limits his factual sufficiency contention to the proof of value of the records at issue. We have reviewed the record in its entirety. We iterate that our evaluation should not substantially intrude upon the jury's role as the sole judge of the weight and credibility of witness testimony, *see Santellan*, 939 S.W.2d at 164, and where there is conflicting evidence, the jury's verdict on such matters is generally regarded as conclusive. *See Van Zandt*, 932 S.W.2d at 96. Woods's testimony was the sole testimony related to the records' value. Appellant elected not to cross examine Woods. Our review of the record as a whole, with consideration given to all of the evidence, both for and against the jury's finding, has not revealed to us any evidence that causes us to conclude that the proof of guilt is so obviously weak or is otherwise so greatly outweighed by contrary proof as to render Appellant's conviction clearly wrong or manifestly unjust. Therefore, we hold that the evidence is factually sufficient to support the jury's verdict. Appellant's fifth issue is overruled.

**Charge Instruction on Necessity**

In his second issue, Appellant argues that the trial court erred in refusing to instruct the jury in its charge regarding the justification of necessity. Upon a timely request, a defendant has the right to an instruction on any defensive issue raised by the evidence, whether such evidence is strong or weak, unimpeached or contradicted, regardless of what the trial court may or may not think about the credibility of this evidence. *McGarity v. State*, 5 S.W.3d 223, 226 (Tex. App.–San

Antonio 1999, no pet.) (citing *Miller v. State*, 815 S.W.2d 582, 585 (Tex. Crim. App. 1991)). A charge on a defensive issue is required if the accused presents affirmative evidence that would constitute a defense to the crime charged and a jury charge is properly requested. *See id.* If the issue is raised by any party, refusal to submit the requested instruction is an abuse of discretion. *McGarity*, 5 S.W.3d at 226. When the evidence fails to raise a defensive issue, the trial court commits no error in refusing a requested instruction. *See id.* at 227.

For the evidence to support submission of the necessity defense to the jury, the defendant must admit to the offense. *Id.; see Allen v. State*, 971 S.W.2d 715, 720 (Tex. App.–Houston [14th Dist.] 1998, no pet.). The necessity instruction is not required unless there was evidence from the accused admitting the offense, and henceforth claiming justification for having committed the offense because of other facts. *See Maldano v. State*, 902 S.W.2d 708, 712 (Tex. App.–El Paso 1995, no pet.). One cannot establish that an act is justified without first identifying or admitting to the commission of the act. *Id.*

In the case at hand, Appellant did not admit to committing robbery. Rather, Appellant sought to challenge the hospital's ownership of the records he took and declined to admit that he struck Rolling. Therefore, we hold that the trial court did not err in refusing to instruct the jury on the defense of necessity in its charge. Appellant's second issue is overruled.

**Charge Instruction on Duress**

In his third issue, Appellant argues that the trial court erred in refusing to instruct the jury in its charge on the defense of duress. "When raised by the evidence and timely requested, a defendant is entitled to a jury instruction on the affirmative defense of duress *if he engaged in the proscribed conduct* because he was compelled to do so by threat of imminent death or serious bodily injury to himself or another." *Shaw v. State*, 874 S.W.2d 115, 119 (Tex. App.–Austin 1994, no pet.) (emphasis added). Thus, similar to the justification of necessity, the affirmative defense of duress requires that the accused admit to having engaged in the proscribed conduct. *See, e.g., Bernal v. State*, 647 S.W.2d 699, 706 (Tex. App.–Dallas 1983, no pet.) (appellant's denial of having had sexual intercourse with complainant did not raise issue of his having "engaged in the proscribed conduct"). As set forth above, Appellant did not admit to committing robbery in the instant case. Therefore, we hold that the trial court did not err in refusing to instruct the jury on the defense of duress in its charge. Appellant's third issue is overruled.

**Charge Instruction Regarding Definition of "Owner"**

In his fourth issue, Appellant argues that the trial court erred in failing to properly instruct the jury regarding the definition of "owner" for purposes of the theft and robbery statutes. Specifically, Appellant argues that the jury should have been instructed that an owner includes a person who has a greater right to possession of the property than the actor *at the time of the alleged commission of the offense*. When reviewing charge error, we employ a two step analysis. *Washington v. State*, 930 S.W.2d 695, 698 (Tex. App.–El Paso 1996, no pet.). We must first determine whether error actually exists in the charge. *See Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984); *Washington*, 930 S.W.2d at 698. In making this determination, we view the charge as a whole and our review should not be limited to a series of isolated statements or parts of the charge standing alone. *Washington*, 930 S.W.2d at 698; *see Holley v. State*, 766

S.W.2d 254, 256 (Tex. Crim. App. 1989). Second, we must determine whether sufficient harm resulted from the error to require reversal. *Almanza*, 686 S.W.2d at 171; *Washington*, 930 S.W.2d at 698. Which harmless error standard applies depends upon whether the defendant objected. *Abdnor v. State*, 871 S.W.2d 726, 731–32 (Tex. Crim. App. 1994); *Washington*, 930 S.W.2d at 698. In a case where the defendant failed to object, he must show that he suffered actual egregious harm. *See Almanza*, 686 S.W.2d at 171; *Washington*, 930 S.W.2d at 698.

In the case at hand, Appellant argues that the temporal addition to the definition of "owner" was necessary to allow the jury to consider whether Appellant had gained a superior right to possession by the time he and his wife left the hospital inasmuch as they had requested copies and been told that copies would not be available until morning. However, the trial court defined the word "owner" in accordance with Texas Penal Code, section 1.07(a)(35)(A). Moreover, in the application paragraph, the jury was charged that it could find Appellant guilty of robbery if it found that on or about January 12, 2004, in Smith County, Texas, Appellant did then and there unlawfully appropriate, by acquiring or exercising control over property from the person of the owner with intent to deprive the owner of the property. The term "then and there," as used in the application paragraph, means at the time and place last previously mentioned or charged. *See* Black's Law Dictionary 1478 (6th ed. 1990). Thus, the jury was given a temporal framework within which to consider the evidence and make its finding. Further still, as set forth above, the rights of disclosure and access in HIPPA do not serve to create a superior right of possession in Appellant to the medical records either before or after he requested copies of the documents. Having reviewed the charge as a whole in light of the entirety of the record, we hold that the trial court did not err in declining to submit Appellant's temporal element to its definition of the word "owner." Appellant's fourth issue is overruled.

### Disposition

Having overruled Appellant's first, second, third, fourth, and fifth issues, we *affirm* the trial court's judgment.

---------

Notes:

[1] Ownership of these medical records is a contested issue in this case. Our reference to these records as "Appellant's medical records" is made solely for ease of reference and should be interpreted as "medical records pertaining to Appellant."

[2] *See* 45 C.F.R. § 164.502(a)(1), (2) (2007).

[3] *See* 45 C.F.R. § 164.524 (2007).

[4] *See* 45 C.F.R. § 164.524(c) (2007).

[5] Appellant raises this issue under his factual sufficiency argument. We presume that Appellant intended to raise this "no evidence" issue as a legal sufficiency contention.

[6] Appellant has not argued that the evidence is insufficient to support the element of bodily injury. Bodily injury is defined as physical pain, illness, or any impairment of physical condition. Tex. Penal Code Ann. § 1.07(a)(8) (Vernon 2007). The definition is broad and encompasses even relatively minor physical contacts as long as they constitute more than mere offensive touching. *Lane v. State*, 763 S.W.2d 785, 786 (Tex. Crim. App. 1989); *In re M.C.L.*, 110 S.W.3d 591, 600

(Tex. App.–Austin 2003, no pet.). The evidence in the instant case supports contact amounting to more than offensive touching inasmuch as it was enough to cause the lens to pop out of Rolling's glasses and break the skin ultimately requiring two stitches.

---------

**16 S.W.3d 854 (Tex.App. —Houston [14 Dist.] 2000) 2000)**

**Avery Gustavius BREAUX, Jr., Appellant,**

**v.**

**The STATE of Texas, Appellee.**

**Nos. 14-99-00215-CR, 14-99-00216-CR.**

**Court of Appeals of Texas, Fourteenth District, Houston**

**April 13, 2000**

Page 855

Frances M. Northcutt, Houston, for appellant.

Calvin A. Hartmann, Houston, for appellee.

Panel consists of Justices YATES, FOWLER, and EDELMAN.

**O P I N I O N**

LESLIE BROCK YATES, Justice.

Appellant, Avery Gustavius Breaux, Jr., was certified to stand trial as an adult and pleaded guilty to the offenses of aggravated assault and aggravated robbery without an agreement as to punishment. Finding his judicial confession sufficient evidence to substantiate guilt, the trial court found appellant guilty of both offenses and sentenced him to twenty-five years' imprisonment in the Texas Department of Criminal Justice--Institutional Division. On appeal, appellant raises two points of error challenging the sufficiency of the evidence to support his plea of guilty. We affirm in part and reverse and remand in part.

In his first point of error, appellant complains the evidence is insufficient in both the aggravated assault and aggravated robbery cases because his judicial confessions were not voluntary. Appellant challenges the voluntariness of his judicial confessions based on his negative answer to the judge's query of whether he had "looked over the papers."

When a defendant pleads guilty, article 1.15 of the Code of Criminal Procedure requires the State to "introduce evidence into the record showing the guilt of the defendant ... and in no event shall a person charged be convicted upon his plea without sufficient evidence to support the

Page 856

same." TEX.CODE CRIM. PROC. ANN. art. 1.15 (Vernon Supp.2000); *Palacios v. State,* 942 S.W.2d 748, 749 (Tex.App.--Houston [14 th Dist.] 1997, pet. ref'd). A judicial confession alone is sufficient to support a guilty plea. See *Dinnery v. State,* 592 S.W.2d 343, 353 (Tex.Crim.App.1980)(op. on reh'g). However, to constitute a judicial confession, the statement of the accused must have been voluntarily given before a magistrate, or court, in the due course of legal proceedings. See *Franco v. State,* 552 S.W.2d 142, 144 (Tex.Crim.App.1977); *Rice v. State,* 22 Tex.App. 654, 3 S.W. 791, 792 (1887).

The record reveals that, prior to entering his plea of guilty, appellant signed the following plea papers: Waivers of Constitutional Rights, Agreements to Stipulate, Judicial Confessions, and Written Plea Admonishments. [1] The reporter's record of the plea proceedings indicates that after explaining the range of punishment, the judge, referring to the plea papers, asked appellant,

"Have you looked over these papers?" Appellant answered, "No."

After appellant gave his negative answer, the judge made a substantial effort to ensure that the defendant understood the proceedings. The judge questioned appellant concerning the contents of the documents to determine whether he had signed the papers voluntarily. She inquired of appellant whether: (1) he wished to give up the right to a jury trial, (2) he understood his attorney's explanation of the papers he signed, (3) he understood the English language, (4) he understood he was subject to the full range of punishment, (5) he understood that if given deferred adjudication, it could be revoked and he could be sentenced to as much as life in prison, (6) he understood that he was giving up the right to confront and cross-examine witnesses, (7) he understood his rights and wanted to give them up, (8) he was satisfied with his attorney's representation, and (9) he realized the papers he signed would be used as evidence against him. To each of these inquiries appellant answered in the affirmative. Further, appellant indicated that no one had promised him anything in exchange for entering his plea.

Once the judge was satisfied that appellant had voluntarily signed the papers, she accepted his pleas of guilty. The Waivers of Constitutional Rights, Agreements to Stipulate, and Judicial Confessions were then offered and admitted into evidence. The judge found the evidence was sufficient to substantiate appellant's guilt.

Appellant claims that while the trial judge specifically inquired about some of his rights, she made no specific inquiry about whether he understood that the plea papers contained a judicial confession or waived his right against self-incrimination. Therefore, appellant claims, because his judicial confession was not voluntary, it was inadmissible. To the contrary, the trial judge asked appellant if his attorney had explained the papers he had signed and if, by signing the papers, he understood his rights and wanted to give them up. Due process does not require a trial judge to enumerate, laundry-list style, every Constitutional right that a defendant possesses and demand that the defendant note for the record his separate waiver of each. See *Lyles v. State,* 745 S.W.2d 567, 568 (Tex.App.--Houston [1 st Dist.] 1988, pet. ref'd).

We find that the judge's inquiries and appellant's affirmative answers indicate that appellant was made aware of the content and effect of the plea papers, including the judicial confessions, and that the documents were voluntarily executed. Therefore, we overrule appellant's first point of error.

In his second point of error, appellant complains that the evidence is insufficient
Page 857.
in the aggravated assault case to support his conviction. Appellant bases his complaint upon the omission of the element of "injury" from his judicial confession.

As noted above, the State is required to introduce evidence showing the defendant's guilt. See TEX.CODE CRIM. PROC. ANN. art. 1.15 (Vernon Supp.2000). The evidence is sufficient under article 1.15 if it embraces every essential element of the offense charged and establishes the defendant's guilt. See *Stone v. State,* 919 S.W.2d 424, 427 (Tex.Crim.App.1996). Thus, while a judicial confession alone is usually sufficient to satisfy the requirements of article 1.15, a judicial confession that omits an element of the offense is insufficient to support a guilty plea. [2] See *York v. State,* 566 S.W.2d 936, 939 (Tex.Crim.App.1978); *Massey v. State,* 777 S.W.2d 739, 740

(Tex.App.--Beaumont 1989, no pet.). Causation of bodily injury to another is an essential element of assault. See TEX. PEN.CODE ANN. § 22.01, 22.02 (Vernon 1994 & Supp.2000); *Burkholder v. State,* 660 S.W.2d 540, 541 (Tex.Crim.App.1983).

Appellant's judicial confession for aggravated assault stated in pertinent part:

The charges against me allege that in Harris County, Texas, AVERY GUSTAVIUS BREAUX, JR., hereafter styled the Defendant, on or about FEBRUARY 23, 1998, did then and there unlawfully, intentionally, knowingly and recklessly, by driving a motor vehicle in the direction of JOHN UPTON, cause bodily [sic] to JOHN UPTON, hereafter called the Complainant, by striking the Complainant with a deadly weapon, namely, a motor vehicle, while the Complainant was lawfully discharging an official duty, knowing the Complainant was a public servant.

\* \* \* \* \*

I understand the above allegations and I confess that they are true and that the acts alleged above were committed on February 23, 1998.

(emphasis added).

Appellant's judicial confession, the only evidence contained in the record to support his conviction, omitted an essential element of the offense of aggravated assault--injury. This case is remarkably similar to the facts in York. See York, 566 S.W.2d at 938-39. In York, part of the clause "without the effective consent of the owner" was omitted from the judicial confession. See id. The court found the evidence was insufficient to support the conviction because a necessary element of the offense of burglary of a habitation was not established by the confession and no other evidence was offered in support of the plea. See id. Here, there being no evidence of injury to the complainant, as necessitated by article 1.15 of the Code of Criminal Procedure and section 22.02 of the penal code, we find the evidence insufficient to support appellant's conviction. Appellant's second point of error is sustained.

The trial court's judgment in trial cause number 784,223 (the aggravated robbery case) is affirmed; and the judgment in cause number 795,625 (the aggravated assault case) is reversed and remanded to the trial court. [3]

---------

Notes:

[1] These forms were signed in duplicate--one set for the aggravated assault, and the other for the aggravated robbery.

[2] An exception to this rule provides that if the judicial confession contains a "catch-all" phrase that the defendant is guilty "as charged in the indictment," the confession is sufficient evidence to support the conviction even where an element of the offense has been omitted. See Snyder v. State, 629 S.W.2d 930, 932 (Tex.Crim.App.1982). This exception seems also to apply to sworn oral statements made by the defendant during the course of the plea proceedings that the indictment is "true and correct." See Dinnery, 592 S.W.2d at 353. Here, however, neither appellant's written judicial confession, nor any oral statements made during the course of the plea proceedings contained such an admission.

[3] Because appellant voluntarily entered a plea of guilty, the Double Jeopardy Clause of the Fifth amendment to the United States Constitution does not preclude a second trial. See Bender v.

State, 758 S.W.2d 278, 280-81 (Tex.Crim.App.1988); Ex parte Martin, 747 S.W.2d 789, 792-93 (Tex.Crim.App.1988).

---------

**323 S.W.3d 893 (Tex.Crim.App. 2010)**

**Kelvin Kianta BROOKS, Appellant,**

**v.**

**The STATE of Texas.**

**No. PD-0210-09.**

**Court of Criminal Appeals of Texas.**

**October 6, 2010**

Rehearing Denied Nov. 17, 2010.

Page 894

Walter M. Reaves, Jr., West, for Appellant.

John R. Messinger, Asst. Crim. D.A., Waco, Jeffrey L. Van Horn, State's Attorney, Austin, for State.

HERVEY, J., announced the judgment of the Court and delivered an opinion in which KELLER, P.J., KEASLER, and COCHRAN, JJ., joined.

**OPINION**

HARVEY, J.

We granted discretionary review in this case to address, among other things, whether there is any meaningful distinction between a legal-sufficiency standard under *Jackson v. Virginia* [1] and a factual-sufficiency standard under *Clewis v. State* and whether there is a need to retain both standards.[2] Under the *Jackson v. Virginia* legal-sufficiency standard, a reviewing court is required to defer to a jury's credibility and weight determinations.[3] In *Clewis,* this Court adopted a factual-sufficiency standard, which is supposed to be distinguished from a *Jackson v. Virginia* legal-sufficiency standard primarily by not requiring a reviewing court to defer to a jury's credibility and weight determinations.[4] But then *Clewis* contradicted itself by also requiring a reviewing court to apply this standard with deference to these jury determinations " so as to avoid an appellate court's substituting its judgment for that of the jury." [5] After having made several attempts to " clarify" *Clewis* in part to resolve this fundamental contradiction, we eventually came to realize that the *Clewis* factual-sufficiency standard is " barely distinguishable" from the

Page 895

*Jackson v. Virginia* legal-sufficiency standard.[6] We now take the next small step in this progression and recognize that these two standards have become essentially the same standard and that there is no meaningful distinction between them that would justify retaining them both. We, therefore, overrule *Clewis* and decide that the *Jackson v. Virginia* legal-sufficiency standard is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt.

The record reflects that, in cause number 10-07-00309-CR, a jury convicted appellant of possessing with intent to deliver more than four but less than 200 grams of crack cocaine and sentenced him to 25 years in prison. Appellant claimed on direct appeal that the evidence is

legally and factually insufficient to support the intent-to-deliver element of this offense.

The evidence shows that two police officers went into a bar to investigate a report that someone matching appellant's description was there with a gun. When the officers asked appellant to step outside, appellant ran and threw two baggies towards a pool table just before one of the officers tased him. One of the baggies contained a small amount (about 3 grams) of marijuana. The other baggie contained one baggie holding 4.72 grams of crack cocaine and another baggie holding six ecstasy tablets that weighed 1.29 grams.[7] Appellant also had a cell phone and, according to one of the officers, " a couple of dollars." [8] Appellant did not appear to be under the influence of narcotics, and he was not in possession of any drug paraphernalia that could have been used for smoking crack cocaine. The police did not find a gun. The police gave appellant's cell phone and money to an acquaintance of appellant's before they took appellant to jail.

An experienced Waco Police Department drug-enforcement investigator (Thompson) testified that the bag containing the 4.72 grams of crack cocaine contained " two larger size rocks and then maybe a smaller one" and a useable amount of " crumbs." He testified that each of the two large rocks weighed at least two grams and the other one weighed " a gram and a half or something like that." Thompson testified that " he would say" that 4.72 grams was a " dealer amount," which could have been cut up into 23 or 24 rocks. He testified that 4.72 grams of crack cocaine is worth about $470.

Thompson stated that a " typical quantity" that a dealer would have would be more than two rocks and that he " would think" that someone with more than a gram would be a dealer. Thompson testified that it is not " typical" for drug users to be in possession of a large amount of drugs and that he has " not run across many people that are [crack cocaine] users that have more than one to two rocks" because they are going to " smoke it as soon as [they] can get it." He also testified that " most" crack cocaine users " typically"

Page 896

would have some type of paraphernalia " to smoke the crack with" and that " [t]ypically dealers don't have crack pipes because it's not really common for them to use their product that they are selling." For example, Thompson testified:

Q. [STATE]: Okay. So if somebody had approximately 4.72 grams and about three or four rocks and some crumbs, is that a dealer amount or user amount?A. [THOMPSON]: I would say that's dealer amount.

* * *

Q. So if he's got 4.72 grams-A. I would think they were a dealer.Q. Okay. I'm going to go-oh, you said that there are some other things that you would look for to see if somebody was dealing as opposed to using the drugs. What are some of those things that you would look for?A. In my experience, and we've come across people that are just possessing crack to use it. They usually have what is called a crack pipe or some type of heating element to heat the crack up with. Most of the people that we've come across out in the field that smoke crack have a crack pipe somewhere or have some brillo which you use inside of your crack pipe as a filter to keep from inhaling the whole piece of crack up when you're smoking it. Typically dealers don't have crack

pipes because it's not really common for them to use their product that they are selling. You can't make any money if you're hooked on your own product. So typically a user is going to have some type of instrument to smoke the crack with, and, like I said before, they normally don't have more than one or two because they are smoking. You don't save crack. It's not like a rainy day type of deal. You want to smoke it as soon as possible.[9]

On cross-examination, Thompson described other factors, none of which are present in the record in this case, indicating that a person could be a dealer: (1) possession of five, ten, or twenty dollar bills; (2) names in the person's cell phone; (3) possession of some document identifying who owes what; (4) possession of a weapon; or (5) others observed the person trying to sell drugs. Thompson also acknowledged that a person could possess 4.72 grams of crack cocaine for personal use.

Appellant testified that he possessed only the baggie containing the small amount of marijuana. He denied possessing the baggies containing the crack cocaine and the ecstasy pills. Appellant also admitted that he has two prior convictions for possession of cocaine and another prior conviction for possession with intent to deliver cocaine. The jury was instructed in the charge that it could have considered these extraneous offenses " in determining the intent, motive, opportunity, preparation, plan, knowledge, identity, or absence of mistake or accident by the Defendant, if any, in connection with the offenses, if any, alleged against him in the indictment in this case, and for no other purpose."

During closing jury arguments, the State relied primarily on Thompson's testimony to argue that appellant possessed the crack cocaine with the intent to deliver it:

[STATE]: There is no evidence at all, none, that he was a user. What does that tell you? What does that tell the reasonable person? I'm going to go to

Page 897

Investigator Thompson right now because he kind of ties in with that. The dealer level back on the crack, and I'm bouncing back and forth because it's basically the same charge. Just with crack we have added the element of intent to deliver. But Investigator Thompson testified that a typical user, one, two rocks, max, because what do they do when they get it? They want to smoke it because they are craving this drug, because they have to use it. They don't hold it for a rainy day. They don't keep it for later. They use it then. And when they use it, they have paraphernalia on them. They don't carry a couple of rocks and then go home and find their stuff. They have it all on their person. No drug paraphernalia, no brillo pad, no push pipe, no push rod, no crack pipe, nothing. Again, because he's not a user. There is no evidence of that. In fact, the amount that he had is dealer amount. This is 23 to 25 crack rocks. It's way more than one or two for a user. 4.72 grams doesn't really seem like a lot in here. It's a lot on the street. He had $500, $600 worth of drugs on him that night.

* * *

About him being a user and not a dealer, he got on the stand. Did he tell you, " I'm a user, not a dealer" ? He didn't say that. That would have been the perfect chance for him to say that. Does he look like a user? You know we had somebody in voir dire say, " I've seen crack users, and I can tell when I see them." Did he have a pipe on him? No. What else did he not have? You know, no

pipe. He had some money on him, not a lot because he hadn't started selling yet. He still had his whole 25-rock stash. He hadn't started selling yet. He had the cell phone. Yeah, it would have been nice to get the names out of the cell phone and see if they match up with other drug dealers, you know, that we know. The police, they were being nice. They gave the phone to his sister and let her take it home. So are we going to blame the cops for being a little too nice that night, even after he had cussed at them and resisted, swung at them, kicked them? That's not reasonable either.

During its closing jury arguments, the defense relied on other factors to argue that the evidence did not show appellant's intent to deliver.

[DEFENSE]: I know Mr. Brooks has a past. He came up here and he testified that he has a juvenile conviction, that he has two possession convictions, he has a delivery conviction. And when you look at all that, it would be easy for you to go back there and say, " You know what? Because of all this, you know, he's not telling the truth and we shouldn't believe him." But I don't think that's what you're going to do. Yeah, he has had run-ins with the law, and as he stated, he panicked. He panicked because he had the marijuana on him. But as he testified to you, he didn't know anything about that cocaine, didn't know anything about that [ecstasy]. There was no evidence presented to you other than Officer Thompson who came up here yesterday and said, " Oh, it's four grams to 200 grams, but that 4.72, oh, yeah, easy, that's a delivery. Oh, yeah. It's worth $500, $600." But listen to his testimony carefully. He also said that he looks for other things, too, and they should have looked for other things too. They should have looked to determine whether or not Mr. Brooks was carrying a large amount of money, whether or not he had a gun, and we know that there was no gun found in that place now, whether or not he had

Page 898

any documents with him that would indicate, " These people owe me money" or " This is who I sold to." They should have gotten a cell phone to see if there were any callers in there that were potential buyers or users or anything of that nature. They should have asked people in the bar whether or not Mr. Brooks when he went in there, did anybody ever come up to him and say, " Do you have anything I can get from you tonight" or " Can you sell me something?" There was no testimony whatsoever on that. All you have is, ladies and gentlemen, as far as the delivery is what Allen Thompson said, but most importantly, as I indicated to you, you have to show that he was in possession of those items, and it's just not there.

The court of appeals decided that " [s]tanding alone, 4.72 grams is insufficient evidence of intent [to deliver because this amount is also consistent with personal use], additional evidence is required." *See Brooks v. State,* No. 10-07-00309-CR, slip op. at 8, 2008 WL 4427266 (Tex.App.-Waco, delivered October 1, 2008) (memorandum opinion not designated for publication). The court of appeals decided that the additional evidence is legally sufficient " to establish possession with intent to deliver," but that " viewing the evidence in a neutral light, it is not factually sufficient." *See Brooks,* slip op. at 9-10 (" Viewing the evidence in the light most favorable to the verdict, the evidence is legally sufficient to establish possession with intent to deliver. However, viewing the evidence in a neutral light, it is not factually sufficient. The record does not reflect that Brooks was arrested in a high crime or high drug area, the drugs were packaged in such a way to suggest that

Brooks is a dealer, Brooks was in possession of any drug paraphernalia for the purpose of dealing, or Brooks possessed a large amount of cash.... Accordingly, we find the proof of guilt to be so weak as to render the jury's verdict clearly wrong and manifestly unjust." ).

We granted review on both the appellant's and the State's petitions for discretionary review. Appellant's petition for discretionary review presents the following ground for review:

(1) The Court of Appeals erred in holding the evidence was legally sufficient to establish appellant had the intent to distribute cocaine, where the court found the same evidence was factually insufficient to establish the necessary intent.[10]

The State's petition for discretionary review presents the following grounds for review:

(1) Is there any meaningful distinction between legal sufficiency review under *Jackson v. Virginia* and factually [sic] sufficiency review when that review is limited to the weakness of the evidence in the abstract and, if so, does it escape review in this Court?(2) Did the Tenth Court of Appeals ignore its duty to adequately explain why the evidence, though legally sufficient, is so weak as to render the jury's verdict clearly wrong and manifestly unjust?

## I. Is There Any Meaningful Distinction Between *Jackson v. Virginia* Legal-Sufficiency Review and *Clewis* Factual-Sufficiency Review

We begin the discussion by noting that in *Watson* this Court recognized that a factual-sufficiency standard is " barely distinguishable" from a legal-sufficiency standard and that " the **only** apparent difference"

Page 899

between these two standards is that the appellate court views the evidence in a " neutral light" under a factual-sufficiency standard and " in the light most favorable to the verdict" under a legal-sufficiency standard. *See Watson,* 204 S.W.3d at 415 (emphasis supplied). It is fair to characterize the *Jackson v. Virginia* legal-sufficiency standard as:

Considering all of the evidence in the light most favorable to the verdict, was a jury rationally justified in finding guilt beyond a reasonable doubt. [11]

Compare this to the *Clewis* factual-sufficiency standard which may fairly be characterized as:

Considering all of the evidence in a neutral light, was a jury rationally justified in finding guilt beyond a reasonable doubt.[12]

Viewing the evidence " in the light most favorable to the verdict" under a legal-sufficiency standard means that the reviewing court is required to defer to the jury's credibility and weight determinations because the jury is the **sole** judge of the witnesses' credibility and the weight to be given their testimony.[13] Viewing the evidence in a " neutral light" under a factual-sufficiency standard is supposed to mean that the reviewing court is not required to defer to the jury's credibility and weight determinations and that the reviewing court may sit as a " thirteenth juror" and " disagree[ ] with a jury's resolution of conflicting evidence" and with a jury's " weighing of the evidence." *See Tibbs v. Florida,* 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982) (internal quotes omitted) (describing appellate reversals of convictions based on evidentiary weight); *Watson,* 204 S.W.3d at 447 (Cochran, J., dissenting) (factual-sufficiency standard " explicitly makes the reviewing court a ' thirteenth juror' who makes an independent, *de novo* determination of credibility and the weight to be given the testimony and the inferences to be drawn from the

base facts" ).[14] Therefore, the difference between a factual-sufficiency standard and a legal-sufficiency standard is that the reviewing court is required to defer to the jury's credibility and weight determinations (i.e., it must view the evidence in the light most favorable to the verdict) under a legal-sufficiency standard while it is not

Page 900

required to defer to a jury's credibility and weight determinations (i.e., it must view the evidence in a " neutral light" ) under a factual-sufficiency standard. *See id.; Johnson v. State,* 23 S.W.3d 1, 13 (Tex.Cr.App.2000) (McCormick, P.J., dissenting) (" To defer or not to defer, that is the question." ).

It is significant that *Clewis* purported to treat the evidentiary-weight standard described in *Tibbs* as a component of the *Clewis* factual-sufficiency standard that views the evidence in a " neutral light." *See Clewis,* 922 S.W.2d at 149 (Clinton, J., concurring) (" The reviewing court no longer ' views the evidence in the light most favorable to the prosecution; ' rather it must consider and weigh the evidence to determine whether the jury's resolution of conflicting testimony was manifestly unjust" (citing *Tibbs,* 457 U.S. at 42, 102 S.Ct. 2211)).[15] This Court's decision in *Johnson* also recognized that " there appears to be no substantive differences" between the *Clewis* factual-sufficiency standard and the evidentiary-weight standard described in *Tibbs. See Johnson,* 23 S.W.3d at 8 n. 8 (" Elsewhere, the equivalent of determining legal sufficiency is often referred to as examining the ' sufficiency of the evidence,' and the companion term to factual sufficiency is referenced as reviewing the ' weight of the evidence.' However, there appears to be no substantive differences between these terms, and this Court has treated them interchangeably." ). It is also noteworthy that the evidentiary-weight standard described in *Tibbs* does not mention anything about the reviewing court being required to afford " appropriate deference" to the jury's credibility and weight determinations. *But see Clewis,* 922 S.W.2d at 133 (reviewing court must apply a factual-sufficiency standard in an " appropriately deferential" manner).

Therefore, if a reviewing court is required to defer in any manner to a jury's credibility and weight determinations, then it is not viewing the evidence in a " neutral light" and not applying the type of factual-sufficiency standard described in *Tibbs* and purportedly adopted in *Clewis.* And it is very clear that this Court's factual-sufficiency decisions have always required a reviewing court in a factual-sufficiency review to afford a great amount of deference (though this Court has never said precisely how much deference) to a jury's credibility and weight determinations. *See Clewis,* 922 S.W.2d at 133 (reviewing court may disagree with a jury's weighing of the evidence but in an " appropriately deferential" manner " so as to avoid an appellate court's substituting its judgment for that of the jury" ); *see also Johnson,* 23 S.W.3d at 7 (factual-sufficiency review " must employ appropriate deference to prevent an appellate court from substituting its judgment for that of the fact finder, and any evaluation should not substantially intrude upon the fact finder's role as the sole judge of the weight and credibility given to witness testimony" ).[16]

Page 901

And in *Watson* this Court reiterated that it had never tolerated, " even in the ' factual sufficiency' context," an " appellate court simply opting to ' disagree' with the jury's verdict." *See Watson,* 204 S.W.3d at 416. This Court further stated in *Watson:*

It is in the very nature of a factual-sufficiency review that it authorizes an appellate court, **albeit to a very limited degree,** to act in the capacity of a so-called " thirteenth juror."

\* \* \*

An appellate court judge cannot conclude that a conviction is " clearly wrong" or " manifestly unjust" simply because, on the quantum of evidence admitted, he would have voted to acquit had he been on the jury. Nor can an appellate judge declare that a conflict in the evidence justifies a new trial simply because he disagrees with the jury's resolution of that conflict.

*See Watson,* 204 S.W.3d at 416-17 (emphasis supplied).

This, however, is inconsistent with the evidentiary-weight standard described in *Tibbs* (and purportedly adopted in *Clewis* ) and with viewing the evidence in a " neutral light," which permit the reviewing court to show **no** deference at all to a jury's credibility and weight determinations and to sit as a " thirteenth juror" without any limitation and to declare that a conflict in the evidence justifies a new trial simply because the reviewing court disagrees with the jury's resolution of conflicting evidence. *See Tibbs,* 457 U.S. at 42, 102 S.Ct. 2211. This is what is supposed to distinguish the factual-sufficiency standard from the legal-sufficiency standard. *See id.* Thus the *Clewis* factual-sufficiency standard's requirement that the reviewing court view the evidence with " appropriate deference" to a jury's credibility and weight determinations is not only contradictory and inconsistent with the evidentiary-weight standard described in *Tibbs,* it also makes the *Clewis* factual-sufficiency standard even more " barely distinguishable" from a *Jackson v. Virginia* legal-sufficiency standard. [17]

The final nail in the coffin that made a legal-sufficiency standard " indistinguishable" from a factual-sufficiency standard came in this Court's decision in *Lancon v. State.* [18] There this Court decided that the reviewing court cannot decide that the evidence is factually insufficient " solely because [it] would have resolved the conflicting evidence in a different way" since " the jury is the sole judge of a witness's credibility,

Page 902

and the weight to be given the testimony." *See Lancon,* 253 S.W.3d at 707. Our current formulation of a factual-sufficiency standard in *Lancon,* recognizing that the jury is " the sole judge of a witness's credibility, and the weight to be given their testimony," entirely eliminates the viewing the evidence in a " neutral light" component of a factual-sufficiency standard and makes the current factual-sufficiency standard indistinguishable from the *Jackson v. Virginia* legal-sufficiency standard. *See also Johnson,* 23 S.W.3d at 8 (also recognizing that if " a reviewing court was to accord absolute deference to the fact finder's determinations, then a factual sufficiency determination would, no doubt, become the functional equivalent of a legal sufficiency review" ). [19]

This may be illustrated by considering the following formulation of the factual-sufficiency standard that *Watson* approved: " Considering all of the evidence in a neutral light, was a jury rationally justified in finding guilt beyond a reasonable doubt." *See Watson,* 204 S.W.3d at 415. Substituting " in the light most favorable to the jury's verdict" for the " a neutral light" component of this formulation of the standard, as our cases such as *Lancon* have done by recognizing that " the jury is the sole judge of a witness's credibility, and the weight to be given the testimony," [20] the

factual-sufficiency standard from *Watson* may be reformulated as follows: " Considering all of the evidence in **the light most favorable to the verdict,** was a jury rationally justified in finding guilt beyond a reasonable doubt." This is the *Jackson v. Virginia* legal-sufficiency standard. There is, therefore, no meaningful distinction between the *Jackson v. Virginia* legal-sufficiency standard and the *Clewis* factual-sufficiency standard, and these two standards have become indistinguishable.

## II. Double-Jeopardy Considerations

The *Clewis* factual-sufficiency standard being " barely distinguishable" (and now indistinguishable) from a legal-sufficiency standard also raises some troubling double-jeopardy questions under the United States Supreme Court's decision in *Tibbs.* First, we find it necessary to discuss the proceedings involving Mr. Tibbs in the Florida courts.

In 1976, the Florida Supreme Court reversed Tibbs' convictions for rape of one person and first-degree murder of another person because of the " weakness and inadequacy" of the rape victim's testimony, which was the only testimony that directly connected Tibbs to these crimes. *See*

Page 903

*Tibbs v. Florida,* 397 So.2d 1120, 1126 (Fla.1981) (several aspects of the rape victim's testimony " cast serious doubt on her believability" ); *Tibbs v. Florida,* 337 So.2d 788, 791 (Fla.1976) and at 792 (Boyd, J., specially concurring). The Florida Supreme Court remanded the case to the trial court for a new trial, which at the time was the remedy provided by Florida law upon a finding that the evidence did not support a defendant's conviction. *See id.*

Before Tibbs could be retried, the United States Supreme Court decided that double-jeopardy principles prohibit the states from retrying a defendant whose conviction has been reversed on appeal on evidentiary-sufficiency (i.e., legal-sufficiency) grounds essentially because this has the same effect as an acquittal by a jury.[21] After the United States Supreme Court handed down these decisions, the Florida trial court granted Tibbs' motion to dismiss his indictment on the grounds that double-jeopardy principles prohibited his retrial. *See Tibbs,* 397 So.2d at 1121. A Florida Court of Appeals reversed this order and reinstated Tibbs' indictment upon deciding that the Florida Supreme Court's 1976 decision reversing Tibbs' convictions " was based on the weight, rather than the legal sufficiency, of the evidence." *See id.; State v. Tibbs,* 370 So.2d 386, 388-89 (Fla.Dist.Ct.App.1979).

In 1981, the Florida Supreme Court reviewed this decision noting at the outset " that the distinction between an appellate reversal based on evidentiary weight and one based on evidentiary sufficiency was never of any consequence until [the United State's Supreme Court's decision in] *Burks,* " apparently because the remedy provided in both situations was a remand for a new trial. *See Tibbs,* 397 So.2d at 1122. The Florida Supreme Court examined several of its prior decisions that the Florida Court of Appeals had relied upon for deciding that there was a distinction in Florida law between convictions reversed for evidentiary weight (proper remedy is remand for new trial) and convictions reversed for evidentiary sufficiency (proper remedy is an appellate acquittal). *See Tibbs,* 397 So.2d at 1122-23 (Florida Court of Appeals " distinguished *Burks* by placing Tibbs' reversal in [evidentiary weight] category; appellate reversals where the evidence is technically sufficient but its weight so tenuous or insubstantial that a new trial is

ordered" ). The Florida Supreme Court, however, viewed " these ambiguous decisions as reversals which were based on [evidentiary] sufficiency; that is, as cases in which the state failed to prove the defendant's guilt beyond a reasonable doubt." *See Tibbs,* 397 So.2d at 1124-25.

The Florida Supreme Court, therefore, concluded that the Florida Court of Appeals' distinction between reversals based on evidentiary weight and reversals based on evidentiary sufficiency had a " questionable historical foundation." *See Tibbs,* 397 So.2d at 1125. Despite this questionable historical foundation, the Florida Supreme Court decided that its 1976 decision reversing Tibbs' convictions was " one of those rare instances in which reversal was based on evidentiary weight" and the Florida Supreme Court's " improper weighing of the evidence" and that double-jeopardy principles did not prohibit Tibb's retrial. *See Tibbs,* 397 So.2d at 1126-27. The Florida Supreme Court also decided that appellate reversals based on evidentiary weight, " if ever valid in Florida, should ... be eliminated from Florida law." *See Tibbs,* 397 So.2d at 1125.
Page 904

On review of the Florida Supreme Court's 1981 decision that double-jeopardy principles did not bar Tibbs' retrial, the United States Supreme Court decided that double-jeopardy principles do not bar a retrial when an appellate court " sits as a ' thirteenth juror' " and " disagrees with the jury's resolution of the conflicting testimony." *See Tibbs,* 457 U.S. at 32, 42-43, 102 S.Ct. 2211. In reaching this decision, the United States Supreme Court noted that a reversal based on " insufficiency of the evidence" has the same effect as a jury acquittal " because it means that no rational factfinder could have voted to convict the defendant" and that " the prosecution has failed to produce sufficient evidence to prove its case." *See Tibbs,* 457 U.S. at 41, 102 S.Ct. 2211. The United States Supreme Court further stated that an appellate reversal based on evidentiary weight " no more signifies acquittal than does a disagreement among the jurors themselves" and that an " appellate court's disagreement with the jurors' weighing of the evidence does not require the special deference accorded verdicts of acquittal." The Supreme Court wrote:
As we suggested just last Term, these policies do not have the same force when a judge disagrees with a jury's resolution of conflicting evidence and concludes that a guilty verdict is against the great weight of the evidence.... A reversal on this ground, unlike a reversal based on insufficient evidence, does not mean that an acquittal was the only proper verdict. Instead, the appellate court sits as a " thirteenth juror" and disagrees with the jury's resolution of the conflicting testimony. This difference of opinion no more signifies acquittal than does a disagreement among the jurors themselves. A deadlocked jury, we consistently have recognized, does not result in an acquittal barring retrial under the Double Jeopardy Clause. Similarly, an appellate court's disagreement with the jurors' weighing of the evidence does not require the special deference accorded verdicts of acquittal.
*See Tibbs,* 457 U.S. at 42, 102 S.Ct. 2211 (citation to authority and footnote omitted).

The United States Supreme Court also examined the Florida Supreme Court's 1976 decision reversing Tibbs' convictions and concluded that a " close reading" of that decision suggested " that the Florida Supreme Court overturned Tibbs' convictions because the evidence, although sufficient to support the jury's verdict, did not fully persuade the court of Tibbs' guilt." *See Tibbs,* 457 U.S. at 46, 102 S.Ct. 2211. The United States Supreme Court further noted that any ambiguity

in this 1976 Florida Supreme Court decision was resolved in its 1981 decision when the Florida Supreme Court " unequivocally held" that its 1976 decision reversing Tibbs' convictions was " one of those rare instances in which reversal was based on evidentiary weight." *See Tibbs,* 457 U.S. at 47, 102 S.Ct. 2211. The United States Supreme Court concluded that under " these circumstances, the Double Jeopardy Clause [did] not bar retrial." *See id.*

We believe that the *Clewis* factual-sufficiency standard with its remedy of a new trial could very well violate double-jeopardy principles under *Tibbs* if factual-sufficiency review is " barely distinguishable" from legal-sufficiency review.[22] With our

Page 905

prior decisions requiring a great amount of appellate deference to a jury's credibility and weight determinations and not permitting appellate courts to sit as " thirteenth jurors" except perhaps to " a very limited degree," [23] it is questionable whether appellate reversals in Texas under such a factual-sufficiency standard are really reversals based on evidentiary weight (they may actually be reversals based on evidentiary sufficiency). Having decided in Part I of this opinion that the current *Clewis* factual-sufficiency standard is indistinguishable from a *Jackson v. Virginia* legal-sufficiency standard, the remedy of a new trial under this factual-sufficiency standard would violate double-jeopardy principles.

We also note that, were we to decide that reviewing courts must continue to apply a factual-sufficiency standard with its remedy of a new trial in criminal cases, then we must also be prepared to decide that they should apply this standard as " thirteenth jurors" with no deference at all to a jury's credibility and weight determinations in order to avoid these potential federal constitutional double-jeopardy issues. *See also Tibbs,* 457 U.S. at 42, 102 S.Ct. 2211. We must also keep in mind that such a nondeferential standard could violate the right to trial by jury under the Texas Constitution. *See Roberts,* 221 S.W.3d at 661-62 n. 7; *Clewis,* 922 S.W.2d at 133. Simply retaining and attempting to once again " clarify" the *Clewis* factual-sufficiency standard that is currently indistinguishable from a *Jackson v. Virginia* legal-sufficiency standard would not seem to be an option. Retaining any kind of factual-sufficiency standard in criminal cases would, therefore, still make it necessary for this Court to overrule *Clewis* and abandon its requirement, carried on by our subsequent decisions meant to " clarify" *Clewis,* that reviewing courts must be " appropriately deferential" to a jury's credibility and weight determinations. *See Clewis,* 922 S.W.2d at 133. Thus, the only way to retain a factual-sufficiency standard, which would be meaningfully distinct from a *Jackson v. Virginia* legal-sufficiency standard, would be to allow reviewing courts to sit as " thirteenth jurors." However, our factual-sufficiency decisions have consistently declined to do this. *See, e.g., Watson,* 204 S.W.3d at 416 (this Court has never tolerated " even in the ' factual sufficiency' context," an " appellate court simply opting to ' disagree' with the jury's verdict" ).

We believe that these and the reasons given by the Florida Supreme Court for abandoning its factual-sufficiency standard are good reasons for discarding the confusing and contradictory *Clewis* factual-sufficiency standard. We agree with the Florida Supreme Court that: Considerations of policy support, if not dictate, this result. Elimination of [reversals based on evidentiary weight] accords Florida appellate courts their proper role in examining the sufficiency of the evidence, while leaving questions of weight for resolution only before the trier of fact.

Eliminating reversals for evidentiary weight will avoid disparate appellate results, or alternatively our having to review appellate reversals based on evidentiary shortcomings to

Page 906

determine whether they were based on sufficiency or on weight. Finally, it will eliminate any temptation appellate tribunals might have to direct a retrial merely by styling reversals as based on " weight" when in fact there is a lack of competent substantial evidence to support the verdict or judgment and the double jeopardy clause should operate to bar retrial.

*See Tibbs,* 397 So.2d at 1125-26.[24]

## III. Is *Clewis* Necessary to Address Some Widespread Criminal Justice Problem That *Jackson v. Virginia* Is Inadequate To Address

We agree with the discussion in Judge Cochran's dissenting opinion in *Watson* that there are no jurisprudential systemic problems for which the *Jackson v. Virginia* legal-sufficiency standard is inadequate or that can be resolved more satisfactorily in other ways besides retaining *Clewis* ' " internally inconsistent" factual-sufficiency standard. *See Watson,* 204 S.W.3d at 448-50 (Cochran, J., dissenting) and at 450( *Clewis* " has not contributed to the integrity of the appellate review process; it has led to inconsistent results; and it has required numerous, but futile, attempts to clarify its content and application" ).[25] It bears emphasizing that a rigorous and proper application of the *Jackson v. Virginia* legal-sufficiency standard is as exacting a standard as any factual-sufficiency standard (especially one that is " barely distinguishable" or indistinguishable from a *Jackson v. Virginia* legal-sufficiency standard).[26] A hypothetical

Page 907

that illustrates a proper application of the *Jackson v. Virginia* legal-sufficiency standard is robbery-at-a-convenience-store case:

The store clerk at trial identifies A as the robber. A properly authenticated surveillance videotape of the event clearly shows that B committed the robbery. But, the jury convicts A. It was within the jury's prerogative to believe the convenience store clerk and disregard the video. But based on *all* the evidence the jury's finding of guilt is not a rational finding.*See Johnson,* 23 S.W.3d at 15 (McCormick, P.J., dissenting).

## IV. Texas Constitution, Texas Statutes And Case Law Revisited

Case law makes it fairly clear that, from the time that Texas was a republic in the 1830s and 1840s until the United States Supreme Court decided *Jackson v. Virginia* in 1979, this Court and its predecessors, under what are essentially the same constitutional and statutory provisions that currently exist and existed when *Clewis* was decided in 1996, applied a single and deferential evidentiary-sufficiency standard in criminal cases that essentially was the same standard as the *Jackson v. Virginia* standard.[27] And, until this Court decided *Clewis* in 1996, this Court applied only the *Jackson v. Virginia* evidentiary-sufficiency standard after the United States Supreme Court decided *Jackson v. Virginia* in 1979.[28] In 1996, however, Clewis decided that a civil factual-sufficiency standard is also constitutionally and statutorily mandated in criminal cases under state law. [29]

There is very little to add to what this Court has already extensively written on a direct-appeal court's constitutional and statutory authority to apply this factual-

sufficiency standard in criminal cases.[30] Our factual-sufficiency cases decided that Texas direct-appeal courts, which would include this Court in its role as a direct-appeal court in death-penalty cases, are required to apply a civil factual-sufficiency standard under their constitutional grant of general appellate jurisdiction to review " questions of fact," [31] as also codified in Article 44.25, TEX.CODE CRIM. PROC., which currently states that direct-appeal courts and this Court " may reverse the judgment in a criminal action, as well upon the law as upon the facts." [32] Our factual-sufficiency cases further noted that Articles 36.13 and 38.04, TEX.CODE CRIM. PROC., and their statutory predecessors, which " reserve the fact-finding function to the jury," [33] have " peacefully coexisted with that appellate authority for at least a hundred and twenty-three years" and were meant " merely to allocate the fact-finding function at the trial level and do not purport to affect appellate review." *See Watson,* 204 S.W.3d at 409.[34] Also, according to our factual-sufficiency decisions, the " factual conclusivity clause" in Article V, Section 6(a), makes " the resolution of factual issues" by direct-appeal courts conclusive on this Court in nondeath-penalty cases and also " seems to presuppose that [a direct-appeal] court already possesses the power to conduct factual [sufficiency] review." *See*

*Watson,* 204 S.W.3d at 412, 413-14, *Bigby,* 892 S.W.2d at 872-73.[35]

The dissenters in this Court's factual-sufficiency cases took the position that, even though direct-appeal courts may have the authority to apply this factual-sufficiency standard under their grant of general appellate jurisdiction, when the courts of appeals acquired criminal jurisdiction in 1981, the Legislature, pursuant to its constitutional authority in Article V, Sections 5(a) and 6(a), to regulate appellate jurisdiction, made significant changes to Article 44.25 that were carefully designed to ensure that direct-appeal courts defer to a jury's credibility and weight determinations. [36] The dissenters considered it significant that in 1981, when Article 44.25 was changed to its current version-permitting a case to be reversed only " upon the law as upon the facts" -its statutory predecessor provided that a case could be reversed " upon the law as upon the facts" and also " because the verdict is contrary to the evidence." [37] Before this, the statutory predecessor to Article 44.25 provided that a case could be reversed " upon the law as upon the facts" and also because " the verdict is contrary to the weight of the evidence." [38] The dissenters believed that the 1981 legislative changes to Article 44.25 indicated a legislative intent that direct-appeal courts should defer to a jury's credibility and weight determinations by expressly withdrawing the authority (that arguably had existed before 1981) of direct-appeal courts to reverse a judgment because the verdict is contrary to the weight of the evidence. [39]

Our decision in *Clewis* to adopt a civil factual-sufficiency standard was meant to " harmonize[ ] the criminal and civil jurisprudence of this State with regard to appellate review of questions of factual sufficiency."

*See Clewis,* 922 S.W.2d at 129. However, when *Clewis* was decided in 1996, the Texas Supreme Court had decided that direct-appeal courts were required to exercise a factual-sufficiency standard with " deferential standards of review." *See Roberts,* 221 S.W.3d at 664 n. 7; *Cropper v.*

*Caterpillar Tractor Co.,* 754 S.W.2d 646, 651 (Tex.1988).[40] With its requirement that **all** of the evidence must be viewed under deferential standards to determine whether a jury's verdict is " manifestly unjust and clearly wrong," this civil factual-sufficiency standard that *Clewis* adopted for criminal cases was essentially the *Jackson v. Virginia* standard.

Thus, when this Court decided *Clewis* in 1996, direct-appeal courts were already harmoniously applying essentially the same standard of factual sufficiency in civil and criminal cases.[41] *Clewis* ' main accomplishment, therefore, was to adopt for criminal cases another evidentiary-sufficiency standard that was essentially the *Jackson v. Virginia* standard and that direct-appeal courts had been applying for about 150 years. This, in large part, explains why it was inevitable that these two standards would eventually be recognized as indistinguishable. *See* Part I of this Opinion. The *Jackson v. Virginia* standard is consistent with well-settled evidentiary-sufficiency practice in this State and with a direct-appeal court's constitutional and statutory mandates to review " questions of law" and " questions of fact." [42]

Page 911

The issue thus becomes whether direct-appeal courts' constitutional jurisdiction to review " questions of fact," as also codified in Article 44.25 authorizing direct-appeal courts to reverse a judgment " upon the facts," should now be construed for the first time to mandate direct-appeal courts to sit as " thirteenth jurors" in criminal cases contrary to 150 years of practice in civil and criminal cases. We decline to question over 150 years of criminal and civil jurisprudence in this State and construe constitutional and statutory mandates to review " questions of fact" to also require direct-appeal courts to sit as " thirteenth jurors" in criminal cases. *See also Clewis,* 876 S.W.2d at 431 (" Appellate fact jurisdiction ... should not be confused with the appellate standard of review required to exercise that fact jurisdiction. The state constitution, at most, says that an intermediate appellate court has conclusive fact *jurisdiction* in both civil and criminal cases. It does not purport to set out the *standard of review* required to exercise that fact jurisdiction." ) (emphasis in original).[43]

We also note that *Watson* and *Clewis* relied on several cases, most notably the 1883 case of *Walker v. State,* [44] apparently for the proposition that the statutory predecessors to Article 44.25 required factual-sufficiency review that permits direct-appeal courts to sit as " thirteenth jurors." *Walker* is cited in both *Clewis* and *Watson* as a watershed case purportedly recognizing that the statutory predecessors to Article 44.25 required such a review.[45] It is not clear that cases such as *Walker* were applying factual-sufficiency review that permits a direct-appeal court to sit as a " thirteenth juror" in criminal cases since *Walker* " was fully consistent with the *Jackson* standard alone." *See Watson,* 204 S.W.3d at 428 (Cochran, J., dissenting) ( *Walker* " was fully consistent with the *Jackson* standard alone" even though it " could be read to support the proposition that the appellate court felt that it had the authority to reverse a jury verdict even though the evidence was ' sufficient.' " ). [46] We do not believe that cases such as *Walker* clearly support the proposition that Article 44.25 and its statutory predecessors mandate direct-appeal courts to sit as " thirteenth jurors" in criminal cases. *See also Watson,* 204 S.W.3d at 424-32 (Cochran, J., dissenting).[47] In addition, reading

Page 912

*Walker* to mandate direct-appeal courts to sit as " thirteenth jurors" would be inconsistent with the overwhelming weight of civil and criminal authority that direct-appeal courts should review a jury's verdict under deferential standards.

As the Court with final appellate jurisdiction in this State,[48] we decide that the *Jackson v. Virginia* standard is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt. All other cases to the contrary, including *Clewis,* are overruled.

## V. Disposition of This Case

We must now decide how to dispose of this case. In light of our disposition of the State's first ground for review, it is unnecessary to address the State's second ground for review. And having decided that there is no meaningful distinction between a *Clewis* factual-sufficiency standard and a *Jackson v. Virginia* legal-sufficiency standard, we could decide that the court of appeals necessarily found that the evidence is legally insufficient to support appellant's conviction when it decided that the evidence is factually insufficient to support appellant's conviction. However, primarily because the " confusing" factual-sufficiency standard may have skewed a rigorous application of the *Jackson v. Virginia* standard by the court of appeals, we believe that it is appropriate to dispose of this case by sending it back to the court of appeals to reconsider the sufficiency of the evidence to support appellant's conviction under a proper application of the *Jackson v. Virginia* standard. *Cf. Tibbs,* 397 So.2d at 1125-26 (abandoning reversals based on weight of the evidence and stating that " [c]ases now pending on appeal in which a court has characterized the reversal as based on evidentiary weight should be reconsidered" ).

The judgment of the court of appeals is vacated, and the case is remanded there for further proceedings not inconsistent with this opinion.

COCHRAN J., filed a concurring opinion in which WOMACK, J., joined.

PRICE, J., filed a dissenting opinion in which MEYERS, JOHNSON, and Holcomb, JJ., joined.

WOMACK, J., concurred.

COCHRAN, J., concurring in which WOMACK, J., joined.

I adhere to my view that the 1996 judicial creation of the " *Clewis* [1] factual-sufficiency review was a well-intentioned but ultimately unworkable effort to incorporate civil standards of review on elements of a crime that must be proven beyond a reasonable doubt." [2]

Page 913

I.

## A. The Evidence in This Case Either Is or Is Not Legally Sufficient to Support a Conviction.

The evidence in this case is either sufficient to support appellant's conviction under the constitutionally-mandated *Jackson* [3] standard or it is not. It cannot be " semi-sufficient."

Appellant was charged with possession of cocaine with the intent to distribute it. At trial, he denied that the baggie containing 4.72 grams of cocaine and five ecstacy pills found in the pool table pocket return was his, although he admitted ownership of the baggie of marijuana that he tossed under that pool table. On appeal, he argued that the evidence was both legally and factually insufficient to prove that he possessed the cocaine with the intent to distribute it. The court of appeals found that the evidence was legally sufficient to support a finding, beyond a

reasonable doubt, that appellant possessed the cocaine with the intent to distribute it. In doing so, it relied on a list of seven facts, beyond the mere amount of cocaine, that supported the jury's guilty verdict.[4] But then, in finding the evidence factually insufficient to support a finding of intent to distribute, the majority set out a totally different list of facts that the record did not show: There was no evidence that (1) appellant was in a high crime area; (2) the cocaine was packaged especially for sale; (3) he was carrying a large amount of cash; or (4) he had drug-dealing paraphernalia on him.[5] The court used positive inferences for legal sufficiency (what the evidence did show) and then negative inferences for factual sufficiency (what the evidence did not show).

I agree that this is a close call on legal sufficiency, but I do not see how " missing" facts can transform the purportedly legally sufficient evidence into factually insufficient evidence. There is no higher standard than " proof beyond a reasonable doubt." If the evidence meets that standard, how can it fall short using a lower standard? Indeed, the Waco Court of Appeals may have had second thoughts itself about this question because it held, in a subsequent (but almost identical) case,

Page 914

that the evidence was factually and legally sufficient.[6] If nothing else, these two cases demonstrate that the *Clewis* factual sufficiency review has led to random, inconsistent results, based primarily on " the luck of the draw." [7] This doctrine is not based on a sound logical or historical foundation, and it serves only to muddle criminal law. It should be overturned.

**B. Both Parties Agree That the Proper Issue Is Legal Sufficiency of the Evidence.**

Fittingly, both appellant and the State agree that the proper issue in cases such as this is whether the evidence is *legally* sufficient. The State argues in its Petition for Discretionary Review, " Evidence that is factually insufficient due to its inherent weakness should always be legally insufficient; either the evidence is such that a rational juror could convict upon it or it is not, regardless of the light in which it is viewed." [8] Appellant " suggests that in this situation (i.e. a question of intent), if the evidence is factually insufficient it must also be legally insufficient." [9] They are both correct: There is no " semi-sufficient" standard of review.

II.

**A. Logic Requires a Single Standard of Sufficiency Review in Criminal Cases.**

I have already set out my concerns about the intellectual legitimacy, historical authenticity, and appropriateness of the *Clewis* factual sufficiency review in Texas.[10] I now focus only upon the most important reason to overrule *Clewis:* Logic.

The attempt to impose Texas civil standards of a second-round factual sufficiency review is logically incompatible with the constitutionally mandated legal sufficiency review of criminal convictions that requires the State to prove all elements of a crime

Page 915

beyond a reasonable doubt. Piling a factual sufficiency standard of review that was developed for civil trials employing a preponderance-of-the-evidence standard of proof atop a legal sufficiency standard of review that was developed for criminal trials employing a beyond-a-reasonable-doubt standard of proof does not work. That is why this Court has so frequently tinkered with the *Clewis*

formulation, and why we have always been unsuccessful.

The *Clewis* doctrine of re-reviewing the sufficiency of the evidence after the appellate court has already held that the evidence satisfies the highest standard of proof possible-beyond a reasonable doubt-to decide if it is nonetheless factually sufficient is internally inconsistent. If the evidence suffices to prove guilt beyond a reasonable doubt, and it supports a rational, reasonable verdict, as required under *Jackson,* that evidence cannot logically be so lacking in probative value as to make the jury's verdict " manifestly unjust" under the vague and subjective civil-law factual-sufficiency standard. To declare the evidence factually insufficient necessarily turns an appellate judge, viewing only the cold written record, into a self-appointed thirteenth juror with absolute veto power over the twelve citizens who actually saw the witnesses, heard the evidence, and reached a rational, reasonable verdict. The United States Supreme Court recognized this in *Tibbs v. Florida,* [11] as did the Florida Supreme Court when it judicially jettisoned factual-sufficiency review in that same case.[12]

## B. Legally Sufficient Evidence in a Criminal Trial.

For more than 150 years, Texas appellate courts reviewed the sufficiency of the evidence in Texas criminal cases under a single standard (although the precise wording varied), taking into account both the facts that were proven at trial and the law applicable to the particular offense. [13] This Court (and the intermediate courts of appeals once they were given jurisdiction over the direct appeal of criminal cases in 1981) reviewed the facts proven in the light most favorable to the verdict, giving great deference to the jury's credibility and weight determinations. But we did not hesitate to reverse a conviction if the evidence failed to prove a defendant's guilt " with reasonable certainty," or " beyond a reasonable doubt." [14] There were never two distinct " sufficiency of the evidence" hurdles in Texas criminal appellate review.[15]

Page 916

*1. The constitutionally required* Jackson *standard.*

In 1979, the United States Supreme Court delivered its opinion in *Jackson v. Virginia,* [16] and set the national standard for review of the sufficiency of evidence under the Due Process Clause of the federal constitution. In all criminal trials, state and federal, the government must produce " sufficient evidence to justify a rational trier of the facts to find guilt beyond a reasonable doubt." [17] The Court explicitly rejected the " no evidence" standard of review that it had applied nineteen years earlier in *Thompson v. Louisville.* [18]

In *Jackson,* the Court explained that the *Thompson* " no evidence" review " secures to an accused the most elemental of due process rights: freedom from a wholly arbitrary deprivation of liberty[,]" [19] but that standard is inadequate for " a question of evidentiary ' sufficiency.' " [20] Instead, the correct standard must incorporate the prosecution's burden of proof-beyond a reasonable doubt-in a due-process review. The Court noted that a " ' reasonable doubt' has often been described as one ' based on reason which arises from the evidence or lack of evidence.' " [21]

A reasonable doubt might arise because the verdict is manifestly against the great weight and preponderance of the credible evidence or because there is nothing more than a mere scintilla of evidence to support some element of the offense. But, of course, the reviewing court does not "

ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." [22] Rather, it must give " full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." [23] Thus, " *all of the evidence* is to be considered in the light most favorable to the prosecution" because the reviewing court may impinge upon " ' jury' discretion only to the extent necessary to guarantee the fundamental protection of due process of law." [24]

Therefore, after 1979, Texas courts were prohibited from applying a " no evidence"

Page 917

standard of review to a legal-sufficiency challenge because that standard affords " inadequate protection against potential misapplication of the reasonable-doubt standard" in criminal cases.[25] In 1989, we explained, " Adherence to the no evidence standard is now, and has been for the last decade, expressly forbidden by *Jackson.* It is no longer permissible to merely quote the *Jackson* standard and then to turn around and apply the *Thompson* no evidence standard as we have historically done." [26]

*2. Legal sufficiency in criminal cases is judged by the quality, not the quantity, of evidence supporting the accuracy of the verdict.*

Legal sufficiency of the evidence is a test of adequacy, not mere quantity. Sufficient evidence is " such evidence, in character, weight, or amount, as will legally justify the judicial or official action demanded." [27] In criminal cases, only that evidence which is sufficient in character, weight, and amount to justify a factfinder in concluding that every element of the offense has been proven beyond a reasonable doubt is adequate to support a conviction. There is no higher burden of proof in any trial, criminal or civil, and there is no higher standard of appellate review than the standard mandated by *Jackson.* All civil burdens of proof and standards of appellate review are lesser standards than that mandated by *Jackson.*

Indeed, the Supreme Court explicitly held in *In re Winship,* [28] that a juvenile could not constitutionally be adjudicated under the civil standards of proof (or appellate review) of preponderance of the evidence.[29] The Court noted that " ' the preponderance test is susceptible to the misinterpretation that it calls on the trier of fact merely to perform an abstract weighing of the evidence in order to determine which side has produced the greater quantum, without regard to its effect in convincing his mind of the truth of the proposition asserted.' " [30]

As Justice Harlan explained in his *Winship* concurrence, although " the phrases ' preponderance of the evidence' and ' proof beyond a reasonable doubt' are quantitatively imprecise, they do communicate to the finder of fact different notions concerning the degree of confidence he is expected to have in the correctness of his factual conclusions." [31] Justice Harlan noted that " [t]he preponderance test has been criticized, justifiably in my view, when it is read as asking the trier of fact to weigh in some objective sense the quantity of evidence submitted by each side rather than asking him to decide what he believes most probably happened." [32] Indeed, that is precisely why the standard of proof and

Page 918

review in criminal cases has been expressed, not by the quantity of evidence produced or how it might be weighed when viewed neutrally, but rather by the quality of the evidence and the level of

certainty it engenders in the factfinder's mind.

Legal sufficiency of the evidence in a criminal proceeding may be divided into two zones: evidence of such sufficient strength, character, and credibility to engender certainty beyond a reasonable doubt in the reasonable factfinder's mind and evidence that lacks that strength.[33] Appellate review of a jury's verdict of criminal conviction focuses solely on that " either-or" character of evidentiary sufficiency because a defendant is entitled to an acquittal if the evidence lacks that strength.

## C. Texas Civil Standards of Review.

Texas is considered a " hold-out" state by having a two-tiered standard of appellate review for civil cases, although commentators state that " recent decisions hint that there is support for assimilation into the single standard of review used in most jurisdictions." [34] It has long been acknowledged that " [f]ew issues of Texas law have created more confusion or spawned more appellate litigation than the treatment of ' no evidence' and ' insufficient evidence' points of error" in civil cases.[35] The difficulty in distinguishing these two types of claims-which require dramatically different results-is that appellate courts have little guidance except their own intuition to guide them.[36]

*1. The " five zone" review for legal and factual sufficiency.*

Traditionally, Texas appellate courts have employed a five-zone review of civil verdicts when the burden of proof at trial is that of " preponderance of the evidence." [37] In his much cited law review article, Justice Calvert distinguished those five zones and defined them.[38]

Page 919

*2. Zone 1-" no evidence."*

Zone 1 is the " no evidence" zone, similar to the old legal sufficiency standard rejected by the Supreme Court in *Jackson* for criminal cases. A " no evidence" challenge by the party without the burden of proof in a civil case may be sustained only when:

• There is a complete lack of evidence of some element of a claim or defense; • The evidence offered at trial is inadmissible under the rules of law or of evidence and thus cannot be given any evidentiary value on appeal; • There is no more than a " mere scintilla" of evidence to prove some essential fact of either the claim or defense; [39] or• The evidence conclusively demonstrates the opposite of the essential fact. [40]

If the appellate court finds " no evidence" to support the verdict, the evidence is legally insufficient, and the opponent is entitled to a judgment in his favor as a matter of law.[41]

*3. Zone 2-" factually insufficient evidence."*

In zone 2, the party with the burden of proof has offered some evidence in support of his claim or defense and the case is allowed to go to the jury for a verdict. But the evidence supporting the jury's verdict, while more than a " mere scintilla," is slim indeed.[42] In this scenario, the appellate court may find that it is " factually

Page 920

insufficient," but it must carefully set out all of the evidence supporting the verdict and explain why the evidence is nonetheless insufficient.[43] This challenge is always brought by the party without the burden of proof.[44] The rationale for allowing the party (who prevailed at trial but was found

by the appellate court to have produced insufficient evidence) to try again in a second trial is " that there is available to the appellee other evidence of the vital fact which will support a finding in his favor and it would work an injustice to cut off his right to produce it." [45] The appellate court assumes that the party who had the burden of proof and who originally prevailed may be able to produce additional evidence at a second trial, evidence that he failed to offer at the first trial.[46]

### 4. Zone 3-" zone of reasonable disagreement."

Zone 3, the zone of reasonable disagreement, is the great middle ground, in which a verdict will be upheld for either the party with the burden of proof or the opposing party as there is conflicting evidence or inferences on either side of the vital fact issue or issues, but the jury's verdict is reasonable and does not " shock the conscience," nor it is not so " clearly unjust" to indicate obvious bias.[47]

### 5. Zone 4-" great weight and preponderance. "

In zone 4, the party with the burden of proof has offered significant evidence to support the claim or defense; the great weight and preponderance of the credible evidence supports his position.[48] However,

Page 921

the jury has returned a verdict in favor of the opposing party-the party without the burden of proof. In this scenario, the party with the burden of proof may challenge the result, claiming that the verdict is " against the great weight and preponderance of the evidence." [49] In this " against the great weight and preponderance" scenario, all of the evidence, both pro and con, is set out, and the appellate court must explain why the verdict is against the great weight and preponderance of the evidence.[50]

### 6. Zone 5-" conclusive evidence."

At the opposite end of the spectrum from zone 1 is zone 5-" conclusive evidence" -in which the party with the burden of proof has established conclusively, or as a matter of law, that he is entitled to a judgment in his favor because the opponent has offered no evidence in opposition and the proponent has offered sufficient evidence of the vital fact or claim.

### 7. The Texas Supreme Court's Reformulation of Legal Sufficiency.

Although this five-zone theory has been the traditional formulation of civil legal and factual sufficiency standards in civil cases, in 2005, the Texas Supreme Court articulated a new formulation of the test for legal sufficiency review in

Page 922

*City of Keller v. Wilson:* [51]

The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review. Whether a reviewing court begins by considering all the evidence or only the evidence supporting the verdict, legal-sufficiency review in the proper light must credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not.[52]

Thus, when reasonable jurors could resolve conflicting evidence either way, an appellate court must assume that jurors resolved all such conflicts in accord with their verdict, and when the evidence supports conflicting inferences, the court must assume that jurors made all inferences in

favor of the verdict and disregard other possible inferences.[53] " If the evidence at trial would enable reasonable and fair-minded people to differ in their conclusions, then jurors must be allowed to do so. A reviewing court cannot substitute its judgment for that of the trier-of-fact, so long as the evidence falls within this zone of reasonable disagreement." [54] The appellate court does not view the evidence in a neutral light, but rather " in the light favorable to the verdict," [55] just as is done in criminal cases under *Jackson* and in Texas civil cases under a factual sufficiency review. Under this formulation, zone 3 (the zone of " reasonable disagreement" ) would seem to have increased considerably in size, while zones 2 and 4 (those of " factual insufficiency" and " against the great weight and preponderance" ) have diminished as a verdict that is outside the zone of reasonable disagreement would seem to be within the zone of legally insufficient evidence. [56]

Some commentators have noted that this new formulation of legal sufficiency has virtually merged the Texas legal sufficiency standard with that of factual sufficiency in civil cases.[57] And it has brought Texas

Page 923

civil standards " more closely in line with federal standards for legal sufficiency review." [58] These commentators argue that the language of the " reasonable juror" standard " provides a cloak for the reasoning of judges, rather than precision in reasoning." [59] They contend that the *City of Keller* standard " leaves considerable leeway for an appellate court to intercept a jury's verdict when it feels motivated to do so." [60] These commentators complain that the " reasonable juror" standard is too flexible and subjective,[61] apparently preferring the purportedly more objective standard of " shocks the conscience" or " manifestly unjust." One can certainly agree with their ultimate conclusion however, that appellate courts should make " a firm rededication to a jurisprudence of restraint and standards of review that recognize the fundamental right to trial by jury and a concomitant hard-minded application of standards of review." [62] Particularly in Texas, the most jury-deferential state in the nation,[63] appellate courts must defer to a " reasonable" jury verdict in both civil and criminal cases.

## D. The Criminal Legal Sufficiency Standard Cannot Be Harmonized with the Civil Factual Sufficiency Standard.

### 1. Clewis *is a chimera.*

In *Clewis,* this Court attempted to superimpose the five-zone civil standard of review, predicated upon trials in which the burden of proof is by a preponderance of the evidence upon the two-zone criminal standard of review that requires proof beyond a reasonable doubt.[64] Visualizing the five-zone civil standard (" no evidence," " insufficient evidence," " zone of reasonable disagreement," " the great weight and preponderance of the evidence," and " conclusive evidence" ) as a football field with the " no evidence" zone at one end and with each zone comprised of an ever greater quantum of evidence offered by the party with the burden of proof until the " conclusive evidence" zone at the other end, reviewing courts are required to uphold as factually sufficient any verdict in favor of the party with the burden of proof that is at least within the third zone, that of reasonable disagreement. But in assessing the legal sufficiency of evidence in a criminal case, the State's evidence must be persuasive enough to almost make a

touchdown; reaching the midfield is never enough to meet the " beyond a reasonable doubt" standard.

In a civil case, if the jury returns a verdict in favor of the party that did not have the burden of proof (usually the defendant), but that verdict is determined by the appellate court to be against the great weight and preponderance of the evidence offered by the party that did have the

Page 924

burden of proof (usually the plaintiff), then the appellate court may reverse the judgment and remand for a new trial. This gives the plaintiff a second opportunity to prove his case before a new jury, after the first jury had rejected his claim although he had originally produced " the great weight and preponderance of the evidence" to support its claim. That scenario would not generally arise [65] in criminal cases because if the jury returns a verdict favoring the party without the burden of proof (the defendant), there will be no appeal because the State may not appeal an acquittal.

Similarly, if the party with the burden of proof in a civil trial (usually the plaintiff) obtains a jury verdict in its favor, but an appellate court determines that there is insufficient evidence, even when viewed in the light most favorable to the verdict,[66] to reach " the zone of reasonable disagreement," then the appellate court may reverse the jury verdict and remand for a new trial. That scenario also would not arise in criminal cases because if the State's evidence is so weak in strength, character, and credibility that it does not reach the level of " the zone of reasonable disagreement," then it most assuredly does not meet the " beyond a reasonable doubt" standard of legal sufficiency required in all criminal cases. Such a lack of evidentiary support is not merely factually insufficient, it is legally insufficient, and the defendant cannot be required to undergo a second trial.

What this Court did in *Clewis* was adopt the language of Texas civil factual sufficiency review without first determining whether there was a proper fit between those civil standards of review and the differing evidentiary standards of proof in civil and criminal cases. This mistake was quite understandable when *Clewis* was decided in 1996 because this Court had recently and properly adopted the Texas civil standards of legal and factual sufficiency for those few instances in criminal cases in which the burden of proof is a preponderance of the evidence, as occurs with affirmative defenses.[67] But as appellate courts attempted to reconcile the five-zone civil factual-sufficiency standards with the heightened burden of proof in criminal cases in which the State is required to prove every element beyond a reasonable doubt, we began to realize that this civil standard of review did not align with the criminal burden of proof. And we tinkered and tinkered with various reformulations of this " factual sufficiency" standard of review in criminal cases in a vain attempt to harmonize them.[68]

Page 925

*2.* Clewis *and* Watson *relied upon a false premise that evidence should be viewed in a neutral light when conducting a factual sufficiency review.*

In *Watson v. State,* [69] we stated that the only difference between a factual-sufficiency review and a legal-sufficiency review is that, under the former, an appellate court should view the evidence in a neutral light, rather than in the light most favorable to the verdict.[70] But it is a

strange distinction that ignores the quality or credibility of evidence, and it is one that has never been a part of Texas factual-sufficiency review in civil cases. [71] Instead, it was created by the Austin Court of Appeals in *Stone v. State,* [72] and simply imported,

Page 926

without further analysis, into this Court's decision in *Clewis.* Indeed, in *Lancon v. State,* [73] a post- *Watson* decision in 2008, we again rejected the " neutral" light analysis and held that it is the jury's sole prerogative to make credibility decisions. Appellate courts must defer to those credibility assessments; they may not view all conflicting witness testimony as equally credible.[74] Witnesses are not fungible, some are credible and some are not. Neither juries nor appellate courts must tally up the number of witnesses " neutrally" and then base a sufficiency decision on the greater number.

In sum, we have never been successful in our attempts to superimpose the five-zone civil standards for sufficiency review on top of the constitutionally mandated legal sufficiency review of a criminal conviction. These two standards of review depend upon their distinctly different burdens of proof. Like oil and water, they do not mix. They are not logically consistent, and they promote only confusion and conflation of two distinct concepts. We are required to follow the heightened *Jackson* legal sufficiency formulation; we cannot follow a lesser factual sufficiency formulation.

I agree that it is time to consign the civil-law concept of factual sufficiency review in criminal cases to the dustbin of history.

PRICE, J., dissenting in which MEYERS, JOHNSON, and HOLCOMB, JJ., joined.

By dint of persistence, a plurality of the Court purports to overrule *Clewis.* [1] The plurality frames the question as a policy choice, asserting that we granted discretionary review in order to determine whether " there is a need to retain" factual sufficiency review.[2] But as our opinion less than four years ago in *Watson* demonstrated, the authority to reverse a conviction on the basis of factual insufficiency has been recognized from the beginning to be inherent in the appellate jurisdiction of first-tier appellate courts in Texas.[3] We cannot simply decide it need not be " retained"

Page 927

any longer absent a change in the constitutional and statutory provisions that confer that jurisdiction-or else a change in our own long-standing construction of those provisions. To be sure, the plurality today would undoubtedly change those constructions too, if only it could invoke something more substantial than dissenting opinions to justify it.

*I.*

The plurality's primary justification for overruling *Clewis* is that, because the standards for factual sufficiency and legal sufficiency have essentially melded into one, there is no longer any " meaningful distinction between them that would justify retaining them both." [4] But the plurality's premise is flawed. The plurality begins its analysis with the claim that *Watson* itself " recognized" that the two standards were " barely distinguishable." [5] What *Watson* actually recognized was that the standard for factual sufficiency, as partially reformulated in *Zuniga,* [6] which *Watson* overruled in part, " seems barely distinguishable" from the legal sufficiency standard from *Jackson v. Virginia.* [7] The only difference is that the former views all of the evidence in a " neutral" light

rather than, as in the latter, " in the light most favorable to the verdict." But we insisted in *Watson* - as I still do-that " the distinction is a real one[.]" [8]

A holding of legally insufficient evidence-that is, that the evidence is so lacking that federal due process will not tolerate a conviction-has double jeopardy implications.[9] Under the standard established by *Jackson v. Virginia* for deciding whether the evidence satisfies due process, a reviewing court " faced with a record of historical facts that supports conflicting inferences must presume-even if it does not affirmatively appear in the record-that the trier of fact resolved any such conflicts in favor of the prosecution." [10] But this kind of categorical deference is not required of a reviewing court in Texas when conducting a non-due-process review for factual sufficiency. For a reviewing court to view the evidence in a " neutral" light means that it need not resolve every conflict in the evidence, or draw every inference from ambiguous evidence, in favor of the defendant's guilt just because a rational jury *could* have. Rational juries can also choose to acquit a defendant even when presented with legally sufficient evidence. [11] Factual sufficiency review recognizes that there may be rare cases in which, though some jury might convict, and it would not be irrational for it to do

Page 928

so, most juries would almost certainly harbor a reasonable doubt given the tenuousness of the State's evidence or the weight and apparent credibility and/or reliability of the exculpatory evidence. Under these circumstances, factual sufficiency review in Texas permits a first-tier appellate court to reverse a conviction and remand for a new trial, in the interest of justice, to grant the defendant a second chance to obtain a jury acquittal.[12]

The deference required of the appellate court in a factual sufficiency review is of a different kind than that required by legal sufficiency. It is not, as with legal sufficiency analysis, total deference to the jury's prerogative to resolve all conflicts and ambiguities in the record against the defendant. Instead, it is a qualified deference to the jury's apparent assessment of the weight, credibility, or reliability of the (admittedly legally sufficient) evidence. This deference is important because it respects the jury's fact-finding role at the trial court level.[13] But it is not the absolute deference that legal sufficiency review affords to the jury's resolution of conflicts and ambiguities. It demands that, before a first-tier appellate court may reverse a conviction based upon factually insufficient evidence, it must be able to say, with some objective basis in the record, that the jury's verdict, while legally sufficient, is nevertheless against the great weight and preponderance of the evidence, and therefore " manifestly unjust." [14] This does not grant an appellate judge license to declare the evidence to be factually insufficient " simply because, on the quantum of evidence admitted, he would have voted to acquit had he been on the jury. Nor can an appellate court judge declare that a conflict in the evidence justifies a new trial simply because he disagrees with the jury's resolution of that conflict." [15]

The plurality asserts that this is not a true factual sufficiency review because it:

Page 929

is inconsistent with the evidentiary-weight standard described in *Tibbs* (and purportedly adopted in *Clewis* ) and with viewing the evidence in a " neutral light," which permit the reviewing court to show **no** deference at all to a jury's credibility and weight determinations and to sit as a " thirteenth

juror" without any limitation and to declare that a conflict in the evidence justifies a new trial simply because the reviewing court disagrees with the jury's resolution of conflicting evidence. *See Tibbs,* 457 U.S. at 42, 102 S.Ct. 2211.[16]

This passage represents a distorted view of factual sufficiency review. I agree that the citation to *Tibbs* supports the proposition that *when* a reviewing court *does* overturn a jury verdict as too tenuous or against the great weight and preponderance of the evidence, it acts as a thirteenth juror and does not, ultimately, defer to the jury's resolution of weight and credibility.[17] But *Tibbs* does not support the assertion that factual sufficiency is not genuinely factual sufficiency unless the reviewing court sits as a thirteenth juror " without any limitation." It is true that we insist that a simple disagreement with the jury's resolution of conflicting evidence will not support a reversal under a factual sufficiency review. Not every appellate disagreement with a jury verdict signifies that the jury verdict is " manifestly unjust" -in fact, most do not. And when that is the case, a reviewing court must decline to exercise its fact jurisdiction to reverse and remand for a new trial. But this limitation does not mean that when a reviewing court *does* exercise its prerogative to reverse and remand a conviction for factual insufficiency, either because the State's evidence is intolerably tenuous or because the verdict is against the great weight of the evidence, it has not acted as a thirteenth juror.[18] Obviously, it has. And that is precisely why *Tibbs* holds that such a reversal carries no double jeopardy consequences.

As for the plurality's claim that a factual sufficiency review that pays any deference at all to the jury's verdict is not really a review of the evidence in a " neutral light," [19] this is simply inaccurate. Deference is not an all-or-nothing proposition. A reviewing court may look to the record *without* the requirement of resolving conflicts and ambiguities in the light most favorable to the jury's verdict and *still* limit the exercise of its power to reverse and remand for a new trial in the interest of justice, out of deference to the jury's verdict, to those cases in which the State's evidence is *most* tenuous or the weight of the evidence *greatly* preponderates against conviction. The qualified deference that we have said first-tier appellate courts should pay to jury verdicts does not somehow convert factual sufficiency review into legal sufficiency review.
Page 930

Therefore, even if I agreed that we could simply jettison factual sufficiency review as a matter of policy, I would not accept the plurality's primary justification for doing so.

## II.

Having declared the standards for legal and factual sufficiency review to be indistinguishable, the plurality finds it necessary to eliminate the latter because a finding of factual insufficiency might necessitate an appellate acquittal.[20] Because I do not accept the premise that the standards are indistinguishable, I do not share the plurality's concern.

## III.

Next the plurality cites various policy considerations for dispensing with factual sufficiency review. First, the plurality quotes with approval a number of reasons that the Florida Supreme Court listed to explain why it would no longer entertain evidentiary-weight grounds on appellate review.[21] Insofar as I can tell, however, there was no argument to be made in the criminal appellate courts of Florida that factual review was considered to be inherent in their appellate

jurisdiction, as we have said it is in ours. For this reason, the Florida Supreme Court was free to reject any attempt to raise such a claim purely on policy grounds. Next, the plurality today endorses an argument from one of the dissenting opinions in *Watson,* a sort of cost/benefit analysis that concludes that factual sufficiency review is simply not worth the candle.[22] Such policy considerations cannot by themselves serve to trump the constitutional and statutory authority of first-tier appellate courts in Texas to conduct factual sufficiency review, recognized in our case law long before *Clewis* was decided.[23]

### IV.

Any argument to undermine the basis for that constitutional and statutory authority, the plurality has saved for last-perhaps because it can only muster dissenting opinions to support it. The plurality in fact acknowledges that " [t]here is very little to add to what this Court has already extensively written on a direct-appeal court's constitutional and statutory authority to apply this factual sufficiency standard in criminal cases." [24] Indeed, the arguments have been aired and rejected in this Court many times in recent years. Even so, the plurality today somehow manages to characterize the question of the jurisdiction of first-tier criminal appellate courts in Texas to conduct factual sufficiency review as one of first impression.[25] But of course this is not an issue of

Page 931

first impression; if it were, there would be no *Clewis* (or, for that matter, *Watson* ) to overrule.

And yet overrule *Clewis* the plurality purports to do. Along the way, the plurality fails even to pay lip service to the doctrine of *stare decisis. Stare decisis* dictates that " we keep in mind the strong preference for adhering to past decisions[.]" [26] It is better, we have often said, to be consistent than to be right (although I regard this as a rebuttable presumption).[27] Still, we have acknowledged that there are legitimate justifications for overruling established precedent, and we do not hesitate to do so " if the reasons ... are weighty enough." [28] I suppose that, were it to address the question head on, the plurality today might argue (judging by its policy arguments for abandoning factual sufficiency review-all of which we have rejected in the past) that factual sufficiency review has become " unworkable." [29] In keeping with the overarching theme of its opinion, the plurality might argue that because the standard for reviewing the evidence for factual sufficiency is now indistinguishable from the standard for reviewing legal sufficiency, and because this lack of distinction might create jeopardy problems, we must not construe the fact jurisdiction of first-tier criminal appellate courts to include a review for factual sufficiency. Because I reject these premises, I would reject any argument that the presumption that consistent-is-better-than-right has been rebutted.[30] The only thing that arguably makes *Clewis* seem unworkable is this Court's lamentable propensity to grant a State's petition for discretionary review every three or four years to revisit the question whether it is unworkable. The arguments themselves are not new.

To purporting to overrule *Clewis* (and the century of case law that preceded it that exercised fact review jurisdiction to reverse convictions that were built on too tenuous a foundation or were against the great weight of the evidence),[31] and remanding the cause to the court of appeals

Page 932

to revisit its legal sufficiency analysis, I dissent.

---------

Notes:

[1] 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

[2] 922 S.W.2d 126 (Tex.Cr.App.1996).

[3] *See Jackson,* 443 U.S. at 319, 99 S.Ct. 2781.

[4] *See Clewis,* 922 S.W.2d at 133.

[5] *See id.*

[6] *See Rollerson v. State,* 227 S.W.3d 718, 724 (Tex.Cr.App.2007) (factual-sufficiency review is " barely distinguishable" from legal-sufficiency review); *Watson v. State,* 204 S.W.3d 404, 442-48 (Tex.Cr.App.2006) (Cochran, J., dissenting) (discussing this Court's attempts to " clarify" *Clewis* ).

[7] Appellant was also charged with and convicted of possessing more than one but less than four grams of ecstasy and sentenced to 10 years in prison in cause number 10-07-00310-CR. That conviction is not at issue in this proceeding.

[8] Appellant testified at trial that he had " like $30 or $40" on him.

[9] We note that appellant was charged with just possessing the six ecstasy pills that weighed 1.29 grams. The record contains no testimony on how many pills a typical user would take or a typical seller would possess with intent to deliver.

[10] The question presented in this ground is whether a jury could rationally find beyond a reasonable doubt that appellant possessed with intent to deliver 4.72 grams of crack cocaine because appellant fit a profile of " most" or " typical" drug dealers.

[11] *See Jackson,* 443 U.S. at 319, 99 S.Ct. 2781.

[12] Our decision in *Watson* approved of this formulation of the *Clewis* standard. *See Watson,* 204 S.W.3d at 415. Stated another way, the question under the *Clewis* factual-sufficiency standard is whether, after viewing all of the evidence in a " neutral light," the jury's verdict is either " clearly wrong and manifestly unjust" or " against the great weight and preponderance of the [conflicting] evidence." *See Watson,* 204 S.W.3d at 414-15; *see also Clewis,* 922 S.W.2d at 129 (reviewing court views the evidence in a neutral light and sets aside the jury's verdict " if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust" ).

[13] *See Jackson,* 443 U.S. at 319, 99 S.Ct. 2781 (" Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all* of the evidence is to be considered in the light most favorable to the prosecution." ) (emphasis in original) and at 326, 99 S.Ct. 2781 (a " court faced with a record of historical facts that supports conflicting inferences must presume-even if it does not affirmatively appear in the record-that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution" ).

[14] The Supreme Court in *Tibbs* explained the difference between reversals based on evidentiary sufficiency (i.e., *Jackson v. Virginia* ) and reversals based on evidentiary weight (i.e., factual-sufficiency) which " draws the appellate court into questions of credibility." *See Tibbs,* 457 U.S. at 38 n.11, 102 S.Ct. 2211.

[15] The lead majority opinion in *Clewis* seems to have cited *Tibbs* for the proposition that " when conducting a factual sufficiency review, an appellate court cannot substitute its judgment for that of

the factfinder since this would violate the defendant's right to trial by jury." *See Clewis,* 922 S.W.2d at 133 (citing *Tibbs,* 457 U.S. at 42, 102 S.Ct. 2211). *Tibbs,* however, stands for the opposite proposition-that the reviewing court can substitute its judgment for the factfinder's in conducting a factual-sufficiency review. *See Tibbs,* 457 U.S. at 42, 102 S.Ct. 2211 (reviewing court can sit as " thirteenth juror" and disagree " with the jury's resolution of conflicting testimony" and " the jurors' weighing of the evidence" ).

[16] This requirement that the reviewing court afford " appropriate deference" to a jury's credibility and weight determinations in a factual-sufficiency review is motivated by a concern that not requiring such deference might violate the right to trial by jury set out in the Texas Constitution. *See Clewis,* 922 S.W.2d at 134-36 (discussing " factfinder deference and right to trial by jury" ); *see also Roberts v. State,* 221 S.W.3d 659, 661-62 n. 7 (Tex.Cr.App.2007) (in order to safeguard Texas' constitutional right to trial by jury, the Texas Supreme Court imposed several requirements upon the reviewing court when it reverses on factual-sufficiency grounds such as requiring the reviewing court to exercise its factual-sufficiency jurisdiction with " deferential standards of review" ).

[17] *See Watson,* 204 S.W.3d at 441 (Cochran, J., dissenting) (" Thus, *Clewis* empowered courts of appeals to act as a ' thirteenth juror' (one who was not even present to see and hear the witnesses) and disagree with the fact-finder's determination, but to be deferential to the fact-finder's judgment as it did so. This standard was ambiguous and contradictory from the beginning." ) and at 445 (one " cannot view the evidence in a neutral light while at the same time giving deference to the factfinder's determinations of weight and credibility" ); *Johnson,* 23 S.W.3d at 13-14 (McCormick, P.J., dissenting) (also discussing " *Clewis* ' internal contradictions on the question of appellate deference to the jury's credibility and weight determinations" ).

[18] 253 S.W.3d 699 (Tex.Cr.App.2008).

[19] A dissenting opinion in *Lancon* stated that the majority opinion " seems to say that from now on, the level of deference due a jury's decision will be total deference when the decision is based on an evaluation of credibility." *See Lancon,* 253 S.W.3d at 708 (Johnson, J., dissenting). We disagree. Our decision in *Lancon* merely recognizes that the jury is the " sole judge of a witness's credibility, and the weight to be given the testimony" thus requiring the reviewing court to defer to the jury on these determinations (i.e., view the evidence in the light most favorable to the verdict). Viewing the evidence in the light most favorable to the verdict, however, begins the *Jackson v. Virginia* legal-sufficiency analysis. The *Jackson v. Virginia* standard still requires the reviewing court to determine whether " *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *See Jackson,* 443 U.S. at 319, 99 S.Ct. 2781 (emphasis in original); *Watson,* 204 S.W.3d at 418 n. 7 (Hervey, J., dissenting). This is the portion of the *Jackson v. Virginia* standard that essentially incorporates a factual-sufficiency review. *See Clewis v. State,* 876 S.W.2d 428, 438-39 (Tex.App.-Dallas 1994)( *Jackson v. Virginia* standard necessarily encompasses a factual-sufficiency review), *vacated,* 922 S.W.2d at 136.

[20] *See Jackson,* 443 U.S. at 319, 99 S.Ct. 2781.

[21] *See Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978); *Greene v. Massey,* 437 U.S. 19, 98 S.Ct. 2151, 57 L.Ed.2d 15 (1978).

[22] For example, in *Watson,* in which we recognized that factual-sufficiency review is " barely distinguishable" from legal-sufficiency review, we stated that the first ground rule for factual-sufficiency review is that " the appellate court should be mindful that a jury has already passed on the facts, and convicted, and that the court should never order a new trial simply because it disagrees with the verdict, **but only where it seems to the court to represent a manifest injustice**...." *See Watson,* 204 S.W.3d at 414. This, however, arguably describes a situation where " the prosecution has failed to produce sufficient evidence to prove its case" and " an acquittal was the only proper verdict." *See Tibbs,* 457 U.S. at 41-42, 102 S.Ct. 2211. Thus described, our factual-sufficiency standard with its remedy of a new trial could violate double-jeopardy principles. *See id.*

[23] *See Watson,* 204 S.W.3d at 416-17.

[24] We also note that the Florida Supreme Court's 1981 decision in *Tibbs* examined its 1976 decision in *Tibbs,* other Florida state-court decisions, and the Florida Court of Appeals' decision in determining whether its 1976 decision reversing Tibbs' conviction was a reversal based on evidentiary weight or a reversal based on evidentiary sufficiency. *See Tibbs,* 397 So.2d at 1125-27. The United States Supreme Court examined the Florida Supreme Court's 1976 decision reversing Tibbs' conviction and the Florida Supreme Court's 1981 decision that Tibbs' retrial did not violate double-jeopardy principles in determining that the Florida Supreme Court's 1976 decision reversing Tibbs' conviction was a reversal based on evidentiary weight and not a reversal based on evidentiary sufficiency. *See Tibbs,* 457 U.S. at 46-47, 102 S.Ct. 2211. A single *Jackson v. Virginia* legal-sufficiency standard probably would have avoided all of this. *See Tibbs,* 397 So.2d at 1125-26 (eliminating reversals based on evidentiary weight will avoid " having to review appellate reversals based on evidentiary shortcomings to determine whether they were based on sufficiency or on weight" ).

[25] In addition, having two evidentiary standards instead of one rigorously and properly applied standard may actually be detrimental. *See* Amanda Peters, *Symposium: Treaties and Domestic Law After Medellin v. Texas: Article: The Meaning, Measure, and Misuse of Standards of Review,* 13 Lewis & Clark L.Rev. 233, 255-56 note 3 (Spring 2009) (having two standards of sufficiency review promotes the " boilerplate" recitation of both standards and the rigorous application of neither).

[26] *See Watson,* 204 S.W.3d at 449 (Cochran, J., dissenting) (" reviewing courts must apply the *Jackson* legal sufficiency standard robustly, taking into account *all* of the evidence, although viewed in the light most favorable to the jury's verdict. If that evidence supports a rational and reasonable finding of guilt beyond a reasonable doubt, it cannot be said that the jury's verdict is manifestly unjust or shocks the conscience of the reviewing court. The verdict is either rational and reasonable or it is not; it cannot be ' semi-rational' and still meet the *Jackson* standard. There is no jurisprudential value in reversing a rational, reasonable verdict and forcing the parties to go back and do it again." ) (footnotes omitted and emphasis in original); *Johnson,* 23 S.W.3d at 15 (McCormick, P.J., dissenting) (a properly applied *Jackson v. Virginia* legal-sufficiency standard is much more exacting than *Clewis* claims and when the evidence is sufficient under a properly applied *Jackson v. Virginia* legal-sufficiency standard, it can never be factually insufficient) and at

16 (" when the intermediate appellate courts determine that the evidence is sufficient under *Jackson v. Virginia* but ' factually insufficient' under *Clewis* to support a conviction, and remand a case for a new trial, they either will have misapplied *Clewis* (in which case the conviction should have been affirmed) or they will have failed to appreciate that the evidence is also insufficient under *Jackson v. Virginia* (in which case the defendant should have received an acquittal." ) (footnotes omitted)).

[27] *See Watson,* 204 S.W.3d at 406-07 (acknowledging that early case law never " expressly declared that factual-sufficiency review, *per se,* was authorized in criminal cases" ) and at 412-14 (also acknowledging that " factual sufficiency went into hiding in the late Forties and early Fifties" and did not begin to reveal itself again until 1994 culminating in the 1996 *Clewis* decision); *Watson,* 204 S.W.3d at 424-32 (Cochran, J., dissenting) (discussing origins of Texas appellate review of evidentiary sufficiency and concluding, " Until *Clewis* in 1996, this Court had consistently used a single standard (although the precise wording varied) and reviewed the evidence in the light most favorable to the factfinder, giving great deference to the jury's credibility and weight determinations." ).

[28] *See Watson,* 204 S.W.3d at 412-14; *Watson,* 204 S.W.3d at 432-33 (Cochran, J., dissenting) (noting that this Court quickly adopted the *Jackson v. Virginia* standard " and adhered to that single, constitutionally mandated standard for seventeen years" ).

[29] *Clewis* decided that a direct-appeal court's constitutional and statutory jurisdiction to review " questions of fact" in criminal cases require a direct-appeal court to apply a factual-sufficiency standard to the elements of the offense when properly requested to do so by a convicted defendant. *See Clewis,* 922 S.W.2d at 129 (" *Jackson* standard of review does not satisfy a noncapital defendant's right to an appellate review of fact questions" ) and at 129-31 (" When their jurisdiction to review fact questions is properly invoked, the courts of appeals cannot ignore constitutional and statutory mandates." ); *Stone v. State,* 823 S.W.2d 375, 381 (Tex.App.-Austin 1992, pet. ref'd as untimely filed) (stating that it is " duty-bound to exercise the full extent of the constitutional grant of appellate jurisdiction when requested by the litigants" ).

[30] *See Watson,* 204 S.W.3d at 406-414; *Clewis,* 922 S.W.2d at 129-31; *Clewis,* 922 S.W.2d at 136-49 (Clinton, J., concurring); *Bigby v. State,* 892 S.W.2d at 870-75 (Tex.Cr.App.1994); *Watson,* 204 S.W.3d at 417-20 (Hervey, J., dissenting); *Watson,* 204 S.W.3d at 424-40 (Cochran, J., dissenting); *Clewis,* 922 S.W.2d at 151-55 (McCormick, P.J., dissenting).

[31] *See* TEX. CONST. Article V, § 5(a) (providing Texas Court of Criminal Appeals with final appellate jurisdiction " with such exceptions and under such regulation as may be provided in this Constitution or as prescribed by law" ); TEX. CONST. Article V, § 6(a) (providing Courts of Appeals with appellate jurisdiction " under such restrictions and regulations as may be prescribed by law" and also providing that " the decision of said courts shall be conclusive on all questions of fact brought before them on appeal or error" ); *Bigby v. State,* 892 S.W.2d at 871-72 (grant of general appellate jurisdiction authorizes review of " questions of fact" and " questions of law" ); *Clewis,* 876 S.W.2d at 430 (" general grant of [appellate] jurisdiction includes the power to *review* questions of law *and fact* " ) (emphasis in original).

[32] *See Watson,* 204 S.W.3d at 407, 413-14; *Clewis,* 922 S.W.2d at 136-149 (Clinton, J.,

concurring); *Bigby,* 892 S.W.2d at 870-75.

[33] *See* Article 36.13 (providing that " [u]nless otherwise provided in this Code, the jury is the exclusive judge of the facts" ); Article 38.04 (providing that " jury, in all cases, is the exclusive judge of the facts proved, and of the weight to be given the testimony" subject to such exceptions not applicable here).

[34] This is arguably inconsistent with Tex.R.App. Proc. 21.3(h), which permits a trial court to grant a new trial " when the verdict is contrary to the law and the evidence." *Compare Tibbs,* 397 So.2d at 1123 (discussing Florida criminal-procedural rule permitting trial court to grant new trial when the verdict is " contrary to law or the weight of the evidence" ). In addition, in several decisions meant to " clarify" *Clewis,* this Court has not been consistent on whether Articles 36.13 and 38.04 apply to the appellate process. *See Watson,* 204 S.W.3d at 419 n. 12 (Hervey, J., dissenting) (noting that, in 1996 in *Clewis,* this Court stated that these provisions do not apply to the appellate process, but in 1997, in another case, this Court stated that they do apply to the appellate process, and in 2006, in *Watson,* this Court stated that they do not apply to the appellate process). We note that our decision in *Lancon* recognized that these provisions do apply to the appellate process when *Lancon* cited them for the proposition that in a factual-sufficiency review " the jury is the sole judge of what weight" to give the witness testimony. *See Lancon,* 253 S.W.3d at 705 and at 707 (" jury is the sole judge of a witness's credibility, and the weight to be given the testimony" ).

[35] It should be noted that this Court has decided that its review of a direct-appeal court's factual-sufficiency decision is limited by the factual-conclusivity clause to determining only whether the direct-appeal court properly applied " rules of law." *See Roberts,* 221 S.W.3d at 662-63; *Bigby,* 892 S.W.2d at 872 n. 3. This Court, however, has never decided that the factual-conclusivity clause limits this Court's jurisdiction to review a direct-appeal court's decision on other " questions of fact" or that it makes a direct-appeal court's decision on these " questions of fact" conclusive on this Court. *See, e.g., Carmouche v. State,* 10 S.W.3d 323, 331-33 (Tex.Cr.App.2000) (this Court overturned direct-appeal court's decision on " question of fact" regarding factual circumstances under which the police claimed that the defendant consented to be searched based on a videotape which contradicted the police version of the critical events). This, of course, is consistent with the plain language of Article 44.25, which states that this Court and the courts of appeals may reverse a judgment " upon the law as upon the facts," and with Section 22.225(a), TEX. GOV'T CODE, which makes a direct-appeal court's judgment " conclusive on the facts" only in civil cases. *See Clewis,* 876 S.W.2d at 430 n. 4 (noting that Article 44.25 confers " upon the court of criminal appeals the same fact jurisdiction given to the courts of appeals" but declining to " attribute power to the court of criminal appeals that it has expressly disavowed" ); *Watson,* 204 S.W.3d at 437 (Cochran, J., dissenting) (" It would appear that, under article 44.25 (and all of its predecessor statutes), both the courts of appeals and the Court of Criminal Appeals have co-equal jurisdiction to reverse ' on the facts' as well as the law." ) and at 439 n. 118. It would appear that the Legislature did not intend for a direct-appeal court's decision on a " question of fact" in criminal cases to be conclusive on this Court. *See id.; but see Watson,* 204 S.W.3d at 412; *Bigby,* 892 S.W.2d at 872 n. 3.

[36] *See Watson,* 204 S.W.3d at 419-20 (Hervey, J., dissenting); *Clewis,* 922 S.W.2d at 153-54

(McCormick, P.J., dissenting).

[37] *See Watson,* 204 S.W.3d at 407; *Bigby,* 892 S.W.2d at 874 n. 5.

[38] *See Bigby,* 892 S.W.2d at 874 n. 5.

[39] *See Watson,* 204 S.W.3d at 419-20 (Hervey, J., dissenting); *Clewis,* 922 S.W.2d at 153-54 (McCormick, P.J., dissenting).

[40] *See also Jacobs-Cathey Co. v. Cockrum,* 947 S.W.2d 288, 295 (Tex.App.-Waco 1997, writ denied) (when reviewing court reviews factual sufficiency of the evidence in civil cases, " the reviewing court shall neither interfere with the jury's resolution of conflicts in the evidence nor pass on the weight and credibility of the witnesses' testimony" because, among other things, the trier of fact has " the opportunity to observe the demeanor of the witnesses and to weigh their testimony" ).

[41] We further note that, since our 1996 decision in *Clewis,* the Texas Supreme Court, expressly relying on *Jackson v. Virginia,* modified its traditional appellate standards of " legal" and " factual" sufficiency in civil cases with a clear-and-convincing-evidence heightened burden of proof while also noting that the parameters of these standards " differ to some degree from those adopted by the Texas Court of Criminal Appeals." *See In re J.F.C.,* 96 S.W.3d 256, 264-67 (Tex.2002); *see also Watson,* 204 S.W.3d at 445-46 n. 152 (Cochran, J., dissenting) (setting out verbatim these two standards and noting that " there is barely visible light" between these two standards and wondering " if this two-tier review will long endure in civil cases where the burden of proof is heightened" ). These two standards are basically a *Jackson v. Virginia* standard modified to account for the clear-and-convincing-evidence heightened burden of proof. It, therefore, appears that civil appellate standards of " legal" and " factual" sufficiency are moving in the direction of essentially a *Jackson v. Virginia* standard as the burden of proof at trial increases. *See Watson,* 204 S.W.3d at 445-46 n.152 (Cochran, J., dissenting).

[42] *See Clewis,* 876 S.W.2d at 429 n. 1 (discussing the " no evidence" and the " factually insufficient evidence" civil appellate standards of review and the confusion that can occur when " attempting to refer to ' legal sufficiency' in criminal cases" ) and at 438-39 (" Although characterized as a ' legal sufficiency' review and a ' question of law,' the *Jackson* standard necessarily encompasses a *factual* sufficiency review. If after reviewing the evidence, i.e., the facts, in the light most favorable to the verdict, a rational trier of fact could *not* have found the essential elements of the crime *beyond a reasonable doubt,* then the sufficiency challenge must be sustained and the defendant acquitted." ) (emphasis in original); *see also Watson,* 204 S.W.3d at 437 (Cochran, J., dissenting) (" And, of course, both this Court and the courts of appeals have the authority to review ' the facts' as well as the law. If ' the facts' do not establish every element beyond a reasonable doubt, those ' facts' require an appellate court to acquit the defendant under *Jackson.* " ); *Clewis,* 922 S.W.2d at 157 (McCormick, P.J., dissenting) (when conviction is reversed under *Jackson,* it is reversed " upon the law as upon the facts" after the reviewing court has examined all the evidence, i.e., the facts).

[43] It is, therefore, unnecessary in this case to revisit the issue of whether legislative activity in 1981 was meant to insure that direct-appeal courts would defer to the jury's credibility and weight determinations and not sit as " thirteenth jurors." *See Watson,* 204 S.W.3d at 419-20 (Hervey, J.,

dissenting); *Clewis,* 922 S.W.2d at 153-156 (McCormick, P.J., dissenting).

[44] 14 Tex.Ct.App. 609 (1883).

[45] *See Watson,* 204 S.W.3d at 407-09; *Clewis,* 922 S.W.2d at 138-39 (Clinton, J., concurring); *Watson,* 204 S.W.3d at 426-28 (Cochran, J., dissenting) (" most important case discussing sufficiency of the evidence was the court of appeals's 1883 decision in *Walker* " ).

[46] Another case cited in *Watson* apparently for the proposition that Article 44.25 and its statutory predecessors require a factual-sufficiency review that permits direct-appeal courts to sit as " thirteenth jurors" is *Green v. State,* 97 Tex.Crim. 52, 260 S.W. 195 (1924). *See Watson,* 204 S.W.3d at 410. *Green,* however, is another case that, like *Walker,* is ambiguous on this point and appears to be really applying a *Jackson v. Virginia* standard. *See Green,* 260 S.W. at 196 (" Though the verdict should not be lightly annulled it is our duty to set it aside and order another trial **when the evidence viewed in its strongest light from the standpoint of the state,** fails to make guilt reasonably certain." ) (emphasis supplied).

[47] To the extent that *Walker* can be read to support this proposition, we note that *Walker* was relying on that portion of the statutory predecessor to Article 44.25 that permitted a reversal **" for the reason that the verdict is contrary to the weight of the evidence."** *See Walker,* 14 Tex.Ct.App. at 629 (emphasis supplied). This, however, is the language that the Legislature deleted in 1981 when the courts of appeals acquired criminal jurisdiction. *See Bigby,* 892 S.W.2d at 874 n. 5 (discussing history of Article 44.25 and its statutory predecessors).

[48] *See* Article V, § 5(a) (Court of Criminal Appeals " shall have final appellate jurisdiction coextensive with the limits of the state, and its determinations shall be final, in all criminal cases of whatever grade" ); Interpretive Commentary to Article V, § 5(a) (" In defining the jurisdiction of the court of criminal appeals, this section confines its powers to the exercise of appellate jurisdiction in criminal matters exclusively. It thus has no civil jurisdiction, but it is the court of final jurisdiction in criminal matters." ).

[1] *Clewis v. State,* 922 S.W.2d 126 (1996).

[2] *Watson v. State,* 204 S.W.3d 404, 421 (Tex.Crim.App.2006) (Cochran, J., dissenting).

[3] *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

[4] *Brooks v. State,* No. 10-07-00309-CR, 2008 WL 4427266, at *4, 2008 Tex.App. LEXIS 7364, at *12 (Tex.App.-Waco 2008). The majority opinion in the court of appeals noted these additional facts:

(1) both the bag of marihuana and the bag of cocaine were packaged in the same manner; (2) [appellant] was not in possession of any drug paraphernalia for either use or sale; (3) [the State's DEA expert] testified that users typically carry some type of heating element, such as a crack pipe, but dealers do not; (4) at the time of his arrest, [appellant] was not under the influence of a narcotic; (5) [appellant] has a previous conviction for possession with intent to deliver; (6) [appellant] attempted to evade capture and discarded contraband in the process; and(7) [appellant] was found in possession of three different types of drugs.*Id.* The majority did not analyze the probative value of these facts to establish appellant's intent or discuss what legitimate inferences, if any, might be drawn from them. It did not explain why the evidence was legally sufficient when it announced its conclusion.

[5] *Id.* at *5, 2008 Tex.App. LEXIS 7364, at *13. Chief Justice Gray dissented, noting that the majority failed to acknowledge that there was " more evidence of intent to deliver than merely the amount of cocaine." *Id.* at *7, 2008 Tex.App. LEXIS 7364, at *19 (Gray, C.J., dissenting). He also noted that the majority did not " detail the evidence and clearly state why the evidence that is legally sufficient is nevertheless factually insufficient." *Id.* at *7, 2008 Tex.App. LEXIS 7364, at *20.

[6] *Guyton v. State,* No. 10-07-00070-CR, 2009 WL 290935, 2009 Tex.App. LEXIS 839 (Tex.App.-Waco, Feb. 6, 2009, pet.ref'd) (not designated for publication). In *Guyton,* the court of appeals originally reversed the conviction due to factual insufficiency, but, once the State filed a PDR, it reconsidered and held that the evidence was both legally and factually sufficient to support the defendant's conviction for possession of .40 grams of cocaine with the intent to distribute it. *Id.* at *3-4, 2009 Tex.App. LEXIS 839, at *9-13.

[7] *See Watson,* 204 S.W.3d at 426 (Cochran, J., dissenting).

[8] State's Petition for Discretionary Review at 9.

[9] Appellant's Petition for Discretionary Review at 6. Appellant relies on several analogous federal cases in which the courts held that the evidence was legally insufficient to support a finding of " intent to distribute" a controlled substance that the defendant admittedly possessed. In these cases, the inference of intent to distribute was not a reasonable one given the paucity of circumstantial evidence.

As appellant notes, the legal sufficiency standard of review is that required by the United States Constitution as set out in *Jackson v. Virginia.* That same standard is applied in every state and federal jurisdiction in America. It applies to all criminal convictions regardless of the type or degree of crime. This application of a single, constitutionally-mandated standard has led to the creation of an enormous body of " sufficiency of evidence" law and precedent across America that any judge or lawyer may easily access and apply to any given conviction here in Texas. It is a coherent body of law. It is objective and intellectually rigorous. It sets out appellate presumptions, permissible inferences, and specific criteria to use when assessing the legal sufficiency of the evidence. It does not rely upon subjective notions of " shocking the conscience" of individual appellate judges, striking them as " manifestly unjust," or seeming just plain " wrong."

[10] *See Watson,* 204 S.W.3d at 421-26.

[11] 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982) (stating that an appellate reversal for factually insufficiency, " unlike a reversal based on insufficient evidence, does not mean that acquittal was the only proper verdict. Instead, the appellate court sits as a ' thirteenth juror' and disagrees with the jury's resolution of the conflicting testimony. This difference of opinion no more signifies acquittal than does a disagreement among the jurors themselves.... [A]n appellate court's disagreement with the jurors' weighing of the evidence does not require the special deference accorded verdicts of acquittal." ).

[12] *Tibbs v. State,* 397 So.2d 1120, 1123 (Fla.1981) (rejecting its former factual sufficiency review because " the concern on appeal must be whether, after all conflicts in the evidence and all reasonable inferences therefrom have been resolved in favor of the verdict on appeal, there is substantial, competent evidence to support the verdict and judgment. Legal sufficiency alone, as opposed to evidentiary weight, is the appropriate concern of an appellate tribunal." ) (footnote

omitted).

[13] *See Watson,* 204 S.W.3d at 424-26 (Cochran, J., dissenting) (discussing the history of appellate review of sufficiency of the evidence in Texas).

[14] *Id.*

[15] *Id.* at 426 (collecting and discussing Texas criminal cases from 1841 forward and concluding, " Until *Clewis* in 1996, this Court had consistently used a single standard (although the precise phrasing varied) and reviewed the evidence in the light most favorable to the factfinder, giving great deference to the jury's credibility and weight determinations." ).

[16] 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

[17] *Id.* at 312-13, 99 S.Ct. 2781.

[18] 362 U.S. 199, 199, 80 S.Ct. 624, 4 L.Ed.2d 654 (1960) (stating that the " ultimate question presented to us is whether the charges against petitioner were so totally devoid of evidentiary support as to render his conviction unconstitutional under the Due Process Clause of the Fourteenth Amendment. Decision of this question turns not on the sufficiency of the evidence, but on whether this conviction rests upon any evidence at all." ).

[19] *Jackson,* 443 U.S. at 314, 99 S.Ct. 2781.

[20] *Id.* The Supreme Court explained that a " no evidence" standard does not " protect against misapplications of the constitutional standard of reasonable doubt" because a " no evidence" standard is satisfied by a " mere modicum" of evidence. " But it could not seriously be argued that such a ' modicum' of evidence could by itself rationally support a conviction beyond a reasonable doubt." *Id.* at 320, 99 S.Ct. 2781. Under a " no evidence" standard, a reviewing court would affirm the judgment if any evidence supported the conviction. *See Gollihar v. State,* 46 S.W.3d 243, 246 n. 3 (Tex.Crim.App.2001) (citing *Thompson,* 362 U.S. at 199, 80 S.Ct. 624).

[21] *Id.* at 318 n. 9, 99 S.Ct. 2781.

[22] *Id.* at 318-19, 99 S.Ct. 2781 (citation omitted).

[23] *Id.* at 319, 99 S.Ct. 2781.

[24] *Id.*

[25] *Gollihar v. State,* 46 S.W.3d 243, 246 n. 4 (Tex.Crim.App.2001).

[26] *Butler v. State,* 769 S.W.2d 234, 239 (Tex.Crim.App.1989) (en banc), *overruled on other grounds by Geesa v. State,* 820 S.W.2d 154 (Tex.Crim.App.1991).

[27] Black's Law Dictionary 1285 (5th ed.1979).

[28] 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970).

[29] *Id.* at 368, 90 S.Ct. 1068.

[30] *Id.* at 367-68, 90 S.Ct. 1068 (quoting Dorsen & Resneck, *In Re Gault and the Future of Juvenile Law,* 1 Fam. L. Quarterly No. 4, 26-27 (1967)) (rejecting the lower court's suggestion that there is only a " ' tenuous difference' " between the reasonable-doubt and preponderance standards).

[31] *Id.* at 370, 90 S.Ct. 1068 (Harlan, J., concurring).

[32] *Id.* at 371 n. 3, 90 S.Ct. 1068 (citing J. MAGUIRE, EVIDENCE, COMMON SENSE AND COMMON LAW 180 (1947)).

[33] That does not mean, of course, that every factfinder or every appellate judge need agree that

the evidence in a particular case is legally sufficient. As the Supreme Court explained in *Johnson v. Louisiana,* 406 U.S. 356, 92 S.Ct. 1620, 32 L.Ed.2d 152 (1972):

In our view disagreement of three jurors does not alone establish reasonable doubt, particularly when such a heavy majority of the jury, after having considered the dissenters' views, remains convinced of guilt. That rational men disagree is not in itself equivalent to a failure of proof by the State, nor does it indicate infidelity to the reasonable-doubt standard. Jury verdicts finding guilt beyond a reasonable doubt are regularly sustained even though the evidence was such that the jury would have been justified in having a reasonable doubt, even though the trial judge might not have reached the same conclusion as the jury, and even though appellate judges are closely divided on the issue whether there was sufficient evidence to support a conviction.*Id.* at 362-63, 92 S.Ct. 1620 (citations omitted). The United States Supreme Court trusts juries when they reach a rational verdict even though those same justices, the individual trial judge, or appellate judges may be closely divided on the issue of whether they believe there was sufficient evidence to support a conviction.

[34] W. Wendall Hall & Mark Emery, *The Texas Hold Out: Trends in the Review of Civil and Criminal Jury Verdicts,* 49 S. TEX. L.REV. 539, 540 (2008).

[35] William Powers, Jr. & Jack Ratliff, *Another Look at " No Evidence" and " Insufficient Evidence,"* 69 TEX. L.REV. 515, 516 (1991).

[36] *Id.* at 525.

[37] *See id.* at 517-18 (discussing and using the concept of " a five zoned spectrum, with the strength of the proponent's evidence increasing in each successive zone" ).

[38] One might visualize these five zones as laid out on an imaginary football field, starting from the left-hand goal line of the party with the burden of proof. Zone 1, the " no evidence" zone, starts at this goal line and, as the evidence supporting a vital fact or claim steadily increases, the zones march down the field until zone 5, " conclusive evidence," which is at the opposing party's goal line. The 50 yard line would roughly correspond to the line which must be crossed by the party with the burden of proof by the " preponderance of the evidence," leaving a " zone of reasonable disagreement" on either side of the midline.

[39] Robert W. Calvert, *" No Evidence" and " Insufficient Evidence" Points of Error,* 38 TEX. L.REV. 361, 363 (1960). Justice Calvert explained the scintilla rule as follows:

[W]hen the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is, in legal effect, no evidence, and will not support a verdict or judgment. The scintilla rule cannot apply when there is direct evidence of a vital fact; it applies only when the vital fact must be inferred from other relevant facts and circumstances which are proved. If the inference is not a reasonable one a " no evidence" point should be sustained. It follows that " no evidence" points based on the scintilla rule require a careful analysis of the facts proved for the purpose of determining whether the vital fact may be reasonably inferred.*Id.* (footnotes omitted).

[40] *Id.* at 362-63; *see also Merrell Dow Pharmaceuticals, Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997); WILLIAM V. DORSANEO, III, et al., TEXAS LITIGATION GUIDE § 146.03[6][e][ii][A] (2007).

[41] *Havner,* 953 S.W.2d at 730. Justice Calvert explained that, in deciding " no evidence" points, the appellate court views the evidence in the light most favorable to the verdict and considers only that evidence and inferences that support the verdict while ignoring all evidence and inferences that are contrary to the verdict. Calvert, 38 TEX. L.REV. at 364.

[42] According to Justice Calvert, " if the evidence supporting the finding is so uncertain, inconsistent, improbable, or unbelievable that, although constituting some evidence of probative force when considered in its most favorable light in support of the finding, it would nevertheless be clearly unjust to permit the judgment to stand." Calvert, 38 TEX. L.REV. at 367. Justice Calvert appropriately viewed the evidence " in its most favorable light in support of the finding" in assessing factual sufficiency; he did not view it in a " neutral light." I have found no Texas Supreme Court case that has viewed the evidence " in a neutral light" when addressing factual sufficiency claims.

[43] Justice Calvert explains that, in this zone 2 scenario, the appellate court may not find that the evidence is " against the great weight and preponderance of the evidence because there is no evidence of the nonexistence of the fact." Calvert, 38 TEX. L.REV. at 366. That is, when reviewing an " insufficient evidence" point, the appellate court looks only to the evidence that supports the vital fact and determines that this evidence is simply too meager to support a finding of its existence by a preponderance of the evidence. *Id.*

[44] *See* note 49 *infra.*

[45] *Id.* at 370.

[46] *Id.* (" By producing the evidence on retrial the party has fair assurance that a finding of the existence of the vital fact will be permitted to stand." ). Strangely, this same rule does not apply for legally insufficient evidence because " [p]resumptively, at least, all of the evidence available to the appellee has been introduced." *Id.* Justice Calvert did not explain why a party who produced no evidence of a vital fact at the first trial is not entitled to a second bite at the apple, while a party who offered some, but factually insufficient, evidence would be able to produce more evidence and thus is entitled to a second bite at the apple.

[47] *Id.*

[48] Texas courts usually use the short-hand term " great weight of the evidence," but the Texas Supreme Court occasionally reiterates that it is, in reality, the great weight of the *credible* evidence that it is referring to. Quality, not mere quantity, has been its historical determining factor. *See, e.g., Dawson v. St. Louis Expanded Metal Fireproofing Co.,* 94 Tex. 424, 61 S.W. 118, 119 (1901) (" It was within the power of [the court of civil appeals] to disregard a finding of fact by the jury if contrary to the great weight of the credible testimony, and in effect to set aside the finding and to remand the cause, and we understand them to mean that under the facts as found by them under the evidence, there was no negligence." ); *McDonald v. New York Cent. Mut. Fire Ins. Co.,* 380 S.W.2d 545, 548 (Tex.1964) (" [T]he insured does not raise in the Court of Civil Appeals the point of ' insufficient evidence' to support the jury findings or the point that the findings are against ' the great weight and preponderance' of the credible evidence" ); *Darryl v. Ford Motor Co.,* 440 S.W.2d 630, 633 (Tex.1969) (" Nowhere in the amended motion for new trial did the respondent, Ford Motor Company, state that the evidence supporting the jury answers to any specific special issue

was either insufficient or against the great weight of the credible evidence" ); *see also In Re G.A.T.,* 16 S.W.3d 818, 829 (Tex.App.-Houston [14th Dist.] 2000, pet. denied) (" The evidence shows that the verdict was not contrary to the great weight of the credible evidence." ); *Town & Country Mobile Homes, Inc. v. Bilyeu,* 694 S.W.2d 651, 656 (Tex.App.-Fort Worth 1985, no writ) (" In considering an ' insufficient evidence' point, we must remain cognizant of the fact that it is for the jury, as the trier of fact, to judge the credibility of the witnesses, to assign the weight to be given their testimony, and to resolve any conflicts or inconsistencies in the testimony. This Court may not substitute its judgment for that of the jury if the challenged finding is supported by some evidence of probative value and is not against the great weight and preponderance of the evidence." ) (citation omitted).

[49] *See* William Powers, Jr. & Jack Ratliff, 69 TEX. L.REV. at 518-19 (" When the evidence falls into zone 2, the proper terminology is that there is ' insufficient evidence' or ' factually insufficient evidence' to support an affirmative finding. In zone 4, the clearest terminology is that a finding contrary to the evidence is against the ' great weight and preponderance of the evidence,' although this terminology is occasionally (and we think confusingly) used to refer to evidence in zone 2. Despite the differences between zones 2 and 4, attacks on jury findings in these zones are usually called ' factual sufficiency' points. The preferred terminology has the proponent [the party with the burden of proof] claim that an unfavorable (negative) finding should be set aside because it is ' contrary to the great weight and preponderance of the evidence,' and has the opponent [the party without the burden of proof] claim that an unfavorable (affirmative) finding was based on ' insufficient evidence.' " ) (footnotes omitted); *see also* DORSANEO, TEXAS LITIGATION GUIDE § 146.03[6][e][ii][C] (" A party who attacks the factual sufficiency of an adverse finding on an issue on which the party has the burden of proof must demonstrate on appeal that the adverse finding is against the great weight and preponderance of the evidence." ).

[50] *See Pool v. Ford Motor Co.,* 715 S.W.2d 629, 635 (Tex.1986) ( " In order that this court may in the future determine if a correct standard of review of factual insufficiency points has been utilized, courts of appeals, when reversing on insufficiency grounds, should, in their opinions, detail the evidence relevant to the issue in consideration and clearly state why the jury's finding is factually insufficient or is so against the great weight and preponderance as to be manifestly unjust; why it shocks the conscience; or clearly demonstrates bias. Further, those courts, in their opinions, should state in what regard the contrary evidence greatly outweighs the evidence in support of the verdict. It is only in this way that we will be able to determine if the requirements of *In Re King's Estate* [244 S.W.2d 660 (Tex.1951)], have been satisfied." ).

[51] 168 S.W.3d 802 (Tex.2005).

[52] *Id.* at 827.

[53] *See id.* at 818-21.

[54] *Id.* at 822 (footnote omitted). In *City of Keller,* the Supreme Court also described three kinds of evidence that *must* be disregarded when conducting a legal sufficiency analysis: (1) credibility evidence; (2) conflicting evidence; and (3) conflicting inferences. *Id.* at 819-22. Thus, witness credibility in civil cases, as in criminal cases, is solely the prerogative of the factfinder. An appellate court may not discount a witness's testimony as being, in its view, less credible than

another witness's. Furthermore, the appellate court may not choose between two conflicting inferences if the evidence would reasonably support either one. " It is widely recognized that one of the most important attributes of the right to jury trial is the ability of juries to draw, from circumstantial evidence, inferences that cannot be set aside or second-guessed by reviewing courts merely because the reviewers would have reached a different factual conclusion." William V. Dorsaneo, III, *Changing the Balance of Power: Juries, the Courts, and the Legislature,* PRACTICE BEFORE THE SUPREME COURT 5 (State Bar of Texas 2004).

[55] *City of Keller,* 168 S.W.3d at 807.

[56] *See City of Keller,* 168 S.W.3d at 827-28 (" ' The rule as generally stated is that if reasonable minds cannot differ from the conclusion that the evidence lacks probative force it will be held to be the legal equivalent of no evidence.' " ) (quoting Calvert, 38 TEX. L.REV. at 364).

[57] *See* W. Wendall Hall & Mark Emery, 49 S.TEX. L.REV. at 559 (" Some may conclude that *City of Keller* only addresses legal sufficiency challenges, but the reasonable juror standard seems to make the distinction between legal and factual sufficiency mean little." ); *id.* at 562 (noting that under the *City of Keller* " reasonable and fair-minded juror" standard, the Supreme Court may avoid the " yo-yo effect" of reversing and remanding cases for factual insufficiency review and instead render judgment because the verdict is unreasonable and therefore the evidence is legally insufficient).

[58] *Id.* at 556.

[59] *Id.* at 600.

[60] Lonny S. Hoffman, *Harmar and the Ever-Expanding Scope of Legal Sufficiency Review,* 49 S. TEX. L.REV. 611, 614 (2008).

[61] *Id.*

[62] *See* W. Wendall Hall & Mark Emery, 49 S. TEX. L.REV. at 610.

[63] *See Watson,* 204 S.W.3d at 429 n. 47 (Cochran, J., dissenting); *see also* William Powers, Jr., *Judge and Jury in the Texas Supreme Court,* 75 Tex. L.Rev. 1699, 1699 n.3 (1997) (" A hallmark of [the] entire body of law [regarding legal and factual sufficiency claims in civil cases] however, is extraordinary deference to juries." ).

[64] *See Clewis,* 922 S.W.2d at 129.

[65] This situation does arise in those instances in which the defendant bears the burden of production and persuasion for affirmative defenses. *See* note 67 *infra.*

[66] *See* note 42 *supra.*

[67] *See, e.g., Meraz v. State,* 785 S.W.2d 146, 154 (Tex.Crim.App.1990) (applying the civil standards of factual review of " against the great weight and preponderance of the evidence" in a case in which the defendant appealed the jury's rejection of his plea of incompetence because the defendant had the burden to prove incompetence by a preponderance of the evidence); *Bigby v. State,* 892 S.W.2d 864, 875 (Tex.Crim.App.1994) (applying the civil standards of factual review because defendant had both the burden of production and persuasion for his affirmative defense of insanity).

[68] *See Jones v. State,* 944 S.W.2d 642, 647-49 (Tex.Crim.App.1996) (deciding that a factual-sufficiency review requires the appellate court to review all of the evidence, not just the evidence

that supports a verdict; rejecting capital murder defendant's factual sufficiency claim because there was conflicting evidence of whether he intended to shoot the murder victim); *Cain v. State,* 958 S.W.2d 404, 407-09 (Tex.Crim.App.1997) (reversing lower court's holding of factual insufficiency because that court failed to defer to the jury's determination of witness credibility); *Johnson v. State,* 23 S.W.3d 1, 5-8 (Tex.Crim.App.2000) (upholding lower court's finding of factual insufficiency based on witness's express lack of certainty, but reminding appellate court that, " [u]nless the available record clearly reveals a different result is appropriate, an appellate court must defer to the jury's determination concerning what weight to give contradictory testimonial evidence because resolution often turns on an evaluation of credibility and demeanor, and those jurors were in attendance when the testimony was delivered." ); *Goodman v. State,* 66 S.W.3d 283, 285-86 & n. 5 (Tex.Crim.App.2001) (attempting to follow Justice Calvert's five-zone analysis of factual insufficiency in civil cases and stating that, only when the evidentiary scales tip " radically" toward a negative finding on an essential element may the reviewing court exercise any " thirteenth juror" role and conclude that the jury's verdict is " clearly wrong" ); *Swearingen v. State,* 101 S.W.3d 89, 97 (Tex.Crim.App.2003) (reiterating the importance of giving deference to the factfinder's credibility and weight determinations); *Zuniga v. State,* 144 S.W.3d 477, 483-84 (Tex.Crim.App.2004) (recognizing that the different civil and criminal standards of proof are an important source of confusion in any attempt to review criminal convictions for factual sufficiency; " Once again, the preponderance-of-the-evidence language creeps into a factual-sufficiency review where the burden of proof at trial was beyond a reasonable doubt. And, the Court's statement that the reviewing court must use both standards is confusing." ).

[69] 204 S.W.3d 404 (Tex.Crim.App.2006).

[70] *Id.* at 415.

[71] I am unable to find any Texas Supreme Court case that even mentions the word " neutral" in relation to a factual sufficiency review. In *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661 (1951), the Supreme Court set out the applicable standard for reviewing " great weight and preponderance" complaints. The court of appeals must " consider and weigh all of the evidence in the case and to set aside the verdict and remand the cause for a new trial, if it thus concludes that the verdict is so against the great weight and preponderance of the evidence as to be manifestly unjust-this, regardless of whether the record contains some ' evidence of probative force' in support of the verdict. The evidence supporting the verdict is to be weighed along with the other evidence in the case, including that which is contrary to the verdict." *Id.* at 664-65 (citation omitted). There is nothing in this case, or any other Texas Supreme Court case, that suggests that all of the evidence must be viewed " neutrally," as if the sheer quantity of evidence were the only criterion for factual sufficiency. How extraordinary if the jury's verdict should be held to be " against the great weight and preponderance of the evidence" if seven gang members testified that their fellow gang-member defendant was with them the night of the murder while only two nuns testified that they saw the defendant commit the murder. Any jury is entitled to disbelieve the seven gang members and credit the two nuns.

[72] 823 S.W.2d 375, 381 (Tex.App.-Austin 1992, pet. ref'd). In *Stone,* the court of appeals stated: When the court of appeals conducts a factual-sufficiency review, the court does not ask if any

rational jury, *after viewing the evidence in the light most favorable to the prosecution,* could have found the essential elements of the crime beyond a reasonable doubt. Factual-sufficiency review begins with the presumption that the evidence supporting the jury's verdict was legally sufficient, i.e., *constitutionally* sufficient for the purposes of the Due Process Clause of the Fourteenth Amendment. Rather, the court views all the evidence without the prism of " in the light most favorable to the prosecution." Because the court is not bound to view the evidence in the light most favorable to the prosecution, it may consider the testimony of defense witnesses and the existence of alternative hypotheses. The court should set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust.*Id.* The court of appeals then cited *Cain v. Bain,* 709 S.W.2d 175, 176 (1986), and *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661 (1951), but neither of these cases said anything about viewing the evidence " in a neutral light" or " without the prism of ' in the light most favorable' " to the party with the burden of proof. They spoke only of reviewing *all* of the evidence when determining whether the verdict was " against the great weight and preponderance of the evidence." And that is precisely what is required under the *Jackson* legal sufficiency review: an examination of *all* of the evidence, but in the light most favorable to the jury's verdict because the jury, not the appellate court, was the chosen factfinder.

[73] 253 S.W.3d 699 (Tex.Crim.App.2008).

[74] *Id.* at 705 (noting that factual insufficiency claim cannot be based on contradictory and inconsistent witness testimony because " the jury is the sole judge of what weight to give such testimony.... Appellate courts should afford almost complete deference to a jury's decision when that decision is based upon an evaluation of credibility." ).

[1] *Clewis v. State,* 922 S.W.2d 126 (Tex.Crim.App.1996).

[2] Plurality opinion, at 894.

[3] *Watson v. State,* 204 S.W.3d 404, 406-14 (Tex.Crim.App.2006). *See also Clewis, supra,* at 137-44 (Clinton, J., concurring); *Bigby v. State,* 892 S.W.2d 864, 874-75 (Tex.Crim.App.1994).

[4] Plurality opinion, at 894-95.

[5] *Id.* at 8.

[6] *Zuniga v. State,* 144 S.W.3d 477 (Tex.Crim.App.2004).

[7] *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

[8] *Watson v. State, supra,* at 415.

[9] *Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978); *Greene v. Massey,* 437 U.S. 19, 98 S.Ct. 2151, 57 L.Ed.2d 15 (1978).

[10] *Jackson v. Virginia, supra,* at 326, 99 S.Ct. 2781.

[11] *See Watson v. State, supra,* at 416 (" The fact is that rational people can disagree whether legally sufficient evidence is persuasive to a level of confidence beyond a reasonable doubt. ' That rational men disagree is not in itself equivalent to a failure of proof by the State, nor does it indicate infidelity to the reasonable doubt standard. Jury verdicts finding guilt beyond a reasonable doubt are regularly sustained even though the evidence was such that the jury would have been justified in having a reasonable doubt.' " *(quoting Johnson v. Louisiana,* 406 U.S. 356, 362, 92 S.Ct. 1620, 32 L.Ed.2d 152 (1972))).

[12] " A reversal based on the weight of the evidence ... can occur only after the State both has presented sufficient evidence to support conviction and has persuaded the jury to convict. The reversal simply affords the defendant a second opportunity to seek a favorable judgment." *Tibbs v. Florida,* 457 U.S. 31, 42-43, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). This is one of the reasons that reversal for factual insufficiency does not carry double jeopardy implications. Even when a rational jury *could* resolve all conflicts and ambiguities in the evidence in such a way as to justify a conviction, if the appellate court perceives that most juries would not, and (as in Texas) has the authority to act on that perception, it does not place the defendant twice in jeopardy to, at his own instigation, grant him " a second opportunity to seek a favorable judgment." " Giving the defendant this second opportunity, when the evidence is sufficient to support the first verdict, hardly amounts to governmental oppression of the sort against which the Double Jeopardy Clause was intended to protect." *Id.* at 44, 102 S.Ct. 2211 (internal quotation marks and citation omitted).

[13] None of the cases the plurality cites today, not even *Lancon v. State,* 253 S.W.3d 699 (Tex.Crim.App.2008), has held that the statutory provisions assigning the fact-finding function at the trial level to the jury demands absolute deference from a reviewing court. TEX.CODE CRIM. PROC. arts. 36.13 & 38.04. As we pointed out in *Watson,* these provisions have " peacefully co-existed" with appellate factual review authority " for at least a hundred and twenty-three years." *Watson v. State, supra,* at 409. We have used qualifiers such as " due" ( *Marshall v. State,* 210 S.W.3d 618, 625 (Tex.Crim.App.2006)) and " appropriate" ( *Clewis v. State, supra,* at 136) and " *almost* complete" ( *Lancon, supra,* at 705) to describe the deference in the factual sufficiency context, to signify that the use of factual sufficiency review to reverse a jury's conviction should be a rare occurrence.

[14] *Watson v. State, supra,* at 417.

[15] *Id.*

[16] Plurality opinion, at 901.

[17] " A reversal on [the ground that the verdict is against the weight of the evidence], unlike a reversal based on insufficient evidence, does not mean that acquittal was the only proper verdict. Instead, the appellate court sits as a ' thirteenth juror' and disagrees with the jury's resolution of the conflicting testimony." *Tibbs v. Florida, supra,* at 42, 102 S.Ct. 2211.

[18] There is no suggestion that Florida law leading up to the Supreme Court's decision in *Tibbs* authorized appellate courts, " without any limitation," to reverse convictions and remand for new trials any time they happened to disagree with a jury's verdict. *Tibbs v. State,* 397 So.2d 1120 (Fla.1981).

[19] Plurality opinion, at 900 (" if a reviewing court is required to defer in any manner to a jury's credibility and weight determinations, then it is not viewing the evidence in a ' neutral light[.]' " ).

[20] *Id.* at 18 (" We believe that the *Clewis* factual-sufficiency standard with its remedy of a new trial could very well violate double jeopardy principles under *Tibbs* if factual-sufficiency is ' barely distinguishable' from legal-sufficiency review." ).

[21] *Id.* at 20.

[22] *Id.* at 20-22 *(citing Watson v. State, supra,* at 450 (Cochran, J., dissenting)).

[23] *Watson v. State, supra,* at 406-12.

[24] Plurality opinion, at 907-08.

[25] *See Id.* at 28 (" The issue *thus becomes* whether direct-appeal courts' constitutional jurisdiction to review ' questions of fact,' as also codified in Article 44.25 [of the Code of Criminal Procedure] authorizing direct-appeal courts to reverse a judgment ' upon the facts,' should *now* be construed *for the first time* to mandate direct-appeal courts to sit as ' thirteenth jurors' in criminal cases *contrary to 150 years of practice in civil and criminal cases.* We decline to question over 150 years of criminal and civil jurisprudence in this State and construe constitutional and statutory mandates to review ' questions of fact' to also require direct-appeal courts to sit as ' thirteenth jurors' in criminal cases." ) (emphasis supplied).

[26] *Ex parte Lewis,* 219 S.W.3d 335, 338 (Tex.Crim.App.2007).

[27] *Id.; Roberts v. State,* 273 S.W.3d 322, 334 n. 11 (Tex.Crim.App.2008) (Price, J., concurring).

[28] *Ex parte Lewis, supra.*

[29] *E.g., Paulson v. State,* 28 S.W.3d 570, 571-72 (Tex.Crim.App.2000).

[30] It is sometimes argued that factual sufficiency review is inefficient because it results in so few reversals anyway. *See, e.g., Watson v. State, supra,* at 448 (Cochran, J., dissenting). But factual sufficiency review operates like a fail-safe mechanism, and one would hope that in any reasonable system of criminal justice it would be rare that ordinary procedural mechanisms would fail to ensure just results. It is also argued that the very existence of factual sufficiency review puts a certain psychological pressure on first-tier appellate courts to find evidence that is legally sufficient nevertheless to be legally *insufficient* in order to avoid jeopardy consequences; after all, the appellate court can always hold the evidence factually insufficient instead. *Id.* at 449. The notion is, as I gather, that without factual sufficiency review, first-tier appellate courts would actually acquit more appellants as a matter of appellate review. *Id.* But I find it difficult to understand why it is better to encourage more appellate acquittals than it is to encourage more appellate reversal-and-remands in which a second jury would be given an opportunity to acquit. *See* n. 12, *ante.* If the Court is genuinely concerned about the sanctity of the jury's role as arbiter of the facts, should it not prefer that acquittals come from juries rather than appellate judges?

[31] *See Watson v. State, supra,* at 409-12 (discussing cases from this Court between 1891 and 1940 that reversed on the basis of factual insufficiency).

---------

**614 S.W.2d 578 (Tex.Crim.App. 1981)**

**Miguel CANO, Appellant,**

**v.**

**The STATE of Texas, Appellee.**

**No. 59203.**

**Court of Criminal Appeals of Texas.**

**April 22, 1981**

Antonio G. Cantu, court appointed, San Antonio, for appellant.

Bill M. White, Dist. Atty., Bill Harris, Douglas C. Young and H. Wayne Campbell, Asst. Dist. Attys., San Antonio, Robert Huttash, State's Atty., Austin, for the State.

Before the court en banc.

OPINION ON APPELLANT'S MOTION FOR REHEARING

KEITH, Commissioner.

Our prior unpublished panel opinion is withdrawn and the following opinion is substituted in lieu thereof.

This is an appeal from a conviction of robbery. The punishment, enhanced by proof of two prior felony convictions, is imprisonment for life.

Appellant was convicted of knowingly or intentionally causing bodily injury to Andrea Reyna, the complainant, in the course of robbing her of her purse. He now complains that the trial court erred in overruling his motion for peremptory instruction because the State failed to prove that he knowingly or intentionally caused bodily injury to Ms. Reyna.

Page 579

Ms. Reyna, 77 years of age at the time of the trial, testified that she was walking home from a shopping trip carrying packages in one arm and her purse on the other arm, when appellant ran up and stole her purse. She said that in the act of grabbing her purse, appellant "hit" or "pushed" her down to the pavement. On cross-examination she testified that appellant, in grabbing the purse from her arm, caused her to fall. In the incident, her mouth was cut so severely that several sutures were required in the treatment of her wounds.

We find the evidence sufficient to sustain the conviction. *Ulloa v. State,* 570 S.W.2d 954 (Tex.Cr.App.1978); *Allen v. State,* 533 S.W.2d 352 (Tex.Cr.App.1976); *Lewis v. State,* 530 S.W.2d 117 (Tex.Cr.App.1975).

Appellant's fourth ground of error presents the complaint that the in-court identification of appellant as the robber was impermissibly tainted by pre-trial identification procedures. In making this attack, he points to the fact that Ms. Reyna identified him as her assailant when he was returned to her in custody of the police officers shortly after the commission of the offense.

It was appellant's counsel who elicited the identification from Ms. Reyna that he now urges was error. We note, in passing, that counsel had not sought a pre-trial hearing on the identification issue as suggested by *Martinez v. State,* 437 S.W.2d 842 (Tex.Cr.App.1969), and its progeny. We also note that appellant did not make any timely objection to the identification by Ms. Reyna or by

another witness, Arcos, who gave similar testimony.

Moreover, Danny Silva, a fifteen year old boy who was not subject to the pre-trial identification procedures, also made an in-court identification of appellant as the robber. We do not find that error has been presented. *Deary v. State,* 510 S.W.2d 956 (Tex.Cr.App.1974); *Davis v. State,* 505 S.W.2d 800 (Tex.Cr.App.1974). See also, *Turner v. State,* 486 S.W.2d 797 (Tex.Cr.App.1972).

In his supplemental memorandum supporting his motion for rehearing, appellant relies upon our recent opinion in Garza v. State, --- S.W.2d ---- (Tex. Cr.App.1981). As noted in Garza, supra, "Each case must be judged on its own facts." We have done so in our review of the record in this case and find no merit to the contention advanced by the fourth ground of error.

Appellant complains that at trial the prosecutor suggested to Reyna who appellant was in order that she would be able to identify appellant as the robber. The record reflects that the prosecutor asked Reyna if she could identify the robber, and Reyna replied that she could. Reyna stated that the robber was wearing black pants and a cream colored shirt. The prosecutor then walked behind defense counsel's table, toward appellant, who was seated at the far end of the table. As he did so the prosecutor asked Reyna, "are you referring to this man ." At this point the trial judge ordered the prosecutor to stop, and retired the jury.

According to the trial judge's statement for the record,
"... He (the prosecutor) had not pointed to anyone, but he was walking over and the Court assumed that he was getting ready to stand immediately behind the Defendant, and as he was walking over in that general direction and at the time that he was approximately behind the chair of Mr. Cantu, which is the middle chair, the Court stopped him...."

Defense counsel Cantu stated for the record that neither he nor his co-counsel Engle were wearing clothing that matched the description given by Reyna. Appellant was wearing a white sweater and black pants.

Although the prosecutor's action was clearly improper, we are not convinced that he in fact suggested to Reyna whom she should identify. Before the prosecutor's action Reyna stated that appellant was the man with the cream-colored shirt and black pants. It appears that she meant appellant, because he was wearing clothing of that description, and his defense counsel, who were the only other persons at the counsel

Page 580

table, wore completely dissimilar clothing. Thus the record indicates that Reyna knew who appellant was prior to the prosecutor's actions. Moreover, according to the trial judge the prosecutor never specifically pointed out appellant as the robber. In any event, both Arcos and Silva identified appellant as the man who ran from the scene of the crime and who was apprehended with Reyna's purse. This was sufficient to identify appellant as the robber. Deary v. State, supra.

At the punishment stage of the trial, appellant pleaded "not true" to the enhancement paragraphs. When the State offered the pen packets, lengthy objections were dictated into the record and it is clear that appellant relied upon *Scott v. State,* 553 S.W.2d 361 (Tex.Cr.App.1977), which he cited to the trial court along with his objections. In our original opinion, we found no error was presented and in his motion for rehearing, appellant argues that the panel opinion "incorrectly

addressed Appellant's ground of error number 1." He restates his contention in this manner:

"Appellant's contention on original submission was and now is that certain documents (meticulously identified by Appellant's objection) were not within the certification of the custodian of the record and were not, therefore admissible."

We have given careful consideration to the complaint and the authorities cited, Scott v. State, supra, being his primary authority. In so doing, we note that certified copies of each judgment of conviction and sentence were included in the pen packets; moreover, the certification was in the precise language quoted in *Todd v. State,* 598 S.W.2d 286, 292-293 (Tex.Cr.App.1980).

All of appellant's contentions were considered and rejected in Todd v. State, supra, and we decline to reconsider the question.

No error has been presented; consequently, we overrule appellant's motion for rehearing.

Affirmed.

Opinion approved by the Court.

Davis v. State, 062807 TXCA3, 03-07-00085

**Marvin Dewayne Davis, Appellant**

**v.**

**The State of Texas, Appellee**

**No. 03-07-00085-CR**

**Court of Appeals of Texas, Third District, Austin**

**June 28, 2007**

UNPUBLISHED OPINION

FROM THE COUNTY COURT AT LAW NO. 4 OF TRAVIS COUNTY, NO. 728205, HONORABLE MIKE DENTON, JUDGE PRESIDING.

Before Justices Patterson, Pemberton and Waldrop.

**MEMORANDUM OPINION**

Bob Pemberton, Justice.

Following a bench trial, appellant Marvin Dewayne Davis was found guilty of the offense of assault-family violence. *See* Tex. Penal Code Ann. § 22.01(a)(1) (West Supp. 2006). Punishment was assessed at one year of imprisonment and a fine of $2,000. Imposition of the sentence was deferred and Davis was placed on community supervision. In two issues on appeal, Davis challenges the legal and factual sufficiency of the evidence. We affirm.

**BACKGROUND**

The trial court heard evidence that, on the night of March 1, 2006, T.N., a sixteen-year-old girl, observed her neighbor, Betty Buie, fighting with Buie's boyfriend, Davis. T.N. testified that she heard Buie screaming outside. According to T.N., Buie was telling Davis "[t]hat she wanted to leave and he was telling her no you're not leaving." T.N. testified that after Buie insisted that she was leaving, she saw Davis push Buie and "hit her in the face to the right like kind of towards the cheek." When asked if the hit to the face looked like it hurt, T.N. testified, "Yeah." T.N. also testified that Davis hit Buie with enough force that Buie was knocked to the ground but that she caught herself with her right hand. T.N. explained that as soon as she saw Buie fall to the ground she decided to call the police. The 911 tape of this call was admitted into evidence, and the record reflects that the trial court listened to it.

On cross-examination, T.N. was asked if she could see the incident clearly despite the fact that it occurred at night. T.N. testified that the street was lit from lights from the residences and that she could see "perfect" and "fine."

Deputy Ralph Cisneros responded to the 911 call and interviewed and took pictures of Buie. Copies of the pictures were admitted into evidence. Cisneros testified that Buie was not cooperative during the interview. When asked if he saw any injuries on Buie, Cisneros testified that he observed a small bruise on her right wrist.

Buie testified that Davis was the father of her children. Buie explained that she had an argument with Davis "that got out of control" and "that turned into a kind of wrestling match." However, Buie testified that she and Davis were "both at fault" and that it was "an equal argument." When asked if at some point during the argument she fell and lost her balance, Buie responded that she thought that she and Davis both fell when they were "wrestling" over the keys.

When asked if she was struck in the head, Buie testified, "No, I wasn't struck at all." Buie also denied that there was any outside lighting, although she admitted that one of her neighbors had a "guard light."

Buie also explained that she and Davis were having trouble with Child Protective Services ("CPS") and that her children were currently with CPS. When asked if she was worried that she might not get her children back if Davis was convicted of assault, Buie testified:

No, I mean not necessarily no, but I mean I have no doubts that this will be dismissed because this whole case is ridiculous. I mean I applaud your efforts and I've known some people out there that you know, they go through this and I understand where you're coming from, but this is not the case here.

Davis presented no evidence in his defense. After both sides closed, the trial court found Davis guilty of assault-family violence and placed him on probation. This appeal followed.

**DISCUSSION**

Davis's only argument on appeal is that the evidence is legally and factually insufficient to support his conviction.

When there is a challenge to the legal sufficiency of the evidence to sustain a criminal conviction, we consider whether a rational trier of fact[1] could have found the essential elements of the offense beyond a reasonable doubt. *Vodochodsky v. State*, 158 S.W.3d 502, 509 (Tex. Crim. App. 2005). We review all the evidence in the light most favorable to the verdict and assume that the trier of fact resolved conflicts in the testimony, weighed the evidence, and drew reasonable inferences in a manner that supports the verdict. *See Griffin v. State*, 614 S.W.2d 155, 159 (Tex. Crim. App. 1981). It is not necessary that every fact point directly and independently to the defendant's guilt; it is enough if the conclusion is warranted by the combined and cumulative force of all the incriminating circumstances. *Johnson v. State*, 871 S.W.2d 183, 186 (Tex. Crim. App. 1993). We consider even erroneously admitted evidence. *Id*.

In a factual sufficiency review, we view the evidence in a neutral light and ask whether the fact-finder was rationally justified in finding guilt beyond a reasonable doubt. *See Watson v. State*, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006). We then determine whether the evidence supporting the verdict is so weak that the verdict is clearly wrong and manifestly unjust or whether the verdict is against the great weight and preponderance of the conflicting evidence. *Id*. at 415. We will not reverse a case on a factual sufficiency challenge unless we can say, with some objective basis in the record, that the great weight and preponderance of the evidence contradicts the fact-finder's verdict. *Id*. at 417.

Under both the legal and factual sufficiency standards of review, the trier of fact is the exclusive judge of the facts, the credibility of the witnesses, and the weight to be given to the witnesses' testimony. *Jaggers v. State*, 125 S.W.3d 661, 670 (Tex. App.--Houston [1st Dist.] 2003, pet. ref'd) (citing *Penagraph v. State*, 623 S.W.2d 341, 343 (Tex. Crim. App. 1981)). Under both legal and factual sufficiency reviews, an appellate court must be appropriately deferential to the fact-finder's role at trial. *Harvey v. State*, 135 S.W.3d 712, 717 (Tex. App.--Dallas 2003, no pet.) (citing *Jones v. State*, 944 S.W.2d 642, 647-48 (Tex. Crim. App. 1996)). The fact-finder may believe all, some, or none of any witness's testimony. *Sharp v. State*, 707 S.W.2d 611, 614 (Tex.

Crim. App. 1986); *Jaggers*, 125 S.W.3d at 670. This standard of review applies to both direct and circumstantial evidence cases. *King v. State*, 29 S.W.3d 556, 565 (Tex. Crim. App. 2000).

Davis contends that the State failed to prove that he caused "bodily injury" to Buie. "Bodily injury" means physical pain, illness, or any impairment of physical condition. Tex. Penal Code Ann. § 1.07(a)(8) (West Supp. 2006). This definition is purposefully broad and encompasses even relatively minor physical contact so long as it constitutes more than mere offensive touching. *Lane v. State*, 763 S.W.2d 785, 786 (Tex. Crim. App. 1989); *In re M.C.L.*, 110 S.W.3d 591, 600 (Tex. App.--Austin 2003, no pet.). It is not necessary that the alleged victim testify that she experienced pain; the trier of fact may draw reasonable inferences from the evidence, including an inference that the victim suffered pain as a result of her injuries. *Bolton v. State*, 619 S.W.2d 166, 167 (Tex. Crim. App. 1981) (evidence of cut was sufficient to show bodily injury); *Arzaga v. State*, 86 S.W.3d 767, 778 (Tex. App.--El Paso 2002, no pet.) (evidence of swelling and bruising of lips was sufficient to show bodily injury); *Goodin v. State*, 750 S.W.2d 857, 859 (Tex. App.--Corpus Christi 1988, pet. ref'd) (evidence of bruises and muscle strain was sufficient to show bodily injury).

T.N. testified that she observed Davis strike Buie across the face with enough force to "knock her to the ground." A rational fact-finder could reasonably infer that such force would cause physical pain. Furthermore, Deputy Cisneros testified that he observed a small bruise on Buie's right wrist. Although Cisneros could not be certain that this injury was caused during Buie's altercation with Davis, such an injury is consistent with T.N.'s testimony that she saw Buie use her right hand to prevent herself from completely falling to the ground when Davis struck her. A picture of this bruise was admitted into evidence. Viewing the above evidence in the light most favorable to the verdict, we conclude that there is legally sufficient evidence to support a finding of bodily injury. We overrule Davis's first issue.

We also conclude that the evidence is factually sufficient to support a finding of bodily injury. The only evidence contrary to the finding is Buie's testimony that Davis did not strike her. However, the trial court was in the best position to judge the credibility of this statement in light of the circumstances under which it was made. Buie testified that she and Davis were having trouble with CPS, and a rational fact-finder could have concluded that Buie was not being truthful about Davis's conduct because Buie may have believed that if Davis was convicted of assault, there was a chance that her children would not be returned to her. Although Buie denied that this was a motivating factor in her testimony, the trier of fact could have rationally chosen not to believe her. The trier of fact could have also chosen not to believe Buie's testimony based on Deputy Cisnero's testimony that Buie was not cooperative during his interview of her.

We also note that T.N. testified that, although it was dark outside during the incident, because of the light coming from the residences, she could see the incident "perfect[ly]." The trier of fact could have chosen to credit this testimony and discredit Buie's testimony that there was no outdoor lighting. The trial court also listened to T.N.'s 911 call and could have made a determination that T.N.'s trial testimony was consistent with the statements T.N. made during the call.

Essentially, this was a case of conflicting testimony--an eyewitness testified that she observed an assault and another witness, the alleged victim, denied that there was an assault. It is

the role of the fact-finder to reconcile conflicts in the evidence and, considering the above evidence in a neutral light, we do not believe that it was against the great weight and preponderance of the evidence for the fact-finder to accept the testimony of T.N. and reject the testimony of Buie. We overrule Davis's second issue.

**CONCLUSION**

Having overruled Davis's issues on appeal, we affirm the judgment of the county court at law.

---------

Notes:

[1] In a bench trial, the court acts as the fact-finder. *See Joseph v. State*, 897 S.W.2d 374, 376 (Tex. Crim. App. 1995).

---------

110 S.W.3d 591 (Tex.App.—Austin 2003), 03-02-00464, In re M.C.L.

Page 591

**110 S.W.3d 591 (Tex.App.—Austin 2003)**

**In the Matter of M.C.L.**

**No. 03-02-00464-CV.**

**Court of Appeals of Texas, Third District, Austin.**

**June 19, 2003.**

Page 592

Gregory D. Freed, Juvenile Public Defender, Austin, for appellant.

C. Bryan Case, Jr., Assistant District Attorney, Austin, for appellee.

Before Chief Justice LAW, Justices B.A. SMITH and PURYEAR.

**OPINION**

BEA ANN SMITH, Justice.

After waiving his right to a jury trial, M.C.L., a juvenile, was adjudicated delinquent for committing the offenses of resisting

Page 593

arrest, two counts of assault on a public servant, and criminal mischief in an amount more than $500 but less than $1,500. *See* Tex. Fam.Code Ann. § 54.03 (West 2002); *see also* Tex. Pen.Code Ann. §§ 22.01, 28.03, 38.03 (West 2003). The court held a disposition hearing and ordered M.C.L. committed to the Texas Youth Commission for an indeterminate period of time not to exceed M.C.L.'s twenty-first birthday. By five issues, M.C.L. challenges the legal and factual sufficiency of the evidence to support the juvenile court's judgment. We conclude that the evidence is legally insufficient to support the juvenile court's finding that M.C.L. committed criminal mischief in an amount more than $500 but less than $1,500. The evidence is sufficient, however, to support a finding that the criminal mischief caused pecuniary loss totaling $50 or more but less than $500. We further conclude that the evidence is legally insufficient to support the juvenile court's finding of resisting arrest. Finally, we hold the evidence is factually insufficient to support the court's finding that M.C.L. committed assault on a public servant. We therefore reverse the juvenile court's judgment of adjudication and its disposition order and remand the cause for further proceedings consistent with this opinion.

**BACKGROUND**

According to testimony at trial, on February 13, 2002, Travis County Juvenile Probation Officers Victor Valdez, Jason Hill, and Brent Horton, along with Travis County Deputy Constables Lucy Neyens and Damon Miller, went to M.C.L.'s home to attempt to serve a warrant on M.C.L.'s younger brother, a juvenile probationer. Although the brother was not at home, they found M.C.L., for whom they also had an outstanding arrest warrant. Neyens and Horton immediately arrested and handcuffed M.C.L.; he sat on the couch in handcuffs for about fifteen minutes while the officers searched the premises for his brother. The officers then removed M.C.L. and placed him in Neyens's police car, where he waited for another ten or fifteen minutes while the officers went back to the house and continued searching.

While in the police car, M.C.L. managed to move his handcuffed hands from behind his back

to the front of his body. This provoked the officers to place leg shackles on M.C.L. The events that transpired after the shackles were placed on M.C.L. are disputed. What is clear is that M.C.L., who had been sitting in the police car while the shackles were placed on him, suddenly stood up. The officers thought M.C.L. was trying to escape, and a struggle ensued. The officers wrestled M.C.L. back into the police car and shut the doors. M.C.L. then kicked out the car's rear windows; the broken glass from the windows cut Horton.

M.C.L. was initially charged with two counts of assault on a public servant by cutting and kicking Miller, two counts of assault on a public servant by cutting and kicking Horton, and criminal mischief in an amount more than $1,500 but less than $20,000. At trial, the State amended its petition to reflect a charge of criminal mischief in an amount more than $500 but less than $1,500. After the State presented its case in chief, the juvenile court granted M.C.L.'s motion for a directed verdict on the charge of assault on a public servant by cutting Miller with glass and rendered an adjudication of not true as a matter of law. At the conclusion of the trial, the juvenile court adjudicated M.C.L. delinquent for committing the lesser included offense of resisting arrest by kicking Miller, two counts of assault on a public servant by cutting and kicking Horton, and criminal mischief in an amount more than $500 but less than $1,500. M.C.L.

Page 594

now challenges the sufficiency of the evidence to support the judgment of adjudication.

## DISCUSSION

### Standard of Review

Adjudications of delinquency in juvenile cases are based on the criminal standard of proof. *See* Tex. Fam.Code Ann. § 54.03(f). We therefore review adjudications of delinquency in juvenile cases by applying the same standards applicable to sufficiency of the evidence challenges in criminal cases. *See In re E.P.,* 963 S.W.2d 191, 193 (Tex.App.-Austin 1998, no pet.).

In reviewing a legal sufficiency challenge, we view all the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the elements of the offense beyond a reasonable doubt. *See id.* (citing *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). In a factual sufficiency review, we examine all the evidence in a neutral light, favoring neither party. *Johnson v. State,* 23 S.W.3d 1, 7 (Tex.Crim.App.2000); *Clewis v. State,* 922 S.W.2d 126, 134 (Tex.Crim.App.1996). We will set aside the verdict only if the evidence is so weak as to be clearly wrong or manifestly unjust or if the finding of a vital fact is so contrary to the great weight and preponderance of the evidence as to be clearly wrong. *Zuliani v. State,* 97 S.W.3d 589, 593 (Tex.Crim.App.2003); *Johnson,* 23 S.W.3d at 11.

### Criminal Mischief

By his first two issues, M.C.L. challenges the legal and factual sufficiency of the evidence to prove that M.C.L. committed criminal mischief in an amount more than $500 but less than $1,500.

A person commits the offense of criminal mischief if, without the consent of the owner, he intentionally and knowingly damages or destroys the tangible property of the owner. Tex. Pen.Code Ann. § 28.03(a). Criminal mischief includes as an element the value of the injury inflicted. *See id.* § 28.03(b); *Gallardo v. State,* 167 Tex.Crim. 511, 321 S.W.2d 581, 581 (1959). The amount of pecuniary loss determines the punishment range for the offense. *See* Tex.

Pen.Code Ann. § 28.03(b). Section 28.06 of the penal code provides two methods for determining the diminution in property value caused by criminal mischief; the method used depends on whether the property was damaged or destroyed. *See id.* § 28.06 (West 2003). If the property was destroyed, the amount of pecuniary loss is "the fair market value of the property at the time and place of the destruction," or if the market value cannot be ascertained, "the cost of replacing the property within a reasonable time after the destruction." *Id.* § 28.06(a). If the property was damaged, the amount of pecuniary loss is "the cost of repairing or restoring the damaged property within a reasonable time after the damage occurred." *Id.* § 28.06(b).

M.C.L. complains on appeal that the juvenile court erred in concluding that the amount of pecuniary loss exceeded $500 because this amount was based on the cost of replacing the broken windows with new windows, when the windows were actually replaced with salvaged windows at a lesser cost for labor only. In addition, the State presented no evidence regarding the value of salvaged windows. Thus, concludes M.C.L., the evidence is legally and factually insufficient to support the court's judgment of adjudication for criminal mischief in an amount over $500.

Rex "Doc" Lender, a shop supervisor with Travis County TNR Fleet Services, testified for the State but was never qualified as an expert. His responsibilities as the shop supervisor include overseeing the

Page 595

maintenance on county vehicles. When Neyens's damaged police car was submitted to him, Lender assigned the repair job to a mechanic. Because the shop had on hand another patrol vehicle of the same year that had been totaled, Lender instructed the mechanic to pull the windows out of the totaled car and put them in Neyens's car. Lender testified that it took about six hours of labor to complete the job, and the shop rate is $40 per hour. He did not testify as to the value of the salvaged windows used to repair the vehicle.

Lender also reported that he called EZ Auto Glass to obtain an estimate on replacing "the two rear windows and also the rear vent glass windows and frames." Lender testified that the quoted price was $175 for each window and $559 for each rear vent, totaling $1,468 for all four. Although Lender called only EZ Auto Glass for the estimate, he testified that during his ten years of experience, he has called a number of other establishments to obtain estimates and has concluded that EZ Auto Glass usually provides the best prices.

The relevant statute states only that the amount of pecuniary loss is "the cost of repairing or restoring the damaged property." *Id.* § 28.06(b). The court of criminal appeals has held that damaged property need not actually be repaired. *Elomary v. State,* 796 S.W.2d 191, 193 (Tex.Crim.App.1990); *see also Sebree v. State,* 695 S.W.2d 303, 305 (Tex.App.-Houston [1st Dist.] 1985, no pet.). Requiring the State to establish the exact amount of money paid for the repairs, and to whom, would place a burden on the owner to have the property repaired before a conviction could be obtained. *See Sebree,* 695 S.W.2d at 305. Such a burden would enlarge the amount of proof required by the statute. *Id.* On the other hand, in dealing with estimates it is imperative that we distinguish between a witness merely stating from hearsay what someone else has said the damages might be and an individual who is qualified to provide an expert opinion of

the fair market value of the cost of repairs to the damaged property. *Elomary,* 796 S.W.2d at 193-94. Thus, where the damaged property is not repaired, an unsubstantiated lay opinion as to the estimate of damage by an individual who is not competent to give an expert opinion as to repair costs is insufficient to prove the pecuniary loss without further evidence. *Id.*

The State in this case provided two different methods of demonstrating the cost of repairing the patrol vehicle: (1) the actual cost of repair with salvaged windows, which was $240 for labor, and (2) Lender's testimony of an estimate of the cost of replacing the windows from EZ Auto Glass. The issue then is which of these constitutes evidence of the "cost of repair" for purposes of determining the pecuniary loss caused by M.C.L.'s conduct.

This is not a situation where the owner of the damaged property was unable to have the property repaired before the accused was tried for the charged offense. Rather, Lender testified as to the actual cost of the repairs, thus providing the evidence specifically spelled out in the statute. *Cf. Elomary,* 796 S.W.2d at 192 (property owner could not recall exact cost of repair to her vehicle, but expert in appraising damage to vehicles testified that fair market value of repairs was over $500). We therefore hold that Lender's testimony about EZ Auto Glass's estimate of the cost of installing new windows is no evidence of the cost of this repair.

The State argues that even if we were to discount the estimate provided by EZ Auto Glass for new windows and rely on Lender's testimony regarding the cost of labor, the juvenile court could have still determined the value of the salvaged windows

Page 596

was at least $260, which coupled with the $240 for labor, would amount to a pecuniary loss of at least $500. We disagree. The record is devoid of any evidence indicating the value of the salvaged windows. Even viewing the evidence in the light most favorable to the judgment, there is no evidence that the salvaged windows were worth at least $260. We thus sustain M.C.L.'s first issue.

Because the only evidence of the actual cost of repairs is $240, the evidence is legally insufficient to support the juvenile court's judgment that M.C.L. committed criminal mischief in an amount more than $500 but less than $1,500.[1] Based on Lender's testimony that the repairs took six hours of labor to complete at a rate of $40 per hour, we conclude that the evidence is legally and factually sufficient to support a finding that the pecuniary loss caused by M.C.L.'s conduct was at least $50 but less than $500. We therefore reverse the portion of the judgment finding M.C.L. to have committed criminal mischief in an amount more than $500 but less than $1,500 and remand with instructions that the juvenile court render a finding reflecting that the pecuniary loss caused by M.C.L.'s conduct was at least $50 but less than $500.

**Resisting Arrest**

By his third and fourth issues, M.C.L. challenges the legal and factual sufficiency of the evidence to support the finding that he resisted arrest, arguing that his arrest was already complete before he struggled with the police officers.

A person commits the offense of resisting arrest if he intentionally prevents or obstructs a person he knows is a peace officer from effecting an arrest. Tex. Pen.Code Ann. § 38.03(a). "Effecting an arrest" entails a process or transaction, which has a beginning and an end. *Lewis v. State,* 30 S.W.3d 510, 512 (Tex.App.-Amarillo 2000, no pet.); *Schrader v. State,* 753 S.W.2d 733,

735 (Tex.App.-Austin 1988, pet. ref'd). A conviction for resisting an arrest requires the obstruction or resistance to occur after the arrest begins but before it ends. *Lewis,* 30 S.W.3d at 512. In this case, we must determine when the arrest ended.

Generally, an officer is no longer effecting an arrest once his efforts to restrain or control the suspect are completed. *Id.* The court of criminal appeals has explained when an arrest is complete in the context of the escape statute. *Medford v. State,* 13 S.W.3d 769, 773 (Tex.Crim.App.2000). The court held that an arrest is complete when (1) a person's liberty of movement is successfully restricted or restrained, whether by physical force or the suspect's submission to authority, and (2) a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement to the degree that the law associates with formal arrest. *Id.* Because the occurrence of an arrest cannot be determined by a bright-line test, whether an arrest has occurred must be determined on a case-by-case basis by examining the totality of the circumstances. *Lewis,* 30 S.W.3d at 513 (citing *Rhodes v. State,* 945 S.W.2d 115, 118 (Tex.Crim.App.1997)).

The testimony at trial revealed that after the officers encountered M.C.L. in his home, Neyens handcuffed him. Thus restrained, M.C.L. sat on his couch for approximately fifteen minutes, while the officers

Page 597

searched the house. There is no dispute that M.C.L. was cooperative while sitting on the couch in handcuffs. He was then escorted to the police car, where he was placed in the back seat of the car, still handcuffed, and the doors were shut. There is no dispute that M.C.L. did not struggle or resist while he was being transported to the car and was cooperative while waiting in the car. He waited in the car for another ten or fifteen minutes while the officers returned to his house to continue their search for his brother. During this time, M.C.L. managed to wriggle his handcuffed hands from behind his back to his lap. When Valdez noticed this, he decided to shackle M.C.L. He grabbed the shackles from another police vehicle and returned to M.C.L.; one of the deputy constables opened the back door, and Valdez placed the shackles on M.C.L.'s legs. M.C.L. complied during this procedure as well. It was only after the shackles had been placed on M.C.L.'s legs that he stood up and a struggle ensued.

The State contends that M.C.L. was not completely restrained at the time he began struggling, citing *Lewis.* We disagree. In *Lewis,* the appellant began resisting immediately after he was handcuffed and continued until another officer directed him to stop. 30 S.W.3d at 513. Nothing in the *Lewis* record indicated that Lewis had voluntarily tendered his hands to the officers as a sign of submission or otherwise knowingly submitted to their authority until after the struggle ended. *Id.* at 514. And although Lewis did not exert force until after he had been handcuffed, the court of appeals emphasized that he initiated a struggle "immediately upon the heels of being restrained." *Id.* Indeed, the court acknowledged that had Lewis's exertion of force not occurred "in quick succession" to his being cuffed, it could have been said that the arrest was already complete and the officers were merely transporting their suspect when the struggle began. *Id.* at 513.

In this case, the struggle did not immediately coincide with the placing of handcuffs on the suspect. While the struggle may have followed immediately on the heels of M.C.L. being shackled,

it is clear that the officers had actually restrained and controlled M.C.L. well before he was placed in shackles. According to the record, M.C.L. voluntarily submitted to the officers' authority, first by submitting to being placed in handcuffs and sitting on the couch while the officers searched his house, then by cooperatively moving to the police car and remaining there for at least ten minutes while cuffed, and finally by submitting to being placed in shackles. The arrest was complete, at the earliest, when M.C.L. was handcuffed and placed on his couch, and at the latest when he was moved to the police car where he remained for at least ten minutes, still handcuffed. Viewing the evidence in the light most favorable to the verdict, we conclude that no rational trier of fact could have found that M.C.L. obstructed or prevented a police officer from "effecting an arrest," as the arrest was already complete by the time M.C.L. began exerting force. We therefore sustain M.C.L.'s third issue. We reverse that portion of the judgment finding that M.C.L. committed the offense of resisting arrest and remand to the juvenile court with instructions to render judgment in accordance with this opinion.[2]

Page 598

**Assault on a Public Servant**

By his fifth issue, M.C.L. challenges the factual sufficiency of the evidence to support the juvenile court's finding that M.C.L. assaulted a public servant by kicking Officer Horton, causing him to suffer bodily injury. [3] An individual commits the offense of assault on a public servant if he "intentionally, knowingly, or recklessly causes bodily injury to another" and the offense is committed against "a person the actor knows is a public servant while the public servant is lawfully discharging an official duty." Tex. Pen.Code Ann. § 22.01(a)(1), (b)(1). The State and the juvenile have differing stories about the struggle that ensued after M.C.L. was placed in leg irons.

M.C.L. testified that after the shackles were placed on him, he started to get out of the car because he thought he was being moved to another car. The officers thought M.C.L. was attempting to run, and one of them grabbed him by the neck and threw him against the car. M.C.L. felt more than one pair of hands around his throat and had trouble breathing, although M.C.L. could not recall who grabbed him by the throat. After holding him like this for about twenty seconds, the officers let go of M.C.L.'s throat and tried to pull him back into the police car. Because he was handcuffed and his legs were shackled, M.C.L. had trouble getting into the car. Although M.C.L. never admitted kicking any officer, he stated that the officers were saying he was fighting and struggling with them. They finally got him into the police car and closed the door.

The State's version of the struggle differed somewhat. Valdez testified that after the shackles were placed on him, M.C.L. stood up, one of the constables grabbed him by his neck to subdue him, and Valdez went around to the other side of the car where he and another officer pulled M.C.L. inside the car. Horton was standing near M.C.L. at that time, although Valdez was "not exactly sure how or what Mr. Horton grabbed or what he was doing." When M.C.L. kicked out one of the windows, he was pulled back out of the car so that the officers could attempt to "hogtie" him. Valdez thought Horton might have assisted in trying to hogtie M.C.L. Throughout his testimony, Valdez never mentioned that M.C.L. kicked Horton or anyone else.

Horton testified that after the leg irons were placed on M.C.L., "he just went off." Horton stated that "it was basically the two deputies [Neyens and Miller] who were holding him [M.C.L.]

down," although Horton was right there with them. Horton also stated that he did not suffer any injuries at that time. He further testified that "they" (presumably, the two deputies) struggled to get M.C.L. back in the police car. Once inside, M.C.L. rolled on his back and started kicking. The deputies shut the door, and M.C.L. kicked and shattered a rear window. Shards of glass cut Horton's hands.

Neyens testified that she was the officer who reached from around the open back door to grab M.C.L. around the neck after he was shackled and jumped to his feet. She further testified that she saw M.C.L. kick both Miller and Horton. She stated that M.C.L. "was kicking both of them and spitting and trying to bite." After M.C.L. kicked out the window, he was taken out of the vehicle and placed on the ground, where Neyens, Miller, and Horton tried to secure and recuff him. Neyens stated that both Miller and Horton had cuts on their hands. She did not know if any of the officers' injuries were sustained as a result of the glass or if they were entirely from M.C.L. kicking their hands.

Miller testified that immediately after the shackles were placed on M.C.L's legs, he stood up. He then began "to thrash around moving his hands." Miller grabbed M.C.L.'s hands, and he was "still thrashing around jumping" and spitting and attempting to bite him. Miller thought Horton was between him and M.C.L. and the door at this time. While continuing to secure M.C.L.'s hands, Miller grabbed him under the jaw and tried to push him back into the car. At some point, M.C.L. "folded in the middle and actually fell back into the car about halfway." Miller leaned into the car and continued to secure M.C.L.'s hands; he did not believe that M.C.L. was still kicking at that point. Neyens then ran around to the other side of the car and pulled M.C.L. all the way into the back seat of the car, and they closed the doors. When asked if M.C.L. ever kicked Miller with his feet, Miller responded, "I honestly don't know. All this stuff is happening really fast. . . . When I am inside the car I really can't see if he was kicking or not. I honestly don't think he was kicking with his feet, but his arms were going all over the place." At that point, Miller had not sustained any injuries. Then, M.C.L. began kicking the windows. Just as the officers were preparing to open the doors again to secure him better, M.C.L. kicked out a window. At that point, the officers returned to their vehicles and drove to a substation. Later, Miller noticed that his finger was bleeding.

M.C.L. argues that the evidence is factually insufficient to show that he kicked Horton because (1) Horton never testified that he was kicked and testified that Miller and Neyens were the two officers involved in restraining M.C.L., (2) Miller could not remember if M.C.L. was kicking with his feet but only recalled that his hands were flailing around, (3) M.C.L. was shackled before the struggle ensued and could not have used his feet to kick, and (4) Neyens was behind the car door and therefore could not see whether M.C.L. was kicking. Although Horton did not specifically testify that he was kicked, Neyens unequivocally stated that M.C.L. kicked both Horton and Miller. And although Neyens may have been behind the door when she witnessed the struggle, it was within the juvenile court's discretion, as fact finder, to weigh the credibility of her testimony. *See Garcia v. State,* 57 S.W.3d 436, 441 (Tex.Crim.App.2001) (fact finder responsible for weighing all evidence, resolving evidentiary conflicts, and drawing reasonable conclusions from evidence); *Harmond v. State,* 960 S.W.2d 404, 407 (Tex.App.-Houston [1st Dist.] 1998, no pet.) (same). It

was also within the court's discretion to weigh the different descriptions of M.C.L.'s conduct and the struggle that transpired and determine whether M.C.L. assaulted Horton by kicking him. *Garcia,* 57 S.W.3d at 441; *Harmond,* 960 S.W.2d at 407. We cannot say that the evidence is so weak as to render the juvenile court's finding that M.C.L. kicked Horton clearly wrong or manifestly unjust, or that the finding is so contrary to the great weight

Page 600

and preponderance of the evidence as to be clearly wrong.

We do not reach the same conclusion, however, with regard to the element of injury. Bodily injury is defined as physical pain, illness, or any impairment of physical condition. Tex. Pen.Code Ann. § 1.07(a)(8) (West 2003). The definition is broad and encompasses even relatively minor physical contacts as long as they constitute more than mere offensive touching. *Lane v. State,* 763 S.W.2d 785, 786 (Tex.Crim.App.1989). But even applying this broad definition, the record is devoid of evidence that Horton suffered bodily injury as a result of M.C.L. kicking him. Neyens was the only witness who testified that Horton sustained injuries on his hands, but even she was uncertain as to whether the cuts were inflicted by the kicking or by the broken glass. Horton, on the other hand, testified that he did not suffer any injuries during the struggle to get M.C.L. back in the car before he kicked out the windows. His only testimony regarding bodily injury was that his hands were cut "with shards of glass." Thus, we cannot say that the evidence is factually sufficient to support the finding that Horton suffered bodily injury as a result of M.C.L's kicking him. The State must prove each and every element of the offense in order to sustain an adjudication of delinquency. Tex. Pen.Code Ann. § 2.01 (West 2003); *Narvaiz v. State,* 840 S.W.2d 415, 423 (Tex.Crim.App.1992). We therefore sustain M.C.L.'s fifth issue and reverse the portion of the juvenile court's judgment finding that M.C.L. assaulted a public servant by kicking Horton and causing bodily injury; we remand for further proceedings.

**CONCLUSION**

M.C.L. was adjudicated delinquent based on the juvenile court's finding that he committed four offenses: criminal mischief, two counts of assault on a public servant, and resisting arrest. M.C.L. did not challenge on appeal one of the allegations of assault on a public servant. That portion of the juvenile court's adjudication judgment is affirmed as to the assault of Horton that caused bodily injury by cutting him with glass. With regard to the criminal mischief allegation, we conclude that the evidence is legally insufficient to support the juvenile court's finding that M.C.L. committed the offense of criminal mischief, causing pecuniary loss in an amount more than $500 but less than $1,500. The evidence is legally and factually sufficient, however, to support a finding that M.C.L. committed criminal mischief resulting in a pecuniary loss of at least $50 but less than $500. We further hold that the evidence is legally insufficient to support the juvenile court's finding that M.C.L. committed the offense of resisting arrest, as the arrest was already completed by the time M.C.L. began to struggle. Finally, we conclude that the evidence is factually insufficient to support the remaining assault on a public servant charge, as the evidence of bodily injury to Horton by kicking is so weak as to be clearly wrong and manifestly unjust and the juvenile court's finding of bodily injury is so contrary to the weight and preponderance of the evidence as to be clearly wrong. Accordingly, we reverse the juvenile court's judgment of adjudication and its

disposition order on this charge and remand for further proceedings consistent with this opinion.

---------

Notes:

[1] Because we are reversing based on legal insufficiency, we need not reach M.C.L.'s factual sufficiency complaint.

[2] Because we hold that the evidence is not legally sufficient to support the resisting arrest allegation, we need not reach M.C.L.'s fourth issue regarding the factual sufficiency of the evidence.

[3] M.C.L. was initially charged with four counts of assault on a public servant: (1) by cutting Miller with broken glass, (2) by kicking Miller, (3) by cutting Horton with broken glass, and (4) by kicking Horton. After the State presented its case in chief, the juvenile court rendered an adjudication of not true as a matter of law on the charge of assault on a public servant by cutting Miller with glass. At the conclusion of the trial, the juvenile court reduced the assault on a public servant by kicking Miller allegation to resisting arrest, but we have held that the evidence is legally insufficient to support the resisting arrest finding. M.C.L. does not challenge on appeal the juvenile court's finding that he assaulted a public servant by cutting Horton with glass, and that part of the juvenile court's judgment remains undisturbed. Under M.C.L.'s fifth issue, he challenges only the court's finding that he assaulted Horton by kicking him.

---------

**530 S.W.2d 117 (Tex.Crim.App. 1975)**

**Johnny LEWIS, Appellant,**

**v.**

**The STATE of Texas, Appellee.**

**No. 50637.**

**Court of Criminal Appeals of Texas.**

**November 26, 1975**

W. John Allison, Jr., Dallas, on appeal only, for appellant.

Henry Wade, Dist. Atty., Steve Wilensky, Jay Ethington and Bob Whaley, Asst. Dist. Attys., Dallas, Jim D. Vollers, State's Atty., David S. McAngus, Asst. State's Atty., Austin, for the State.

OPINION

DAVIS, Commissioner.

Appeal is taken from a conviction for robbery. Punishment, enhanced under the provisions of V.T.C.A. Penal Code, Sec. 12.42(d) upon the finding of the jury that appellant had been convicted of two prior felony convictions as charged in the indictment, was set at life.

The indictment alleged the primary offense occurred on or about May 3, 1974, and the record reflects that trial was in February, 1975.

Appellant, in his sole contention, urges that the evidence is insufficient to support the conviction.

The thrust of appellant's contention is that the State has failed to sustain its burden in proving an essential element of the offense in that it was not proven that the appellant caused 'bodily injury' to the complaining witness.

The pertinent portion of V.T.C.A. Penal Code, Sec. 29.02, defining the offense of robbery, provides:

'(a) A person commits an offense if, in the course of committing theft as defined in Chapter 31 of this Code and with the intent to obtain or maintain control of the property, he:

(1) intentionally, knowingly, or recklessly causes bodily injury to another; . . ..'

Joy Bardo, secretary to the accountant for Southwest Airlines on the date in question, testified that, as was her custom, she picked up the day's deposits at the airlines ticket counter at Love Field and started toward her office some hundred yards away where she was going to prepare a bank deposit. Bardo identified appellant as the person who grabbed the suitcase in which she was carrying the money while she was en route to the office. Bardo stated she had a 'tug of war' with appellant, that she got the suitcase back from appellant and appellant 'twisted my arm back and got the bag back and I still had hold of it.' Appellant then said 'Don't give me any blank bitch, give me the bag,' and Bardo released the bag in fear that 'he (appellant) might hurt me.' Relative to any injury sustained at the time in question, the witness related that appellant hurt her arm, caused 'physical pain' to her and as a result of appellant's twisting her arm she sustained a small bruise to her arm.

V.T.C.A. Penal Code, Sec. 1.07--Definitions--(a)(7) reads in pertinent part:

'(a) In this Code:

(7) 'Bodily injury' means physical pain, illness, or any impairment of physical condition.'

Appellant urges that the Legislature intended that a victim sustain greater injuries than that sustained in the instant case 'to elevate ordinary purse snatching to robbery' and asks this Court to 'define the ambit of pain that is sufficient to create the bodily injury condemned as robbery in Section 29.02(a) (1) . . ..'

In *Ramirez v. State, Tex.Cr.App.,* 518 S.W.2d 546, where Sec. 1.07(a)(7), supra, was attacked as being so vague as to be violative of due process, this Court said:

'The terms 'physical pain,' 'illness,' and 'impairment of physical condition' are terms of common usage, and when construed 'according to the fair import of their terms,' in the context used in Section 1.07(a)(7), supra, are not 'so vague that men of common intelligence must necessarily guess at its meaning and differ as to their application.' (citations omitted) A person of ordinary intelligence, who would be law abiding, can determine with reasonable precision what conduct it is his duty to avoid.'

A review of the victim's testimony in the instant case reflects that in the course of forcibly taking the suitcase containing money away from the victim, appellant twisted the victim's arm and caused her 'physical pain.' We find that the State sustained its burden in proving the element of 'bodily injury' and conclude the evidence was sufficient to support the conviction.

The judgment is affirmed.

Opinion approved by the Court.

DOUGLAS, J., not participating.

**106 S.W.3d 724 (Tex. 2003)**

**Marathon Corporation d/b/a Honda Suzuki North, Petitioner**

**v.**

**John Pitzner, a mentally incompetent person, by and through his next friend and guardian, Steven Pitzner, Respondent**

**No. 01-0870.**

**Supreme Court of Texas**

**May 22, 2003**

Rehearing Denied July 3, 2003.

Clay E. Coalson, Meredith Donnell & Abernethy, P.C., Gregory T. Perkes, The Perkes Law Firm, P.C., Corpus Christi, Rodney W. Sipes, Law Offices of Rodney W. Spies, Edinburg, Philip S. Gordon, Gordon Law Firm, Houston, for Petitioner.

Juan A. Magallanes, Gilberto Hinojosa and Richard Otto Burst, Magallanes & Hinojosa, P.C., Brownsville, for Respondent.

PER CURIAM

John Pitzner, an air conditioning repairman, sued Marathon Corporation d/b/a Honda-Suzuki North to recover damages for injuries he alleges he sustained when he fell from the roof of the building Marathon

occupied as a tenant. The trial court rendered judgment on a jury verdict in Pitzner's favor, and the court of appeals affirmed.[1] Because Pitzner failed to produce legally sufficient evidence that the alleged premises defects proximately caused his injuries, we reverse the court of appeals' judgment and render judgment that Pitzner take nothing on his claims against Marathon.

Marathon owned a Honda and Suzuki motorcycle dealership and leased the building from which Pitzner fell. Pitzner worked as an air conditioning repairman for a company owned by Robert S. Hull. Hull's company had serviced the two air conditioning units on the roof of Marathon's premises for many years before Pitzner's fall. Pitzner himself had been the primary repairman to work on the units for about two and a half years and had been on the roof of Marathon's premises at least twenty-five and perhaps as many as fifty times before sustaining his devastating injuries.

Pitzner's fall occurred on a summer day when the temperature was about ninety-nine degrees. The roof was flat and made of asphalt. Pitzner had begun work late in the afternoon. At about 6:30 p.m., Marathon's employees closed the dealership and left. They knew that Pitzner was on the roof but did not tell him that they were leaving. Pitzner was well-acquainted with the employees from previous service calls, and in the past when he needed access to the inside of the building, he would tell someone at Marathon. He had not told them that day that he needed to go inside the building or that they should stay late, as they had sometimes done.

About two hours after Marathon's employees closed the dealership and left, Pitzner was

found semi-conscious in the parking lot with severe head injuries. It is undisputed that he had used a ladder to access the roof of the building, which was about twelve feet, ten inches high, but the ladder was missing when Pitzner was found. There was no other access to the roof, from either inside or outside the building. A screwdriver with a burnt tip was found near Pitzner in the parking lot, but there were no burns on Pitzner or other indications of contact with electricity. He suffered injuries to both the front and back of his head and to his lumbar spine.

The occurrence was initially reported as an assault, with the treating emergency room physician and a paramedic noting in their respective reports that Pitzner suffered from numerous blows to the head with a blunt object or appeared to have been beaten up. The investigating police officer disagreed, however, and surmised that Pitzner had fallen from the building. Because of the severity and extent of his injuries, Pitzner does not recall what happened.

Pitzner's guardian and next friend brought suit on his behalf against a number of defendants, including Marathon. Although Pitzner was a resident of Dallas County, and his injuries occurred there, suit was filed in Hidalgo County. Marathon filed a motion to transfer, which was overruled. By the time of trial, all other defendants had settled, and Marathon was the only remaining defendant.

At trial Marathon posited that Pitzner may have become dizzy or faint from working on the asphalt roof in the heat without any water. Photos and other evidence showed that Pitzner did not have any water with him on the roof. Marathon also suggested at trial that Pitzner had been the victim of foul play. Pitzner's witnesses disagreed and opined that Marathon

Page 727

or the condition of its premises was responsible. An expert witness testified that, in his opinion, based on the injuries to Pitzner's skull and spine, Pitzner was traveling backwards when he left the roof, and his upper body struck the ground first. He also said that, in his opinion, Pitzner received an electrical shock or "a sensation that surprised him," and that he reeled backwards, tripped over a gas line on the roof, and fell from the building.

At trial the jury was instructed that "negligence" with regard to Marathon meant:
(1) That at the time of the occurrence in question there was a dangerous condition on the premises which presented an unreasonable risk of harm to John Pitzner; and,
(2) That prior to the occurrence in question, Marathon Corporation d/b/a Honda-Suzuki North knew or should have known by the exercise of ordinary care about said condition; and
(3) That Marathon Corporation d/b/a Honda-Suzuki North, did not exercise reasonable care to reduce or eliminate the risk.

The jury found Marathon one hundred percent liable for Pitzner's injuries, and the trial court rendered a judgment for $7,731,152.59 in actual damages, including pre-judgment and post-judgment interest. The court of appeals affirmed that judgment.

In this Court, Marathon raises a number of issues, including whether: (1) it owed a duty to Pitzner; (2) it exercised control over Pitzner's work when its employees closed the dealership and left Pitzner on the roof; (3) it had actual or constructive knowledge of premises defects; and (4) any premises defects proximately caused Pitzner's injuries. Marathon also asserts that various determinations regarding its motions to transfer and for a new trial were erroneous. We address

only the proximate cause issue.

The components of proximate cause are cause in fact and foreseeability.[2] The test for cause in fact, or "but for causation," is whether the act or omission was a substantial factor in causing the injury "without which the harm would not have occurred."[3] A finding of cause in fact may be based on either direct or circumstantial evidence,[4] but cannot be supported by mere conjecture, guess, or speculation.[5]

Marathon contends that there is legally insufficient evidence to support the finding that Pitzner's injuries were caused by premises defects. We will sustain a no evidence point of error when (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of the vital fact.[6] Anything more than a scintilla of evidence is legally sufficient to support the trial court's finding, but as we have frequently said,

Page 728

"'some suspicion linked to other suspicion produces only more suspicion, which is not the same as some evidence.'"[7] We have also said that an inference stacked only on other inferences is not legally sufficient evidence.[8]

In reviewing the evidence in the light most favorable to the findings in favor of Pitzner, it is undisputed that the premises did not comply with Dallas City building and mechanical codes in certain respects. Pitzner points to two of these violations as the cause of his fall. First, air conditioning units were required to have a thirty-inch work space in front of their access panels. The access panels of the two units on Marathon's premises faced one another and were ten to twelve inches apart, so that the space was eighteen to twenty inches shy of the code requirements. The spacing from electrical components inside the access panel was also less than the thirty-six inches required by the Dallas Electrical Code.

Second, the air conditioning units did not have a power disconnect on the roof so that all electrical power to the units could be shut off by someone working on the roof. The power disconnect to the units themselves was located downstairs, inside the building, and the main power to the building was located on the ground outside of the building. One of the experts at trial theorized that the lack of a power disconnect and the lack of thirty inches of space between the units caused Pitzner to come into contact with a high-voltage line. The central question in this appeal is whether there is any evidence that Pitzner came into contact with a high-voltage rather than a low-voltage electrical wire or any electrical wire at all.

There was unchallenged testimony from Hull, who completed the repairs after Pitzner's fall, that Pitzner had almost finished repairing a freon leak. All experts agreed that, typically, a repairman would start an air conditioning unit after repairing a freon leak to fully recharge the unit. Pitzner's expert witness said that it was common for repairmen to start an air conditioning unit by connecting two low-voltage lines and that it was also common for repairmen to carry around a screwdriver with a burnt tip so that a new screwdriver would not be ruined each time one was used to short a circuit. He also testified that connecting and shorting two low-voltage lines would not work at premises like Marathon's if the air conditioning unit had been turned off downstairs. In that

event, the expert said that a repairman would reach inside the access panel to push the contactor (a black bar), which would bypass the control circuit and start the unit. Although it was common for repairmen to do this, the expert said, it could result in an electrical shock or flash. However, there was no evidence of whether the power to the units had been turned off inside the building while Pitzner was working on them.

Another expert for Pitzner testified that in his opinion, the lack of space between

Page 729

the units caused Pitzner to reach into the access panel at an angle that made it more likely that he would come into contact with a high-voltage wire, and that after Pitzner was shocked, he reeled backwards, tripped over a gas pipeline that was on the roof, and fell backwards off the roof. The units were ten feet from the edge of the roof. A gas pipeline ran the length of the roof. It was about two inches in diameter and about five inches above the surface of the roof, and it was about six or seven feet from the units and three or four feet from the edge of the roof.

Expert opinions must be supported by facts in evidence, not conjecture.[9] The experts' opinions that Pitzner sustained an electrical shock and fell off the roof because of premises defects pile speculation on speculation and inference on inference. To reach their conclusions, Pitzner's experts postulate that:

1) the power to the air conditioning units had been shut off inside the building so that it was not possible to start the recharged unit by connecting low-voltage wires,

2) therefore, Pitzner must have attempted to reach into the access panel to push the contactor,

3) and therefore, he must have come into contact with a high-voltage wire,

4) which then shocked him, causing him to step back and stumble over a gas pipeline,

5) which then caused him to fall off of the roof,

6) all of which would not have happened if there had been an electrical disconnect on the unit or ten to twelve more inches of space between the two air conditioning units.

But because there is no proof that the units had been shut off inside the building, it is only speculation that Pitzner reached into the access panel, came into contact with a high-voltage wire, was shocked, stumbled back, and fell off of the building.

On this record, the circumstances "could give rise to any number of inferences, none more probable than another."[10] The absence of the ladder at the scene indicates that someone else was present on the premises at some point. The injuries to both the front and back of Pitzner's head are consistent with a fall but also with an assault and battery. The screwdriver's burnt tip could have been burned during a previous job and routinely carried by Pitzner to use on low-voltage wires, or the screwdriver might have been burned on Marathon's roof if it came into contact with a high-voltage wire inside the air conditioning unit. The factfinder could only speculate as to (1) whether Pitzner actually fell from the roof, (2) whether he actually came into contact with a high-voltage wire on Marathon's roof, and (3) whether and how the lack of a power disconnect on the roof or the lack of additional space between the air conditioning units was a substantial factor in causing Pitzner's injuries. As this Court has said, "in cases with only slight circumstantial evidence, something else must be found in the record to corroborate the probability of the fact's existence or non-existence."[11] That "something else" is absent in this case. There is no

evidence that the condition of Marathon's premises proximately caused Pitzner's injuries.

Accordingly, without hearing oral argument,

Page 730

[12] we reverse the judgment of the court of appeals and render judgment that Pitzner take nothing on his claim against Marathon.

---------

Notes:

[ 1] 55 S.W.3d 114.

[ 2] *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 477 (Tex. 1995).

[3] *Id.*

[4] *Havner v. E-Z Mart Stores, Inc.*, 825 S.W.2d 456, 459 (Tex. 1992).

[5] *Boys Clubs*, 907 S.W.2d at 477.

[6] *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1996) (citing *Juliette Fowler Homes, Inc. v. Welch Assocs., Inc.*, 793 S.W.2d 660, 666 n.9 (Tex. 1990) (citing Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 Tex. L. Rev. 361, 362-63 (1960))).

[7] *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 210 (Tex. 2002) (quoting *Browning-Ferris, Inc. v. Reyna*, 865 S.W.2d 925, 927 & n.3 (Tex. 1993) (citing *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983) ("When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence."))).

[8] *See generally Lozano v. Lozano*, 52 S.W.3d 141, 148 (Tex. 2001); *Hammerly Oaks, Inc. v. Edwards*, 958 S.W.2d 387, 392 (Tex. 1997); *Cont'l Coffee Prods., Inc. v. Cazarez*, 937 S.W.2d 444, 450 (Tex. 1996); *Litton Indus. Prods., Inc. v. Gammage*, 668 S.W.2d 319, 324 (Tex. 1984).

[9] *See generally Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499-500 (Tex. 1995).

[10] *Hammerly Oaks*, 958 S.W.2d at 392.

[11] *Lozano*, 52 S.W.3d at 148.

[12] Tex. R. App. P. 59.1.

---------

**152 S.W.3d 764 (Tex.App.—Dallas 2004)**

**Christopher Dean RANDOLPH, Appellant**

**v.**

**The STATE of Texas, Appellee.**

**No. 05-03-00793-CR.**

**Court of Appeals of Texas, Fifth District, Dallas.**

**December 6, 2004**

Page 765

[Copyrighted Material Omitted]

Page 766

Robert Udashen, Kevin B. Ross, Sorrels & Udashen, Dallas, Nathan Kight, Irving, for appellant.

John R. Roach, Collin County District Attorney, Katharine K. Decker, McKinney, for the State.

Page 767

Before Justices FITZGERALD, RICHTER, and LANG.

**OPINION**

LANG, Justice.

Christopher Dean Randolph appeals his conviction, after a bench trial, for driving while intoxicated, claiming error in the trial court's denial of his motion to suppress. Appellant brings two issues on appeal: (1) the trial court erred in denying his motion to suppress because the police officer entered appellant's garage without a warrant, probable cause, or exigent circumstances in violation of the Fourth Amendment of the United States Constitution and Article 1, § 9 of the Texas Constitution;[1] and (2) the trial court erred in denying his motion to suppress because, under article 14.03(a)(4) of the Texas Code of Criminal Procedure, the police officer had no statutory authority to enter appellant's garage and seize him.

The resolution of this appeal requires us to analyze a patchwork of facts. The story begins with Stacy Randolph's complaint to the police that appellant, her husband, assaulted her and that he left the house intoxicated, driving his Porsche automobile. When appellant returned home, the investigating officer confronted appellant in his garage as he left his car and headed into his house. It was at that point the officer smelled alcohol on appellant's breath and he began investigating the driving while intoxicated charge. Appellant's motion to suppress claimed that the officer unlawfully entered his garage and the driving while intoxicated investigation was unlawful. We conclude the trial court did not err in denying appellant's motion to suppress. Accordingly, appellant's issues are decided against him and we affirm the trial court's judgment.

**I. FACTUAL AND PROCEDURAL BACKGROUND**

According to his wife, Stacy Randolph, appellant came home intoxicated. Ms. Randolph did not want him to go out again because she was seven and one-half months pregnant, she thought that if he left he might not return, and she was concerned about him driving while intoxicated. Consequently, she tried to hide his car keys. In response, appellant attempted to kick down the

door of the room where his wife went with the car keys, causing Ms. Randolph to call 9-1-1. After her 9-1-1 call was answered, Ms. Randolph hung up the telephone without speaking. Appellant entered the room, hit his wife in the back of the head, and took the car keys. Afterward, Ms. Randolph heard her husband leave. Officer Quillin of the Plano Police Department received a dispatch regarding the 9-1-1 hang-up call originating from appellant's residence and arrived at the house approximately five minutes later. When Officer Quillin arrived at the Randolphs' house,[2] he knocked

Page 768

on the front door, but no one answered. As a result, Officer Quillin decided to check for signs of a struggle or any other problem. To do so, he inspected the perimeter of the residence and walked through the porte-cochère that leads to the back of the house and the garage. As Officer Quillin passed through the porte-cochère and reached the side door in the rear of the residence, he shined his flashlight into the house and saw Ms. Randolph walking in the hallway. Ms. Randolph saw the officer and let him into her house.

Ms. Randolph told Officer Quillin about the incident, that her husband was drunk, and that he had left to purchase drugs. Ms. Randolph provided Officer Quillin with a written statement and descriptions of appellant's attire and the silver Porsche he was driving. In addition, Officer Quillin asked Ms. Randolph whether she needed medical attention for her injuries, and she responded that she did not. No photographs were taken of her. Officer Quillin also advised Ms. Randolph that she had the right to obtain an emergency protective order and gave her information on how to procure one.

Meanwhile, Officers Cavin and Pfahning were dispatched to find the silver Porsche because of the 9-1-1 call regarding the assault and because the driver was believed to be intoxicated. The officers drove around the vicinity, checking area restaurants and bars.

After obtaining Ms. Randolph's written statement, Officer Quillin drove down the street and parked near the Randolphs' house. There, he wrote his offense report and watched for appellant's possible return. Approximately 45 minutes after the initial 9-1-1 call, Officer Quillin was completing his offense report when he observed a silver Porsche turn onto appellant's street and pull into appellant's driveway. The silver Porsche was not moving erratically or weaving. Officer Quillin returned to the house so that he could speak with appellant about the assault. He parked in front of the house. Through the passenger seat window of his patrol car, he looked through the porte-cochère and observed appellant maneuvering the silver Porsche into the garage. Officer Quillin exited his patrol car and walked through the porte-cochère where he observed appellant standing near the silver Porsche inside the garage.

Calling appellant by name, Officer Quillin identified himself as a police officer and told appellant that he wanted to speak with him. At that point, appellant, who was still standing near his Porsche inside his garage, turned around and acknowledged the officer's presence. Then, appellant turned around slowly and started walking toward the back of the garage and the door to the house. Officer Quillin entered the garage, made contact with appellant, smelled a strong odor of alcohol on appellant, and observed that appellant was staggering. Appellant was advised by Officer Quillin that he was "detaining" appellant for the assault and he escorted appellant out of the

garage. Once out of the garage, for his own safety and because he was the only officer present, Officer Quillin handcuffed appellant. Then, he walked appellant to the front of the house to wait for his back-up. Contrary to the State's contention that at this stage appellant was

Page 769

detained, appellant claims he was, under the facts, arrested.

Officers Cavin and Pfahning arrived at appellant's house approximately three or four minutes after Officer Quillin walked appellant to the front of the house. Upon their arrival, the officers removed the handcuffs and advised appellant that he was not under arrest. Officers Cavin and Pfahning gave appellant the field sobriety tests. Based upon their observations during the field sobriety tests, Officers Cavin and Pfahning arrested appellant for driving while intoxicated and transported him to the jail.

Appellant was charged by information with the offense of driving while intoxicated. Prior to trial, appellant filed a motion to suppress the evidence obtained respecting appellant's intoxication after Officer Quillin entered his garage. Officer Quillin was the only witness to testify at the hearing on appellant's motion to suppress. The trial court denied appellant's motion. During the trial, appellant's motion to suppress was reargued, and the trial court again denied his request to suppress the evidence obtained respecting the driving while intoxicated charge after Officer Quillin entered his garage. After the hearing on appellant's motion to suppress, the trial court made findings of fact and conclusions of law,[3] but amended them after reconsidering the issue at trial.

At the conclusion of the bench trial, the trial court found appellant guilty of misdemeanor driving while intoxicated. Appellant was sentenced to ninety days of confinement in the county jail and fined $1,600. The trial court suspended the sentence and ordered that appellant be placed on two years of community supervision. Appellant appeals his conviction claiming the errors that are described above in the trial court's denial of his motion to suppress.

## II. STANDARD OF REVIEW

A bifurcated standard of review is applied to a trial court's ruling on a motion to suppress evidence. This standard of review gives almost total deference to a trial court's determination of historical facts and applies a de novo review of a trial court's application of the law to those facts. *See Guzman v. State,* 955 S.W.2d 85, 89 (Tex.Crim.App.1997). A trial court is the sole trier of fact, the judge of witness credibility, and the determiner of the weight given to witness testimony. *State v. Ross,* 32 S.W.3d 853, 855 (Tex.Crim.App.2000).

When a trial court rules on a motion to suppress evidence, its application of the law of search and seizure is reviewed de novo. *Walter v. State,* 28 S.W.3d 538, 540 (Tex.Crim.App.2000). A trial court's determinations of reasonable suspicion and probable cause are also reviewed de novo. *Ornelas v. United States,* 517 U.S. 690, 696-99, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996); *accord Guzman,* 955 S.W.2d at 87; *see also State v. Crawford,* 120 S.W.3d 508, 510 (Tex.App.-Dallas 2003, no pet.). If a trial court's decision is correct on any theory of law applicable to the case, the decision will be sustained. *Ross,* 32 S.W.3d at 855-56; *see also Singleton v. State,* 91 S.W.3d 342, 346 (Tex.App.-Texarkana 2002, no pet.).

## III. CONSTITUTIONALITY OF OFFICER'S ENTRY INTO APPELLANT'S GARAGE

Initially, the State and appellant address the issues of whether Officer

Quillin's confrontation of appellant was a detention or an arrest and whether appellant's garage with its door open is a constitutionally protected area.[4] In order to resolve appellant's points on appeal, we need not decide these issues. We will assume without deciding that Officer Quillin arrested appellant, rather than simply detaining him, and the garage was a constitutionally protected area. Now, we address appellant's central claim that the evidence obtained by Officer Quillin should be suppressed from the point in time when Officer Quillin entered appellant's garage and stood next to appellant observing that appellant appeared to be intoxicated.

The parties agree that police officers need probable cause to arrest plus exigent circumstances that make procuring a warrant impracticable, in order to lawfully enter a residence and make a warrantless arrest. *Payton v. New York,* 445 U.S. 573, 583-590, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980);[5] *see also Kirk v. Louisiana,* 536 U.S. 635, 638, 122 S.Ct. 2458, 153 L.Ed.2d 599 (2002); *Welsh v. Wisconsin,* 466 U.S. 740, 749, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984); *Winter v. State,* 902 S.W.2d 571, 573 (Tex.App.-Houston [1st Dist.] 1995, no pet.). In the case before us, if exigent circumstances existed for Officer Quillin's actions, then Officer Quillin was legally authorized to enter the garage, even if it was a constitutionally protected area, and Officer Quillin was authorized to seize appellant and escort him, as he did, to the street, where he was subsequently administered sobriety tests and placed in custody.

**a) applicable law**

In reviewing a warrantless arrest to determine the existence of probable cause, we look to the facts known to the officer at the time of the arrest. *Amores v. State,* 816 S.W.2d 407, 415 (Tex.Crim.App.1991). It is not necessary for an officer to have first-hand knowledge of an offense. *See Astran v. State,* 799 S.W.2d 761, 763 (Tex.Crim.App.1990). Whether probable cause exists is determined by applying the "totality of the circumstances" test. *Amores,* 816 S.W.2d at 413. The standard for the legality of a warrantless arrest is not equal to the sufficiency of the evidence for a conviction; the standard is probable cause, not proof beyond a reasonable doubt. *Delgado v. State,* 718 S.W.2d 718, 720-21 (Tex.Crim.App.1986). The State bears the burden to prove the existence of probable cause to justify a warrantless arrest or search. *Amores,* 816 S.W.2d at 413. An officer has probable cause to make an arrest when the facts and circumstances within the officer's knowledge, and of which he has reasonable trustworthy information, are sufficient to warrant a person of reasonable caution to believe that a particular person has committed or is committing an offense. *Id.* The Supreme Court has repeatedly stated:

"[P]robable cause" to justify an arrest means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.

*Gerstein v. Pugh,* 420 U.S. 103, 111, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975); *see also Michigan v. DeFillippo,* 443 U.S. 31, 37, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979). The same probable cause required for a lawful arrest is required in order to detain and remove a person from his home. *See Hayes v. Florida,* 470 U.S. 811, 816-17, 105 S.Ct. 1643, 84 L.Ed.2d 705 (1985).

A person may be validly detained or arrested for one offense when an officer actually desires to investigate him for a different offense. *Garcia v. State,* 827 S.W.2d 937, 939-44 (Tex.Crim.App.1992); *see Walter,* 28 S.W.3d at 543; *see also Singleton,* 91 S.W.3d at 347; *Fletcher v. State,* 90 S.W.3d 419, 421 (Tex.App.-Amarillo 2002, no pet.). An objective standard is applied to determine the validity of the first arrest which leads to another arrest. *Whren v. United States,* 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). The objective standard is based on the reasoning that a reasonable officer in the same situation would have reasonable suspicion to execute the stop or probable cause to arrest, and therefore, nothing objectively unlawful would have been done. *See Singleton,* 91 S.W.3d at 347.

Applying an objective standard, even if Officer Quillin arrested appellant for the alleged assault solely to investigate him for the offense of driving while intoxicated, Officer Quillin's intent is of no consequence as long as the initial arrest for the alleged assault was valid. *See Garcia,* 827 S.W.2d at 939-44; *see also Walter,* 28 S.W.3d at 543; *Singleton,* 91 S.W.3d at 347; *Fletcher,* 90 S.W.3d at 421.

Exigent circumstances embrace situations in which real, immediate, and serious consequences will certainly occur if a police officer postpones action to obtain a warrant. *Welsh,* 466 U.S. at 751, 104 S.Ct. 2091. Exigent circumstances affecting the validity of a warrantless entry into a residence resulting in an arrest include the following: (1) a risk of danger to the police or *the victim;* (2) an increased likelihood of apprehending a suspect; (3) possible destruction of evidence or contraband; (4) hot or continuous pursuit; and (5) rendering aid or assistance to persons who the officer reasonably believes are in need of assistance. *See Minnesota v. Olson,* 495 U.S. 91, 100, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990); *Steagald v. United States,* 451 U.S. 204, 218, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981); *McNairy v. State,* 835 S.W.2d 101, 107 (Tex.Crim.App.1991); *Ramirez v. State,* 105 S.W.3d 730, 743-44 (Tex.App.-Austin 2003, no pet.); *Beaver v. State,* 106 S.W.3d 243, 247 (Tex.App.-Houston [1st Dist.] 2003, pet. ref'd); *Waugh v. State,* 51 S.W.3d 714, 718 (Tex.App.-Eastland 2001, no pet.). *See also* 40 GEORGE E. DIX & ROBERT O. DAWSON, TEXAS PRACTICE: CRIMINAL PRACTICE AND PROCEDURE § 7.57 (2d ed. 2001).

The validity of a warrantless seizure of a suspect in a constitutionally protected area is also determined by the seriousness of the offense. The warrantless entry of a constitutionally protected area to arrest or detain a suspect for a nonjailable offense is not permissible. *See Welsh,* 466 U.S. at 754, 104 S.Ct. 2091; *see also LaHaye v. State,* 1 S.W.3d 149, 152 (Tex.App.-Texarkana 1999, pet. ref'd); *Winter,* 902 S.W.2d at 574. However, if an offense, either a misdemeanor or a felony, is punishable by confinement and there are exigent circumstances, then it is serious

enough to justify the warrantless entry of a constitutionally protected area. *See generally Welsh,* 466 U.S. at 754, 104 S.Ct. 2091 (a nonjailable, civil traffic offense in the absence of exigent circumstances was not sufficiently serious to allow a warrantless entry); *Waugh,* 51 S.W.3d at 719 n. 3 (discussing *Welsh, Winter,* and *LaHaye*); *LaHaye,* 1 S.W.3d at 152 (the misdemeanor crime of evading arrest was a serious enough crime that officers in hot pursuit could enter a residence without a warrant and arrest an offender); *Winter,* 902 S.W.2d at 573-74 (a police officer could

make a warrantless entry into a home if he was in hot pursuit of a suspect who committed a misdemeanor offense punishable by confinement in jail); Op. Tex. Att'y Gen. No. JM-751 (1987) (discussing constitutionality of certain subsections of article 14.03 of the Code of Criminal Procedure in situations involving warrantless arrests in certain misdemeanor cases involving family violence).

Appellant argues that the alleged assault falls under §§ 22.01(a)(3) and (c) of the Texas Penal Code, which make it punishable only by a fine. Hence, he claims his warrantless arrest for assault in the constitutionally protected area of his garage was not a serious enough offense to permit an officer to enter his residence even if exigent circumstances existed. However, while that specific provision of the assault statute is a nonjailable offense, assault, in general, and driving while intoxicated are both jailable misdemeanor offenses. *See* T EX. PENAL CODE ANN. §§ 22.01, 49.04 (Vernon 2003 & Supp. 2004-05). Because assault is punishable by confinement in jail, it is a serious enough offense to justify the warrantless entry of a constitutionally protected area. *See Illinois v. McArthur,* 531 U.S. 326, 336, 121 S.Ct. 946, 148 L.Ed.2d 838 (2001); *LaHaye,* 1 S.W.3d at 152; *Winter,* 902 S.W.2d at 573-74.

**b) application of the law to the facts**

The record reflects that Ms. Randolph told Officer Quillin that appellant had hit her, he had been drinking, and she thought he had gone to buy drugs. Officer Quillin testified that based upon her demeanor, statements, and actions, he believed that Ms. Randolph was afraid. At trial, Ms. Randolph contradicted Officer Quillin's testimony stating that she told him that she was not afraid because in the past when appellant got like this, he stayed in a hotel. The trial court specifically found, when dictating its findings and conclusions into the record, that Officer Quillin's testimony was credible regarding his belief that Ms. Randolph was afraid her husband might return to the house to assault her or continue to assault her. *See Murphy v. State,* 112 S.W.3d 592, 601 (Tex.Crim.App.2003), *cert. denied* 541 U.S. 940, 124 S.Ct. 1660, 158 L.Ed.2d 363 (2004); *Ross,* 32 S.W.3d at 855. In addition, the record reflects that Officer Quillin remained in the area to see if appellant returned to the house, and that while he was working on his offense report, he observed appellant return, and he followed appellant to the house. Also, Officer Quillin testified that he believed it was his duty to make contact with appellant because he was concerned that appellant might reenter the house and continue to assault Ms. Randolph.

Appellant argues that there were no exigent circumstances because Officer Quillin was not in hot pursuit of appellant. However, hot pursuit is not the only situation that may give rise to exigent circumstances. *See, e.g., McNairy,* 835 S.W.2d at 107; *Ramirez,* 105 S.W.3d at 743-44. Exigent circumstances exist when there is some danger to the officer or the victim. Based on the information known to Officer

Page 773

Quillin at the time and the circumstances, Officer Quillin had reason to believe that appellant (1) had been drinking and was intoxicated; (2) had kicked in the door to a bedroom to get his car keys; (3) had struck his pregnant wife on the head before driving from his residence; (4) had returned to the house shortly after the assault; and (5) posed a continuing physical threat to his pregnant wife. Further, when the officer attempted to make contact with appellant and his request

to speak with appellant was disregarded, the officer had reason to believe that appellant might become angry with his wife for having called the police and physically attack his wife again.

We conclude sufficient exigent circumstances existed to warrant Officer Quillin's limited warrantless intrusion into appellant's garage to arrest him. Also, we conclude Officer Quillin had sufficient probable cause to arrest appellant. Officer Quillin had a "need to act quickly" under the facts presented in order to prevent appellant from engaging in any further violent attacks upon his pregnant wife. *See U.S. v. Santana,* 427 U.S. 38, 42, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976). The officer's actions clearly eliminated the risk of danger to the victim. Accordingly, we conclude that Officer Quillin's actions, even assuming an arrest of appellant, did not violate appellant's constitutional rights.

## IV. STATUTORY AUTHORIZATION TO ARREST

As an additional basis for his argument of trial court error, appellant contends Officer Quillin had no statutory authority to enter appellant's garage and arrest him. While acknowledging the applicability of article 14.03(a)(4), appellant argues Officer Quillin could not arrest him absent probable cause to believe appellant "may cause further bodily injury" under article 14.03(a)(2).

### a) applicable law

In Texas, the limited circumstances where warrantless arrests are permitted are exclusively authorized by statute. A peace officer may arrest without a warrant under article 14.03(a)(4) of the Texas Code of Criminal Procedure if the officer has probable cause to believe the following: (1) the suspect has committed an assault; (2) the victim of the assault is a member of the suspect's family or household; and (3) the assault resulted in bodily injury to the victim. TEX.CODE CRIM. PROC. ANN. art. 14.03(a)(4) (Vernon Supp. 2004-05). This provision appears to be aimed at domestic violence situations, where an immediate arrest would be valuable in defusing the situation. 40 D IX & D AWSON, § 9.83.

A warrantless arrest pursuant to article 14.03(a)(4) of the Texas Code of Criminal Procedure requires that the assault resulted in bodily injury to the victim. However, unlike article 14.03(a)(2), it does not require probable cause to believe there is a danger of further bodily injury to the assault victim.[6] *See Jackson v. State,* 33 S.W.3d 828, 831-32 (Tex.Crim.App.2000) (warrantless arrest was permissible under article 14.03(a)(4) where appellant was related to the murder victims). Section 1.07(a)(8) of the Texas Penal Code defines bodily injury as "physical pain, illness,

Page 774

or any impairment of physical condition." TEX. PEN.CODE ANN . § 1.07(a)(8) (Vernon Supp. 2004-05). The terms "physical pain," "illness," and "impairment of physical condition" are terms of common usage, and are not so vague that men of common intelligence must guess at their meaning and differ in their application. *E.g., Ramirez v. State,* 518 S.W.2d 546, 547-48 (Tex.Crim.App.1975). A fact finder may infer that a victim actually felt or suffered physical pain because people of common intelligence understand pain and some of the natural causes of it. *See Wawrykow v. State,* 866 S.W.2d 96, 99 (Tex.App.-Beaumont 1993, pet. ref'd); *Goodin v. State,* 750 S.W.2d 857, 859 (Tex.App.-Corpus Christi 1988, pet. ref'd).

### b) application of the law to the facts

In order for Officer Quillin's actions to be valid in this case, he had to have probable cause to

believe appellant committed an assault against a family member that resulted in bodily injury. TEX.CODE CRIM. PROC. ANN. arts. 14.01(b), 14.03(a)(4) (Vernon 1977 & Supp. 2004-05). To have probable cause to believe that an offense had been committed, Officer Quillin did not need first-hand knowledge of appellant's alleged assault of his wife. *See Astran,* 799 S.W.2d at 763.

The record shows that Officer Quillin had Ms. Randolph's oral and written statements that appellant hit her on the back of the head to force her to relinquish the keys to his car. Because she purported to be a crime victim, Officer Quillin was permitted to presume Ms. Randolph's statements were reliable, as long as he remained alert to the existence of any circumstances that would make that presumption inoperative. *See Mungia v. State,* 911 S.W.2d 164, 167 (Tex.App.-Corpus Christi 1995, no pet.). Accordingly, the trial court, as fact finder, could infer that Ms. Randolph suffered bodily injury because she felt physical pain when appellant hit her on the back of the head. *See Ramirez,* 518 S.W.2d at 547-48; *Wawrykow,* 866 S.W.2d at 99; *Goodin,* 750 S.W.2d at 859.

We conclude that Officer Quillin had probable cause to believe appellant had committed an assault against a family member resulting in bodily injury. Therefore, the officer was statutorily authorized to arrest appellant.

## V. CONCLUSION

Appellant's first and second issues on appeal are decided against him. The trial court's judgment is affirmed. TEX.R.APP. P. 43.2(a).

---------

Notes:

[1] As appellant has not distinguished between his rights afforded under the state and federal constitutions, we address only the federal constitution. *Johnson v. State,* 853 S.W.2d 527, 533 (Tex.Crim.App.1992)

[2] The front of the Randolphs' house faces the street. The portion of the house that faces and runs parallel to the street is approximately 140 feet to 160 feet long. The front door is located in the middle of the house and faces the street. The garage is attached to the rear of the house. The garage door faces the side of the lot. Two driveways run from the front of the house and meet in front of the garage. One driveway is shaped as an irregular "L." It begins at the street and runs perpendicular to the street, along one side of the house and the property border. When the driveway reaches the rear of the house, it turns toward the middle of the lot and runs behind the house, parallel to the street until it reaches the garage. The second driveway does not open to the street, but begins at the sidewalk in front of the house, passes through a porte-cochère, which is part of the house's structure, and meets the first driveway in front of the garage, at the back of the house. There are no fences around the house, but a wall, approximately seven or eight feet high, is located at the side of the house on the edge of the property between the first driveway that opens to the street and the neighboring house.

[3] We take notice that throughout the reporter's record, the trial court's statements are mistranscribed as referring to the officer's "action of circumstance." However, it is apparent by reading the entire record and from the context of the trial court's statements that it was discussing "exigent circumstances."

[4] As emphasized in *California v. Ciraolo,* 476 U.S. 207, 211, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986), "the touchstone of Fourth Amendment analysis is whether a person has a 'constitutionally protected reasonable expectation of privacy.' " *Id.* (quoting *Katz v. United States,* 389 U.S. 347, 360, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring)).

[5] In *Payton,* the Supreme Court stated that "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Payton,* 445 U.S. at 585, 100 S.Ct. 1371. The Fourth Amendment requires that searches of the home be reasonable. *Illinois v. Rodriguez,* 497 U.S. 177, 185-86, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990). Appellant does not complain of the officer's movement up the driveway of the residence to the point where appellant was observed inside the garage. *See U.S. v. Carter,* 360 F.3d 1235, 1239-40 (10th Cir. 2004).

[6] Contrary to appellant's arguments, Officer Quillin did not need to have probable cause to believe that appellant would cause further bodily injury to his wife. Appellant erroneously relies upon article 14.03(a)(2), which requires that an officer have probable cause to believe that an assault has been committed and that there is a danger of further bodily injury to the victim. TEX.CODE CRIM. PROC. ANN. art. 14.03(a)(2). Article 14.03(a)(2) does not apply in this case.

---------

**25 S.W.3d 878 (Tex.App. —Houston [14 Dist.] 2000) 2000)**

**Roy Lee SALLEY, Appellant,**

**v.**

**The STATE of Texas, Appellee.**

**No. 14-99-00523-CR.**

**Court of Appeals of Texas, Fourteenth District, Houston**

**August 3, 2000**

Page 879

William M. Thursland, Houston, for appellant.

Peyton Peebles, III, Houston, for appellee.

Panel consists of Justices MAURICE E. AMIDEI, ANDERSON, and FROST.

Page 880

**O P I N I O N**

JOHN S. ANDERSON, Justice.

Appellant Roy Lee Salley was convicted by a jury of misdemeanor assault for striking his wife with his hand. The trial court sentenced appellant to sixty days confinement in the Harris county jail. In two appellate issues, appellant claims the trial court erred by (1) allowing hearsay evidence to be presented at trial, and (2) convicting him of assault with legally insufficient evidence. We affirm.

**I.**

**Factual Background**

The record in this case demonstrates that at 4:09 pm, Deputy Constable Christopher Hess (Hess) was dispatched to a family disturbance call. Arriving on the scene less than two minutes later, Hess found the complainant, Donney Mae Caraway, crying and upset with the back of her hair disheveled. Appellant was standing close to the complainant when Hess asked her what had happened. She replied she was in pain, and then explained it was because the appellant hit her in the back of her head with his fist. Hess asked the appellant what had happened and he stated, "whatever she said." Hess turned back to the complainant and asked if she wanted to press charges against appellant. She replied that she did, whereupon the appellant began pleading with her, "come on, baby, don't do this." Hess arrested the appellant, and the complainant wrote out and signed a statement documenting the assault.

At trial, Hess testified to the events the day of appellant's arrest and the conversations he had with the appellant and the complainant. When he testified to the complainant's statements, the appellant objected on the basis that the State was introducing hearsay. Appellant's first point of error concerns the admissibility of this evidence.

**II.**

**Hearsay**

Appellant challenges the trial court's admission of Hess' testimony regarding the complainant's out of court statement accusing the appellant of hitting her in the head. While

appellant insists this testimony is inadmissible hearsay, the State argues it is admissible under several hearsay exceptions, including Rule of Evidence 803(2), the "excited utterance" exception. We agree with the State's analysis.

Rule 803(2) of the rules of evidence provides that a statement is not excluded by the hearsay rule if it is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." TEX.R. EVID. 803(2). This exception is founded on the belief that statements made as a result of a startling event or condition are involuntary and do not allow the declarant an adequate opportunity to fabricate, thereby ensuring enough trustworthiness to fall outside the hearsay exclusion. See *Couchman v. State,* 3 S.W.3d 155, 158-59 (Tex.App.--Fort Worth 1999, pet. ref'd). In order for the utterance to be admissible under the Rule 803(2) exception, the statement must be the product of a startling occurrence, the declarant must have been dominated by the emotion, excitement, fear, or pain of the occurrence, and the statement must be related to the circumstances of the startling occurrence. See *McFarland v. State,* 845 S.W.2d 824, 846 (Tex.Crim.App.1992).

There is no single principle governing the admissibility of evidence under the excited utterance or spontaneous declaration exception to the hearsay rule. See Couchman, 3 S.W.3d at 159; see also *Jones v. State,* 772 S.W.2d 551, 554-55 (Tex.App.--Dallas 1989, pet. ref'd). Each case must be considered on its own particular facts. See *Tejeda v. State,* 905 S.W.2d 313, 316 (Tex.App.--San Antonio 1995, pet. ref'd). If the statements are made while

Page 881

the witness is in the grip of emotion, excitement, fear, or pain, and they relate to the exciting event, they are admissible even after an appreciable time has elapsed between the exciting event and the making of the statement. See id.; see also *Penry v. State,* 691 S.W.2d 636, 647 (Tex.Crim.App.1985). The fact that such statements were made in response to questions by the investigating officer does not make the testimony inadmissible. See Tejeda, 905 S.W.2d at 316; see also Jones, 772 S.W.2d at 555 (citing *Morris v. State,* 157 Tex.Crim. 14, 246 S.W.2d 184, 186 (1951)).

Here, the evidence indicates that the complainant was under the emotional effects of her argument with and physical assault by appellant. Hess testified that fewer than ten minutes elapsed from the time the complainant reported the assault until he arrived on the scene. Hess further testified that the complainant was very upset and crying when he first approached her, she volunteered that her husband hit her, and she was still in pain from the assault. We hold that the complainant's statements to Hess were admissible as excited utterances. Therefore, the trial court did not err by allowing Deputy Hess to testify about his conversations with the complainant. Accordingly, we overrule appellant's first point of error.

**III.**

**Legal Sufficiency**

In his second point of error, appellant claims the evidence is legally insufficient to support his conviction. This point is predicated on an assumption that the testimony regarding the complainant's out of court statement to Hess was inadmissible hearsay. Because we disagree with this assumption, the complainant's statement will be considered as evidence.

In reviewing legal sufficiency, we view the evidence in the light most favorable to the verdict, and ask whether any rational trier of fact could have found beyond a reasonable doubt all of the elements of the offense. See *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); see also *Santellan v. State,* 939 S.W.2d 155, 160 (Tex.Crim.App.1997). The Texas Penal Code defines assault as "intentionally, knowingly, or recklessly caus[ing] bodily injury to another, including the person's spouse." TEX. PEN.CODE ANN. § 22.01(a)(1) (Vernon Supp.2000). The penal code also states that bodily injury means "physical pain, illness, or any impairment of physical condition." TEX. PEN.CODE ANN. § 1.07(a)(8) (Vernon 1994). This definition is purposefully broad and seems to encompass even relatively minor physical contacts so long as they constitute more than mere offensive touching. See *Lane v. State,* 763 S.W.2d 785, 786 (Tex.Crim.App.1989); see also *York v. State,* 833 S.W.2d 734, 736 (Tex.App.--Fort Worth 1992, no pet.).

The evidence presented at trial, largely through the testimony of Deputy Hess, establishes appellant's guilt of the offense of assault. First, Hess stated that when he responded to the call, he found the complainant crying and in pain, and that her hair was "messed up in the back." Second, as was discussed above, the trial court properly admitted the complainant's accusatory statement wherein she said the appellant, "hit her in the head with his fist." Third, Hess also testified to appellant's inculpatory statement in response to the complainant's accusation. Finally, when the complainant took the stand, although she testified she could not remember any of the events leading to her husband's arrest, she did remember arguing with her husband, calling the police, and crying while she spoke to Deputy Hess. Viewing this evidence in the light most favorable to the verdict, any rational trier of fact could have found beyond a reasonable doubt that appellant assaulted the complainant by hitting her with his hand. Therefore, the evidence was legally sufficient to support appellant's conviction. Accordingly, we overrule appellant's second point of error.

Page 882.

We affirm the judgment of the trial court.

**443 U.S. 307 (1979)**

**99 S.Ct. 2781, 61 L.Ed.2d 560**

**Jackson**

**v.**

**Virginia**

**No. 78-5283**

**United States Supreme Court**

**June 28, 1979**

Argued March 21, 1979

CERTIORARI TO THE UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

Syllabus

Petitioner was convicted of first-degree murder after a bench trial in a Virginia court, and his motion and petition in the state courts to set aside the conviction on the ground that there was insufficient evidence of premeditation, a necessary element of first-degree murder, were denied. He then brought a habeas corpus proceeding in Federal District Court, which, applying the "no evidence" criterion of *Thompson v. Louisville*, 362 U.S. 199, found the record devoid of evidence of premeditation and granted the writ. Applying the same criterion, the Court of Appeals reversed, holding that there was some evidence that petitioner had intended to kill the victim.

*Held:*

1. A federal habeas corpus court must consider not whether there was any evidence to support a state court conviction, but whether there was sufficient evidence to justify a rational trier of fact to find guilt beyond a reasonable doubt. *In re Winship*, 397 U.S. 358. Pp. 313-324.

(a) *In re Winship* presupposes, as an essential of the due process guaranteed by the Fourteenth Amendment, that no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof -- defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense. Pp. 313-316.

(b) After *In re Winship,* the critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be not simply to determine whether the jury was properly instructed on reasonable doubt, but to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. The *Thompson* "no evidence" rule is simply inadequate to protect against misapplications of the constitutional standard of reasonable doubt. Pp. 316-320.

(c) In a challenge to a state conviction brought under 28 U.S.C. § 2254, which requires a federal court to entertain a state prisoner's claim that he is being held in "custody in violation of the Constitution

Page 308

or laws or treaties of the United States," the applicant is entitled to habeas corpus relief if it is found that, upon the evidence adduced at the trial, no rational trier of fact could have found proof of guilt beyond a reasonable doubt. Pp. 320-324.

2. A review of the record in this case in the light most favorable to the prosecution shows that a rational factfinder could have found petitioner guilty beyond a reasonable doubt of first-degree murder under Virginia Law. Pp. 324-326.

580 F.2d 1048, affirmed.

STEWART, J., delivered the opinion of the Court, in which BRENNAN, WHITE, MARSHALL, and BLACKMUN, JJ., joined. STEVENS, J., filed an opinion concurring in the judgment, in which BURGER, C.J., and REHNQUIST, J., joined, *post* p 326. POWELL, J., took no part in the consideration or decision of the case.

Page 309

STEWART, J., lead opinion

MR. JUSTICE STEWART delivered the opinion of the Court.

The Constitution prohibits the criminal conviction of any person except upon proof of guilt beyond a reasonable doubt. *In re Winship*, 397 U.S. 358. The question in this case is what standard is to be applied in a federal habeas corpus proceeding when the claim is made that a person has been convicted in a state court upon insufficient evidence.

I

The petitioner was convicted after a bench trial in the Circuit Court of Chesterfield [99 S.Ct. 2784] County, Va., of the first-degree murder of a woman named Mary Houston Cole.[1] Under Virginia law, murder is defined as "the unlawful killing of another with malice aforethought." *Stapleton v. Commonwealth,* 123 Va. 825, 96 S.E. 801. Premeditation, or specific intent to kill, distinguishes murder in the first from murder in the second degree; proof of this element is essential to conviction of the former offense, and the burden of proving it clearly rests with the prosecution. *Shiflett v. Commonwealth,* 143 Va. 609, 130 S.E. 777; *Jefferson v. Commonwealth,* 214 Va. 432, 201 S.E.2d 749.

That the petitioner had shot and killed Mrs. Cole was not in dispute at the trial. The State's evidence established that

Page 310

she had been a member of the staff at the local county jail, that she had befriended him while he was imprisoned there on a disorderly conduct charge, and that, when he was released, she had arranged for him to live in the home of her son and daughter-in-law. Testimony by her relatives indicated that, on the day of the killing, the petitioner had been drinking and had spent a great deal of time shooting at targets with his revolver. Late in the afternoon, according to their testimony, he had unsuccessfully attempted to talk the victim into driving him to North Carolina. She did drive the petitioner to a local diner. There the two were observed by several police officers, who testified that both the petitioner and the victim had been drinking. The two were observed by a deputy sheriff as they were preparing to leave the diner in her car. The petitioner was then in possession of his revolver, and the sheriff also observed a kitchen knife in the automobile. The sheriff testified that he had offered to keep the revolver until the petitioner sobered up, but that the latter had

indicated that this would be unnecessary, since he and the victim were about to engage in sexual activity.

Her body was found in a secluded church parking lot a day and a half later, naked from the waist down, her slacks beneath her body. Uncontradicted medical and expert evidence established that she had been shot twice at close range with the petitioner's gun. She appeared not to have been sexually molested. Six cartridge cases identified as having been fired from the petitioner's gun were found near the body.

After shooting Mrs. Cole, the petitioner drove her car to North Carolina, where, after a short trip to Florida, he was arrested several days later. In a post-arrest statement, introduced in evidence by the prosecution, the petitioner admitted that he had shot the victim. He contended, however, that the shooting had been accidental. When asked to describe his condition at the time of the shooting, he indicated that he had not been drunk, but had been "pretty high." His

Page 311

story was that the victim had attacked him with a knife when he resisted her sexual advances. He said that he had defended himself by firing a number of warning shots into the ground, and had then reloaded his revolver. The victim, he said, then attempted to take the gun from him, and the gun "went off" in the ensuing struggle. He said that he fled without seeking help for the victim because he was afraid. At the trial, his position was that he had acted in self-defense. Alternatively, he claimed that, in any event, the State's own evidence showed that he had been too intoxicated to form the specific intent necessary [99 S.Ct. 2785] under Virginia law to sustain a conviction of murder in the first degree.[2]

The trial judge, declaring himself convinced beyond a reasonable doubt that the petitioner had committed first-degree murder, found him guilty of that offense.[3] The petitioner's motion to set aside the judgment as contrary to the evidence was denied, and he was sentenced to serve a term of 30 years in the Virginia state penitentiary. A petition for writ of error to the Virginia Supreme Court on the ground that the evidence was insufficient to support the conviction was denied.[4]

Page 312

The petitioner then commenced this habeas corpus proceeding in the United States District Court for the Eastern District of Virginia, raising the same basic claim.[5] Applying the "no evidence" criterion of *Thompson v. Louisville*, 362 U.S. 199, the District Court found the record devoid of evidence of premeditation, and granted the writ. The Court of Appeals for the Fourth Circuit reversed the judgment.[6] The court noted that a dissent from the denial of certiorari in a case in this Court had exposed the question whether the constitutional rule of *In re Winship*, 397 U.S. 358, might compel a new criterion by which the validity of a state criminal conviction must be tested in a federal habeas corpus proceeding. *See Freeman v. Zahradnick,* 429 U.S. 1111 (dissent from denial of certiorari). But the appellate court held that, in the absence of further guidance from this Court, it would apply the same "no evidence" criterion of *Thompson v. Louisville* that the District Court had adopted. The court was of the view that some evidence that the petitioner had intended to kill the victim could be found in the facts that the petitioner had reloaded his gun after firing warning shots, that he had had time to do so, and that the victim was then shot not once, but

twice. The court also concluded that the state trial judge could have found that the petitioner was not so intoxicated as to be incapable of premeditation.

We granted certiorari to consider the petitioner's claim that, under *In re Winship, supra,* a federal habeas corpus court must

Page 313

consider not whether there was any evidence to support a state court conviction, but whether there was sufficient evidence to justify a rational trier of the facts to find guilt beyond a reasonable doubt. 439 U.S. 1001.

II

Our inquiry in this case is narrow. The petitioner has not seriously questioned any [99 S.Ct. 2786] aspect of Virginia law governing the allocation of the burden of production or persuasion in a murder trial. *See Mullaney v. Wilbur*, 421 U.S. 684; *Patterson v. New York*, 432 U.S. 197. As the record demonstrates, the judge, sitting as factfinder in the petitioner's trial, was aware that the State bore the burden of establishing the element of premeditation, and stated that he was applying the reasonable doubt standard in his appraisal of the State's evidence. The petitioner, moreover, does not contest the conclusion of the Court of Appeals that, under the "no evidence" rule of *Thompson v. Louisville, supra,* his conviction of first-degree murder is sustainable. And he has not attacked the sufficiency of the evidence to support a conviction of second-degree murder. His sole constitutional claim, based squarely upon *Winship,* is that the District Court and the Court of Appeals were in error in not recognizing that the question to be decided in this case is whether any rational factfinder could have concluded beyond a reasonable doubt that the killing for which the petitioner was convicted was premeditated. The question thus raised goes to the basic nature of the constitutional right recognized in the *Winship* opinion.

III

A

This is the first of our cases to expressly consider the question whether the due process standard recognized in *Winship* constitutionally protects an accused against conviction except upon evidence that is sufficient fairly to support a conclusion

Page 314

that every element of the crime has been established beyond a reasonable doubt. Upon examination of the fundamental differences between the constitutional underpinnings of *Thompson v. Louisville, supra,* and of *In re Winship, supra,* the answer to that question, we think, is clear.

It is axiomatic that a conviction upon a charge not made or upon a charge not tried constitutes a denial of due process. *Cole v. Arkansas*, 333 U.S. 196, 201; *Presnell v. Georgia*, 439 U.S. 14. These standards no more than reflect a broader premise that has never been doubted in our constitutional system: that a person cannot incur the loss of liberty for an offense without notice and a meaningful opportunity to defend. *E.g., Hovey v. Elliott*, 167 U.S. 409, 416-420. *Cf. Boddie v. Connecticut,* 41 U.S. 371, 377-379. A meaningful opportunity to defend, if not the right to a trial itself, presumes as well that a total want of evidence to support a charge will conclude the case in favor of the accused. Accordingly, we held in the *Thompson* case that a conviction based

upon a record wholly devoid of any relevant evidence of a crucial element of the offense charged is constitutionally infirm. *See also Vachon v. New Hampshire*, 414 U.S. 478; *Adderley v. Florida*, 385 U.S. 39; *Gregory v. Chicago*, 394 U.S. 111; *Douglas v. Buder*, 412 U.S. 430. The "no evidence" doctrine of *Thompson v. Louisville* thus secures to an accused the most elemental of due process rights: freedom from a wholly arbitrary deprivation of liberty.

The Court in *Thompson* explicitly stated that the due process right at issue did not concern a question of evidentiary "sufficiency." 362 U.S. at 199. The right established in *In re Winship,* however, clearly stands on a different footing. *Winship* involved an adjudication of juvenile delinquency made by a judge under a state statute providing that the prosecution must prove the conduct charged as delinquent -- which in *Winship* would have been a criminal offense if engaged in by an adult -- by a preponderance of the evidence.

Page 315

Applying that standard, the judge was satisfied that the juvenile was "guilty," but he noted that the result might well have been different under a standard of proof beyond [99 S.Ct. 2787] a reasonable doubt. In short, the record in *Winship* was not totally devoid of evidence of guilt.

The constitutional problem addressed in *Winship* was thus distinct from the stark problem of arbitrariness presented in *Thompson v. Louisville.* In *Winship,* the Court held for the first time that the Due Process Clause of the Fourteenth Amendment protects a defendant in a criminal case against conviction "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." 397 U.S. at 364. In so holding, the Court emphasized that proof beyond a reasonable doubt has traditionally been regarded as the decisive difference between criminal culpability and civil liability. *Id.* at 358-362. *See Davis v. United States*, 160 U.S. 469; *Brinegar v. United States*, 338 U.S. 160, 174; *Leland v. Oregon*, 343 U.S. 790; 9 J. Wigmore, Evidence § 2495, pp. 307-308 (3d ed.1940). *Cf. Woodby v. INS*, 385 U.S. 276, 285. The standard of proof beyond a reasonable doubt, said the Court, "plays a vital role in the American scheme of criminal procedure," because it operates to give "concrete substance" to the presumption of innocence, to ensure against unjust convictions, and to reduce the risk of factual error in a criminal proceeding. 397 U.S. at 363. At the same time, by impressing upon the factfinder the need to reach a subjective state of near certitude of the guilt of the accused, the standard symbolizes the significance that our society attaches to the criminal sanction, and thus to liberty itself. *Id.* at 372 (Harlan, J., concurring).

The constitutional standard recognized in the *Winship* case was expressly phrased as one that protects an accused against a conviction except on "proof beyond a reasonable doubt. . . ." In subsequent cases discussing the reasonable doubt standard, we have never departed from this definition of the rule, or from

Page 316

the *Winship* understanding of the central purposes it serves. *See, e.g., Ivan v. v. City of New York*, 407 U.S. 203, 204; *Lego v. Twomey*, 404 U.S. 477, 486-487; *Mullaney v. Wilbur*, 421 U.S. 684; *Patterson v. New York*, 432 U.S. 197; *Cool v. United States*, 409 U.S. 100, 104. In short, *Winship* presupposes as an essential of the due process guaranteed by the Fourteenth Amendment that no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof --

defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense.

B

Although several of our cases have intimated that the factfinder's application of the reasonable doubt standard to the evidence may present a federal question when a state conviction is challenged, *Lego v. Twomey, supra* at 487; *Johnson v. Louisiana*, 406 U.S. 356, 360, the Federal Courts of Appeals have generally assumed that, so long as the reasonable doubt instruction has been given at trial, the no-evidence doctrine of *Thompson v. Louisville* remains the appropriate guide for a federal habeas corpus court to apply in assessing a state prisoner's challenge to his conviction as founded upon insufficient evidence. *See, e.g., Cunha v. Brewer,* 511 F.2d 894 (CA8).[7] We cannot agree.

The [99 S.Ct. 2788] *Winship* doctrine requires more than simply a trial

Page 317

ritual. A doctrine establishing so fundamental a substantive constitutional standard must also require that the factfinder will rationally apply that standard to the facts in evidence.[8] A "reasonable doubt," at a minimum, is one based upon "reason."[9] Yet a properly instructed jury may occasionally convict even when it can be said that no rational trier of fact could find guilt beyond a reasonable doubt, and the same may be said of a trial judge sitting as a jury. In a federal trial, such an occurrence has traditionally been deemed to require reversal of the conviction. *Glasser v. United States*, 315 U.S. 60, 80; *Bronston v. United States*, 409 U.S. 352. *See also, e.g., Curley v. United States,* 81 U.S.App.D.C. 389, 392-393, 160 F.2d 229, 232-233.[10] Under *Winship,* which established

Page 318

proof beyond a reasonable doubt as an essential of Fourteenth Amendment due process, it follows that, when such a conviction occurs in a state trial, it cannot constitutionally stand.

A federal court has a duty to assess the historic facts when it is called upon to apply a constitutional standard to a conviction obtained in a state court. For example, on direct review of a state court conviction, where the claim is made that an involuntary confession was used against the defendant, this Court reviews the facts to determine whether the confession was wrongly admitted in evidence. *Blackburn v. Alabama*, 361 U.S. 199, 205-210. *Cf. Drope v. Missouri*, 420 U.S. 162, 174-175, and n. 10. The same duty obtains in federal habeas corpus proceedings. *See Townsend v. Sain*, 372 U.S. 293, 318; *Brown v. Allen*, 344 U.S. 443, 506-507 (opinion of Frankfurter, J.).

After *Winship,* the critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be not simply to determine whether the jury was properly instructed, but to determine whether the record evidence could reasonably support a finding of guilt beyond a [99 S.Ct. 2789] reasonable doubt.[11] But this inquiry does not require a court to "ask

Page 319

itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." *Woodby v. INS,* 385 U.S. at 282 (emphasis added). Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier

of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Johnson v. Louisiana,* 406 U.S. at 362. This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that, upon judicial review, *all of the evidence* is to be considered in the light most favorable to the prosecution.[12] The criterion thus impinges upon "jury" discretion only to the extent necessary to guarantee the fundamental protection of due process of law.[13]

Page 320

That the *Thompson* "no evidence" rule is simply inadequate to protect against misapplications of the constitutional standard of reasonable doubt is readily apparent. " [A] mere modicum of evidence may satisfy a `no evidence' standard. . . ." *Jacobellis v. Ohio,* 378 U.S. 184, 202 (Warren, C.J., dissenting). Any evidence that is relevant -- that has any tendency to make the existence of an element of a crime slightly more probable than it would be without the evidence, *cf.* Fed.Rule Evid. 401 -- could be deemed a "mere modicum." But it could not seriously be argued that such a "modicum" of evidence could, by itself, rationally support a conviction beyond a reasonable doubt. The [99 S.Ct. 2790] *Thompson* doctrine simply fails to supply a workable or even a predictable standard for determining whether the due process command of *Winship* has been honored.[14]

C

Under 28 U.S.C. § 2254, a federal court must entertain a claim by a state prisoner that he or she is being held in "custody in violation of the Constitution or laws or treaties of the

Page 321

United States." Under the *Winship* decision, it is clear that a state prisoner who alleges that the evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt has stated a federal constitutional claim. Thus, assuming that state remedies have been exhausted, *see* 28 U.S.C. § 2254(b), and that no independent and adequate state ground stands as a bar, *see Estelle v. Williams*, 425 U.S. 501; *Francis v. Henderson*, 425 U.S. 536; *Wainwright v. Sykes*, 433 U.S. 72; *Fay v. Noia*, 372 U.S. 391, 438, it follows that such a claim is cognizable in a federal habeas corpus proceeding. The respondents have argued, nonetheless, that a challenge to the constitutional sufficiency of the evidence should not be entertained by a federal district court under 28 U.S.C. § 2254.

In addition to the argument that a *Winship* standard invites replication of state criminal trials in the guise of § 2254 proceedings -- an argument that simply fails to recognize that courts can and regularly do gauge the sufficiency of the evidence without intruding into any legitimate domain of the trier of fact -- the respondents have urged that any departure from the *Thompson* test in federal habeas corpus proceedings will expand the number of meritless claims brought to the federal courts, will duplicate the work of the state appellate courts, will disserve the societal interest in the finality of state criminal proceedings, and will increase friction between the federal and state judiciaries. In sum, counsel for the State urges that this type of constitutional claim should be deemed to fall within the limit on federal habeas corpus jurisdiction identified in *Stone v.*

*Powell*, 428 U.S. 465, with respect to Fourth Amendment claims. We disagree.

First, the burden that is likely to follow from acceptance of the *Winship* standard has, we think, been exaggerated. Federal court challenges to the evidentiary support for state convictions have, since *Thompson,* been dealt with under § 2254. *E.g., Freeman v. Stone,* 444 F.2d 113 (CA9); *Grieco v.*

Page 322

*Meachum,* 533 F.2d 713 (CA1); *Williams v. Peyton,* 414 F.2d 776 (CA4). A more stringent standard will expand the contours of this type of claim, but will not create an entirely new class of cases cognizable on federal habeas corpus. Furthermore, most meritorious challenges to constitutional sufficiency of the evidence undoubtedly will be recognized in the state courts, and, if the state courts have fully considered the issue of sufficiency, the task of a federal habeas court should not be difficult. *Cf. Brown v. Allen,* 344 U.S. at 463.[15] And this type of claim can [99 S.Ct. 2791] almost always be judged on the written record, without need for an evidentiary hearing in the federal court.

Second, the problems of finality and federal-state comity arise whenever a state prisoner invokes the jurisdiction of a federal court to redress an alleged constitutional violation. A challenge to a state conviction brought on the ground that the evidence cannot fairly be deemed sufficient to have established guilt beyond a reasonable doubt states a federal constitutional claim. Although state appellate review undoubtedly will serve in the vast majority of cases to vindicate the due process protection that follows from *Winship,* the same could also be said of the vast majority of other federal constitutional rights that may be implicated in a state criminal trial. It is the occasional abuse that the federal writ of habeas corpus stands ready to correct. *Brown v. Allen, supra* at 498-501 (opinion of Frankfurter, J.).

Page 323

The respondents have argued nonetheless that, whenever a person convicted in a state court has been given a "full and fair hearing" in the state system -- meaning in this instance state appellate review of the sufficiency of the evidence -- further federal inquiry -- apart from the possibility of discretionary review by this Court -- should be foreclosed. This argument would prove far too much. A judgment by a state appellate court rejecting a challenge to evidentiary sufficiency is, of course, entitled to deference by the federal courts, as is any judgment affirming a criminal conviction. But Congress, in § 2254, has selected the federal district courts as precisely the forums that are responsible for determining whether state convictions have been secured in accord with federal constitutional law. The federal habeas corpus statute presumes the norm of a fair trial in the state court and adequate state postconviction remedies to redress possible error. *See* 28 U.S.C. §§ 2254(b), (d). What it does not presume is that these state proceedings will always be without error in the constitutional sense. The duty of a federal habeas corpus court to appraise a claim that constitutional error did occur -- reflecting as it does the belief that the "finality" of a deprivation of liberty through the invocation of the criminal sanction is simply not to be achieved at the expense of a constitutional right is not one that can be so lightly abjured.

The constitutional issue presented in this case is far different from the kind of issue that was the subject of the Court's decision in *Stone v. Powell, supra.* The question whether a defendant

has been convicted upon inadequate evidence is central to the basic question of guilt or innocence. The constitutional necessity of proof beyond a reasonable doubt is not confined to those defendants who are morally blameless. *E.g., Mullaney v. Wilbur,* 421 U.S. at 697-698 (requirement of proof beyond a reasonable doubt is not "limit[ed] to those facts which, if not proved, would wholly exonerate" the accused). Under our system of criminal justice, even a thief

Page 324

is entitled to complain that he has been unconstitutionally convicted and imprisoned as a burglar.

We hold that, in a challenge to a state criminal conviction brought under 28 U.S.C. § 2254 -- if the settled procedural prerequisites for such a claim have otherwise been satisfied -- the applicant is entitled to habeas corpus relief if it is found that, upon the record evidence adduced at the trial, no [99 S.Ct. 2792] rational trier of fact could have found proof of guilt beyond a reasonable doubt. [16]

IV

Turning finally to the specific facts of this case, we reject the petitioner's claim that, under the constitutional standard dictated by *Winship,* his conviction of first-degree murder cannot stand. A review of the record in the light most favorable to the prosecution convinces us that a rational factfinder could readily have found the petitioner guilty beyond a reasonable doubt of first-degree murder under Virginia law.

There was no question at the trial that the petitioner had fatally shot Mary Cole. The crucial factual dispute went to the sufficiency of the evidence to support a finding that he had specifically intended to kill her. This question, as the Court of Appeals recognized, must be gauged in the light of applicable Virginia law defining the element of premeditation. Under that law, it is well settled that premeditation need not exist for any particular length of time, and that an intent to kill may be formed at the moment of the commission of the unlawful act. *Commonwealth v. Brown,* 90 Va. 671, 19 S.E. 447. From the circumstantial evidence in the record, it is

Page 325

clear that the trial judge could reasonably have found beyond a reasonable doubt that the petitioner did possess the necessary intent at or before the time of the killing.

The prosecution's uncontradicted evidence established that the petitioner shot the victim not once, but twice. The petitioner himself admitted that the fatal shooting had occurred only after he had first fired several shots into the ground and then reloaded his gun. The evidence was clear that the two shots that killed the victim were fired at close, and thus predictably fatal, range by a person who was experienced in the use of the murder weapon. Immediately after the shooting, the petitioner drove without mishap from Virginia to North Carolina, a fact quite at odds with his story of extreme intoxication. Shortly before the fatal episode, he had publicly expressed an intention to have sexual relations with the victim. Her body was found partially unclothed. From these uncontradicted circumstances, a rational factfinder readily could have inferred beyond a reasonable doubt that the petitioner, notwithstanding evidence that he had been drinking on the day of the killing, did have the capacity to form and had in fact formed an intent to kill the victim.

The petitioner's calculated behavior both before and after the killing demonstrated that he was fully capable of committing premeditated murder. His claim of self-defense would have

required the trial judge to draw a series of improbable inferences from the basic facts, prime among them the inference that he was wholly uninterested in sexual activity with the victim, but that she was so interested as to have willingly removed part of her clothing and then attacked him with a knife when he resisted her advances, even though he was armed with a loaded revolver that he had just demonstrated he knew how to use. It is evident from the record that the trial judge found this story, including the petitioner's belated contention that he had been so intoxicated as to be incapable of premeditation, incredible.

Page 326

Only under a theory that the prosecution was under an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt could this petitioner's [99 S.Ct. 2793] challenge be sustained. That theory the Court has rejected in the past. *Holland v. United States*, 348 U.S. 121, 140. We decline to adopt it today. Under the standard established in this opinion as necessary to preserve the due process protection recognized in *Winship,* a federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume -- even if it does not affirmatively appear in the record -- that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution. Applying these criteria, we hold that a rational trier of fact could reasonably have found that the petitioner committed murder in the first degree under Virginia law.

For these reasons, the judgment of the Court of Appeals is affirmed.

*It is so ordered.*

MR. JUSTICE POWELL took no part in the consideration or decision of this case.

STEVENS, J., concurring

MR. JUSTICE STEVENS, with whom THE CHIEF JUSTICE and MR. JUSTICE REHNQUIST join, concurring in the judgment.

The Constitution prohibits the criminal conviction of any person except upon proof *sufficient to convince the trier of fact* of guilt beyond a reasonable doubt. *Cf. ante* at 309. This rule has prevailed in our courts "at least from our early years as a Nation." *In re Winship*, 397 U.S. 358, 361.

Today the Court creates a new rule of law -- one that has never prevailed in our jurisprudence. According to the Court, the Constitution now prohibits the criminal conviction of any person -- including, apparently, a person against whom the facts have already been found beyond a reasonable doubt by a jury, a trial judge, and one or more levels of state appellate judges -- except upon proof sufficient to convince a *federal*

Page 327

*judge* that a "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Ante* at 319.

The adoption of this novel constitutional rule is not necessary to the decision of this case. Moreover, I believe it is an unwise act of lawmaking. Despite its chimerical appeal as a new counterpart to the venerable principle recognized in *Winship,* I am persuaded that its precipitous adoption will adversely affect the quality of justice administered by federal judges. For that reason, I shall analyze this new brainchild with some care.

I shall begin by explaining why neither the record in this case nor general experience with challenges to the sufficiency of the evidence supporting criminal convictions supports, much less compels, the conclusion that there is *any* need for this new constitutional precept. I shall next show that it is not logically compelled by either the holding or the analysis in *In re Winship, supra.* Finally, I shall try to demonstrate why the Court's new rule -- if it is not just a meaningless shibboleth -- threatens serious harm to the quality of our judicial system.

I

It is, of course, part of this Court's tradition that new rules of law emerge from the process of case-by-case adjudication of constitutional issues. Widespread concern that existing constitutional doctrine is unjust often provides the occasion, and is sometimes even relied upon as a justification, for the exercise of such lawmaking authority by the Court. Without entering the debate over the legitimacy of this justification for judicial action, it is at least certain that it should not be the basis for dramatic -- indeed, for *any* -- constitutional lawmaking efforts unless (1) those efforts are necessary to the decision of the case at hand and (2) powerful reasons favor a change in the law. *See Ashwander v. TVA*, 297 U.S. 288, 345-348 (Brandeis, J., concurring).

Page 328

In this case, the Court's analysis fails on both counts. It has accordingly formulated a new constitutional principle under the [99 S.Ct. 2794] most dangerous possible circumstances -- *i.e.,* where the exercise of judicial authority is neither necessitated nor capable of being limited by "the precise facts to which [the rule is originally] to be applied," *Liverpool, N.Y. & P. S.S. Co. v. Emigration Comm'rs,* 113 U.S. 33, 39, nor even by some broader set of identifiable experiences with the evil supposedly involved.

Most significantly, the Court has announced its new constitutional edict in a case in which it has absolutely no bearing on the outcome. The only factual issue at stake is whether petitioner intended to kill his victim. If the evidence is viewed "in the light most favorable to the prosecution," ante, at 319 -- and, indeed, we may view it through the eyes of the actual factfinder, whose observations about the evidence are recorded in the trial transcript -- there can be only one answer to that question no matter *what* standard of appellate review is applied. In Part IV of its opinion, the Court accepts this conclusion. There is, therefore, no need to fashion a broad new rule of constitutional law to dispose of this squalid but rather routine murder case. Under any view, the evidence is sufficient.

The Court's new rule is adopted simply to forestall some hypothetical evil that has not been demonstrated and, in my view, is not fairly demonstrable. Although the Judiciary has received its share of criticism -- principally because of the delays and costs associated with litigation -- I am aware of no general dissatisfaction with the accuracy of the factfinding process or the adequacy of the rules applied by state appellate courts when reviewing claims of insufficiency.

What little evidence the Court marshals in favor of a contrary conclusion is unconvincing. *See ante* at 317-318 n. 10. The Court is simply incorrect in implying that there are a significant number of occasions when federal convictions are

Page 329

overturned on appeal because no rational trier of fact could have found guilt beyond a reasonable

doubt. The two opinions of this Court cited *ante* at 317 stand for no such proposition. In neither was a conviction reversed for insufficiency. *See Glasser v. United States*, 315 U.S. 60; *Bronston v. United States*, 409 U.S. 352.

Moreover, a study of the 127 federal criminal convictions that were reviewed by the various Courts of Appeals and reported in the most recent hardbound volume of the Federal Reporter, Second Series, Volume 589, reveals that only 3 were overturned on sufficiency grounds. And of those, one was overturned under a "no evidence" standard, while the other two, in which a total of only 3 out of 36 counts were actually reversed, arguably involved legal issues masquerading as sufficiency questions.[1] It is difficult to believe that the federal courts will turn up more sufficiency problems than this on habeas review when, instead of acting as the first level of

Page 330

review, as in the cases [99 S.Ct. 2795] studied, they will be acting as the second, third, or even fourth level of appellate review. In short, there is simply no reason to tinker with an elaborate mechanism that is now functioning well.

II

There is nothing in the facts of this case or, so far as the Court has demonstrated, in those of cases like it to warrant today's excursion into constitutional rulemaking. The Court instead portrays its rule as the logical corollary of the principle recognized in *Winship* regarding the subjective state of mind that persons charged with the responsibility of evaluating the credibility of evidence must possess before they find the defendant guilty in a criminal case. But an examination of *Winship* reveals that it has nothing to do with appellate, much less habeas corpus, review standards; that the reasoning used in that case to reach its conclusion with respect to the trier of fact does not support, and indeed counsels against, the Court's conclusion with respect to federal habeas judges; and that there is no necessary connection between the rule recognized in *Winship* and the rule invented by the Court today.

In distinct contrast to the circumstances of this case, the facts of *Winship* presented a case where the choice of the standard of proof has made a difference: the [trial] judge below forthrightly acknowledged that he believed by a preponderance of the evidence [in], but was not convinced beyond a reasonable doubt

of, the juvenile's guilt. 397 U.S. at 369 (Harlan, J., concurring). Because the trier of fact entertained such a doubt, this Court held that the juvenile was constitutionally entitled to the same verdict that an adult defendant in a criminal case would receive. In so holding, the Court merely extended to juveniles a protection that had traditionally been available to defendants in criminal trials in this Nation. *Id.* at 361.

But nothing in the *Winship* opinion suggests that it also

Page 331

bore on appellate or habeas corpus procedures. Although it repeatedly emphasized the function of the reasonable doubt standard as describing the requisite "subjective state of certitude" of the "*factfinder,*"[2] it never mentioned the question of how appellate judges are to know whether the trier of fact really was convinced beyond a reasonable doubt, or, indeed, whether the factfinder was a "rational" person or group of persons.

Moreover, the mode of analysis employed in *Winship* finds no counterpart in the Court's opinion in this case. For example, in *Winship,* the Court pointed out the [99 S.Ct. 2796] breadth of both the historical and the current acceptance of the reasonable doubt *trial* standard.[3] In this case, by contrast, the Court

Page 332

candidly recognizes that the Federal Courts of Appeals have "generally" *rejected* the habeas standard that it adopts today. *Ante* at 316.[4]

The *Winship* court relied on nine prior opinions of this Court that bore directly on the issue presented. 397 U.S. at 362. Here, the Court purportedly relies on two prior decisions, but as is pointed out *supra* at 329, neither of these cases itself applied a "reasonable doubt" appellate standard to overturn a conviction, neither purported to be interpreting the Constitution, and neither expressed any view whatsoever on the appropriate standard in collateral proceedings such as are involved in this case.[5] As the Court itself notes, we have instead repeatedly endorsed the "no evidence" test, and have continued to do so after *Winship* was decided. *Vachon v.*

Page 333

*New Hampshire,* 414 U.S. 478; *Douglas v. Buder*, 412 U.S. 430; *Gregory v. Chicago*, 394 U.S. 111; *Adderley v. Florida*, 385 U.S. 39; *Thompson v. Louisville*, 362 U.S. 199. *See also Clyatt v. United States*, 197 U.S. 207, 222.

The primary reasoning of the Court in *Winship* is also inapplicable here. The Court noted in that case that the reasonable doubt standard has the desirable effect of significantly reducing the risk of an inaccurate factfinding, and thus of erroneous convictions, as well as of instilling confidence in the criminal justice system. 397 U.S. at 363-364. *See also id.* at 370-372 (Harlan, J., concurring). In this case, however, it would be impossible (and the Court does not even try) to demonstrate that there is an appreciable risk that a factfinding made by a jury beyond a reasonable doubt, and twice reviewed by a trial judge in ruling on directed verdict and post-trial acquittal motions and by one or more levels of appellate courts on direct appeal, as well as by two federal habeas courts under the *Thompson* "no evidence" rule, is likely to be erroneous.[6] Indeed, the very premise of *Winship* is that properly selected [99 S.Ct. 2797] judges and properly instructed juries act rationally, that the former will tell the truth when they declare that they are convinced beyond a reasonable doubt, and the latter will conscientiously obey and understand the reasonable doubt instructions they receive before retiring to reach a verdict, and therefore that either factfinder will itself provide the necessary bulwark against erroneous factual determinations. To presume otherwise is to make light of *Winship.*[7]

Page 334

Having failed to identify the evil against which the rule is directed, and having failed to demonstrate how it follows from the analysis typically used in due process cases of this character, the Court places all of its reliance on a dry, and in my view incorrect, syllogism: if *Winship* requires the factfinder to apply a reasonable doubt standard, then logic requires a reviewing judge to apply a like standard.

But, taken to its ultimate conclusion, this "logic" would require the reviewing court to "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable

doubt." *Woodby v. INS*, 385 U.S. 276, 282 (emphasis added). The Court, however, rejects this standard, as well as others that might be considered consistent with *Winship.* For example, it does not require the reviewing court to view just the evidence most favorable to the prosecution, and then to decide whether that evidence convinced it beyond a reasonable doubt, nor whether, based on the entire record, rational triers of fact could be convinced of guilt beyond a reasonable doubt. Instead, and without explanation, it chooses a still narrower standard that merely asks whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Ante* at 319.[8] It seems to me that, if "logic" allows

this choice after *Winship,* it should also allow the presumption that the Court has rejected -- that trial judges and juries will act rationally and honestly in applying the reasonable doubt standard, at least so long as the trial is free of procedural error and the record contains evidence tending to prove each of the elements of the offense.

Time may prove that the rule the Court has adopted today is the wisest compromise between one extreme that maximizes the protection against the risk that innocent persons will be erroneously convicted and the other extreme that places the greatest faith in the ability of fair procedures to produce just verdicts. But the Court's opinion should not obscure the fact that its new rule is not logically compelled by the analysis or the holding in *Winship* or in any other precedent, or the fact that the rule reflects a new policy choice, rather than the application of a preexisting rule of law.

III

The Court cautions against exaggerating the significance of its new rule. *Ante* at 321. It is true that, in practice, there may [99 S.Ct. 2798] be little or no difference between a record that does not contain at least some evidence tending to prove every element of an offense and a record containing so little evidence that no rational factfinder could be persuaded of guilt beyond a reasonable doubt. Moreover, I think the Court is quite correct when it acknowledges that "most meritorious challenges to constitutional sufficiency of the evidence undoubtedly will be recognized in the state courts." *Ante* at 322. But this only means that the new rule will seldom, if ever, provide a convicted state prisoner with any tangible benefits. It does not mean that the rule will have no impact on the administration of justice. On the contrary, I am persuaded that it will be seriously harmful both to the state and federal judiciaries.

The Court indicates that the new standard to be applied by federal judges in habeas corpus proceedings may be substantially the same as the standard most state reviewing courts are already applying. *Ante* at 322. The federal district courts are therefore being directed simply to duplicate the reviewing function that is now being performed adequately by state appellate courts. In my view, this task may well be inconsistent with the prohibition -- added by Congress to the federal habeas statute in order to forestall undue federal interference with state proceedings, *see Wainwright v. Sykes*, 433 U.S. 72, 80 -- against overturning "a determination after a hearing on the merits of a factual issue, made by a State court of competent jurisdiction." 28 U.S.C. 2254(d). *See*

*LaVallee v. Delle Rose*, 410 U.S. 690. In any case, to assign a single federal district judge the responsibility of directly reviewing, and inevitably supervising, the most routine work of the highest courts of a State can only undermine the morale and the esteem of the state judiciary -- particularly when the stated purpose of the additional layer of review is to determine whether the State's factfinder is "rational."[9] Such consequences are intangible, but nonetheless significant.

Page 337

The potential effect on federal judges is even more serious. Their burdens are already so heavy that they are delegating to staff assistants more and more work that we once expected judges to perform.[10] The new standard will invite an unknown number of state prisoners to make sufficiency challenges that they would not have made under the old rule. Moreover, because the "rational trier of fact" must certainly base its decisions on all of the evidence, the Court's broader standard may well require that the entire transcript of the state trial be read whenever the factfinders' rationality is challenged under the Court's rule.[11] Because this task will confront the [99 S.Ct. 2799] courts of appeals as well as district courts, it will surely impose countless additional hours of unproductive labor on federal judges and their assistants.[12] The increasing volume

Page 338

of work of this character has already led some of our most distinguished lawyers to discontinue or reject service on the federal bench.[13] The addition of a significant volume

Page 339

of pointless labor can only impair the quality of justice administered by federal judges, and thereby undermine "the respect and confidence of the community in applications of the . . . law." *In re Winship,* 397 U.S. at 364.

For these reasons, I am unable to join the Court's gratuitous directive to our colleagues on the federal bench.

---------

Notes:

[1] The degrees of murder in Virginia are specified in Va.Code § 18.2-32 (1975) as follows:
Murder, other than capital murder, by poison, lying in wait, imprisonment, starving, or by any willful, deliberate, and premeditated killing, or in the commission of, or attempt to commit, arson, rape, robbery, burglary or abduction . . . is murder of the first degree, punishable as a Class 2 felony.
All murder other than capital murder and murder in the first degree is murder of the second degree and is punishable as a Class 3 felony.
Class 2 felonies carry a term of 20 years to life. § 18.2-10(b) (1975). The sentence for Class 3 felonies can range from 5 to 20 years, § 18.2-10(c). Murder itself takes its definition in Virginia from the common law. *Stapleton v. Commonwealth,* 123 Va. 825, 96 S.E. 801.

[2] Under Virginia law, voluntary intoxication -- although not an affirmative defense to second-degree murder -- is material to the element of premeditation, and may be found to have negated it. *Hatcher v. Commonwealth,* 218 Va. 811, 241 S.E.2d 756.

[3] When trial without a jury is had on a not guilty plea in Virginia, the court is to "have and

exercise all the powers, privileges and duties given to juries. . . ." Va.Code § 19.2-257 (1975).

[4] There is no appeal as of right from a criminal conviction in Virginia. *Saunders v. Reynolds,* 214 Va. 697, 204 S.E.2d 421. Each petition for writ of error under Va.Code § 19.2-317 (1975) is reviewed on the merits, however, and the effect of a denial is to affirm the judgment of conviction on the merits. *Saunders v. Reynolds, supra.*

The petition for writ of error alleged that

the trial Court erred in finding the Petitioner guilty of first-degree murder in light of the evidence introduced on behalf of the Commonwealth, and on unwarranted inferences drawn from this evidence.

The petitioner contended that an affirmance would violate the Due Process Clause of the Fourteenth Amendment. In its order denying Jackson's petition, the Virginia Supreme Court stated it was "of [the] opinion that there is no reversible error in the judgment complained of. . . ." Virginia law requires sufficiency claims to be raised on direct appeal; such a claim may not be raised in a state habeas corpus proceeding. *Pettus v. Peyton,* 207 Va. 906, 153 S.E.2d 278.

[5] The District Court correctly found that the petitioner had exhausted his state remedies on this issue. *See* n. 4, *supra.*

[6] The opinions of the District Court and the Court of Appeals are not reported. The Court of Appeals' judgment order is reported at 580 F.2d 1048.

[7] The Court of Appeals in the present case, of course, recognized that *Winship* may have changed the constitutional standard in federal habeas corpus. And the Court of Appeals for the Sixth Circuit recently recognized the possible impact of *Winship* on federal habeas corpus in a case in which it held that "a rational trier of fact could have found the defendant . . . guilty beyond a reasonable doubt." *Spruytte v. Koehler, affirmance order,* 590 F.2d 335. An even more recent case in that court provoked a lively debate among three of its members regarding the effect of *Winship* upon federal habeas corpus. The writ was granted in that case, even though the trial record concededly contained "some evidence" of the applicant's guilt. *See Speigner v. Jago,* 603 F.2d 1208.

[8] The trier of fact in this case was a judge, and not a jury. But this is of no constitutional significance. The record makes clear that the judge deemed himself "properly instructed."

[9] A "reasonable doubt" has often been described as one "based on reason which arises from the evidence or lack of evidence." *Johnson v. Louisiana*, 406 U.S. 356, 360 (citing cases). For a discussion of variations in the definition used in jury instructions, *see Holland v. United States*, 348 U.S. 121, 140 (rejecting contention that circumstantial evidence must exclude every hypothesis but that of guilt).

[10] This, of course, does not mean that convictions are frequently reversed upon this ground. The practice in the federal courts of entertaining properly preserved challenges to evidentiary sufficiency, *see* Fed.Rule Crim.Proc. 29, serves only to highlight the traditional understanding in our system that the application of the "beyond a reasonable doubt" standard to the evidence is not irretrievably committed to jury discretion. To be sure, the factfinder in a criminal case has traditionally been permitted to enter an unassailable but unreasonable verdict of "not guilty." This is the logical corollary of the rule that there can be no appeal from a judgment of acquittal, even if

the evidence of guilt is overwhelming. The power of the factfinder to err upon the side of mercy, however, has never been thought to include a power to enter an unreasonable verdict of guilty. *Carpenters & Joiners v. United States*, 330 U.S. 395, 408. *Cf. Capital Traction Co. v. Hof*, 174 U.S. 1, 13-14. Any such premise is wholly belied by the settled practice of testing evidentiary sufficiency through a motion for judgment of acquittal and a post-verdict appeal from the denial of such a motion. *See generally* 4 L. Orfield, Criminal Procedure Under the Federal Rules §§ 29:1-29:29 (1967 and Supp. 1978).

[11] Until 1972, the Court of Appeals for the Second Circuit took the position advanced today by the opinion concurring in the judgment that the "beyond a reasonable doubt" standard is merely descriptive of the state of mind required of the factfinder in a criminal case, and not of the actual quantum and quality of proof necessary to support a criminal conviction. Thus, that court held that, in a jury trial, the judge need not distinguish between criminal and civil cases for the purpose of ruling on a motion for judgment of acquittal. *United States v. Feinberg,* 140 F.2d 592, 594. In *United States v. Taylor,* 464 F.2d 240 (CA2), *Feinberg* was overruled, partly on the strength of *Winship.* The *Taylor* court adopted the directed verdict criterion articulated in *Curley v. United States,* 81 U.S.App.D.C. 389, 392-393, 160 F.2d 229, 232-233 (If "reasonable" jurors "must necessarily have . . . a reasonable doubt" as to guilt, the judge "must require acquittal, because no other result is permissible within the fixed bounds of jury consideration"). This is now the prevailing criterion for judging motions for acquittal in federal criminal trials. *See generally* 2 C. Wright, Federal Practice and Procedure § 467 (1969 and Supp. 1978).

[12] Contrary to the suggestion in the opinion concurring in the judgment, the criterion announced today as the constitutional minimum required to enforce the due process right established in *Winship* is not novel. *See, e.g., United States v. Amato,* 495 F.2d 545, 549 (CA5) ("whether, taking the view [of the evidence] most favorable to the Government, a *reasonably minded jury* could accept the relevant evidence as adequate and sufficient to support the conclusion of the defendant's guilt beyond a reasonable doubt") (emphasis added); *United States v. Jorgenson,* 451 F.2d 516, 521 (CA10) (whether, "considering the evidence in the light most favorable to the government, there is substantial evidence from which a jury might *reasonably find* that an accused is guilty beyond a reasonable doubt") (emphasis added). *Glasser v. United States,* 315 U.S. 60, 80, has universally been understood as a case applying this criterion. *See, e.g., Harding v. United States,* 337 F.2d 254, 256 (CA8). *See generally* 4 Orfield, *supra,* n. 10, § 29.28.

[13] The question whether the evidence is constitutionally sufficient is, of course, wholly unrelated to the question of how rationally the verdict was actually reached. Just as the standard announced today does not permit a court to make its own subjective determination of guilt or innocence, it does not require scrutiny of the reasoning process actually used by the factfinder -- if known. *See generally* 3 F. Wharton, Criminal Procedure § 520 (12th ed.1975 and Supp. 1978).

[14] Application of the *Thompson* standard to assess the validity of a criminal conviction after *Winship* could lead to absurdly unjust results. Our cases have indicated that failure to instruct a jury on the necessity of proof of guilt beyond a reasonable doubt can never be harmless error. *See Cool v. United States*, 409 U.S. 100. *Cf. Taylor v. Kentucky*, 436 U.S. 478. Thus, a defendant whose guilt was actually proved by overwhelming evidence would be denied due process if the

jury was instructed that he could be found guilty on a mere preponderance of the evidence. Yet a defendant against whom there was but one slender bit of evidence would not be denied due process so long as the jury has been properly instructed on the prosecution's burden of proof beyond a reasonable doubt. Such results would be wholly faithless to the constitutional rationale of *Winship.*

[15] The Virginia Supreme Court's order denying Jackson's petition for writ of error does not make clear what criterion was applied to the petitioner's claim that the evidence in support of his first-degree murder conviction was insufficient. *See* n. 4, *supra.* At oral argument, counsel for the petitioner contended that the Virginia sufficiency standard is not keyed to *Winship.* Counsel for the State disagreed. Under these circumstances, we decline to speculate as to the criterion that the state court applied. The fact that a state appellate court invoked the proper standard, however, although entitled to great weight, does not totally bar a properly presented claim of this type under § 2254.

[16] The respondents have suggested that this constitutional standard will invite intrusions upon the power of the States to define criminal offenses. Quite to the contrary, the standard must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law. Whether the State could constitutionally make the conduct at issue criminal at all is, of course, a distinct question. *See Papachristou v. Jacksonville*, 405 U.S. 156; *Robinson v. California*, 370 U.S. 660.

[1] In *United States v. Tarr,* 589 F.2d 55 (CA1 1978), the court overturned one of two counts of which appellant was convicted because there was insufficient evidence to prove that he had the intent to aid and abet the unauthorized transfer of a machinegun in violation of 26 U.S.C. § 5861(e) and 18 U.S.C. § 2. The court found "no evidence" that appellant had the requisite knowledge. 589 F.2d at 60.

In *United States v. Whetzel,* 191 U.S.App.D.C. 184, 589 F.2d 707 (1978), the court overturned 2 of the 35 counts of appellant's conviction because

the Government failed to offer proof that would permit a jury to reasonably infer that the merchandise [appellant] transported had a value of $5,000.

*Id.* at 188, 589 F.2d at 711. However, the basis for this determination was that the Government's valuation method, which the trial court allowed the jury to consider, was legally erroneous. Similarly, in *United States v. Fearn,* 589 F.2d 1316 (CA7 1978), the court overturned the conviction based on a federal nonconstitutional rule, which surely would not apply in habeas review of state convictions, "that a conviction must rest upon firmer ground than the uncorroborated admission or confession of the accused." *Id.* at 1321. The court did not independently analyze whether the uncorroborated confession involved in that case could itself have allowed a rational trier of fact to find guilt beyond a reasonable doubt.

[2] In *In re Winship,* 397 U.S. at 364, the Court stated:

As we said in *Speiser v. Randall,* [357 U.S. 513,] 525-526:

There is always in litigation a margin of error, representing error in factfinding, which both parties must take into account. Where one party has at stake an interest of transcending value -- as a criminal defendant his liberty -- this margin of error is reduced as to him by the process of placing

on the other party the burden of . . . *persuading the factfinder* at the conclusion of the trial of his guilt beyond a reasonable doubt. Due process commands that no man shall lose his liberty unless the Government has borne the burden of . . . *convincing the factfinder* of his guilt.

To this end, the reasonable doubt standard is indispensable, for it "*impresses on the trier of fact the necessity of reaching a subjective state of certitude of the facts in issue.*" Dorsen & Rezneck, *In Re Gault* and the Future of Juvenile Law, 1 Family Law Quarterly, No. 4, pp. 1, 26 (1967). (Emphasis added.)

Later on the same page, the Court added:

It is also important in our free society that every individual going about his ordinary affairs have confidence that his government cannot adjudge him guilty of a criminal offense *without convincing a proper factfinder of his guilt with utmost certainty.*

*Ibid.* (emphasis added). *See also id.* at 370 (Harlan, J., concurring) ("[A] standard of proof represents an attempt to instruct *the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions* for a particular type of adjudication") (emphasis added).

[3] The Court, relying on treatises that analyzed the law in all 50 States as well as in the federal system, determined both that the reasonable doubt standard has prevailed at the *trial* level "at least from our early years as a Nation," and that it

is now accepted in common law jurisdictions as the measure of persuasion by which the prosecution must convince the *trier* of all the essential elements of guilt.

*Id.* at 361 (emphasis added). *See also id.* at 372 (Harlan, J., concurring) ("It is only because of the nearly complete and longstanding acceptance of the reasonable doubt standard by the States in criminal *trials* that the Court has not before today had to hold explicitly that due process, as an expression of fundamental procedural fairness, requires a more stringent standard for criminal trials than for ordinary civil litigation") (emphasis added).

[4] The Court has undertaken no systematic analysis of the standards for reviewing the sufficiency of the evidence that prevail either in state habeas corpus and other collateral proceedings or in state appellate courts. What sources I have discovered suggest that "varied standards" are in use, and that each is "subject to shifting and elastic definitions." Winningham, The Dilemma of the Directed Acquittal, 15 Vand.L.Rev. 699, 705-706 (1962). *See* ALI Code of Criminal Procedure, Commentary on § 321, pp. 961-962 (1930); Rules of Criminal Procedure 481(c), 522(a) and commentary, 10 U.L.A. (1974).

[5] It hardly bears repeating that habeas corpus is not intended as a substitute for appeal, nor as a device for reviewing the merits of guilt determinations at criminal trials. *See generally Stone v. Powell*, 428 U.S. 465. Instead, it is designed to guard against extreme malfunctions in the state criminal justice systems.

[6] As I discuss earlier, *see supra* at 329, the incidence of factual error at the trial level in federal courts appears to be exceedingly low, even when measured by the relatively strict appellate standard used by the Federal Courts of Appeals. Presumably the incidence of errors that survive that first level of review is even smaller.

[7] Indeed, the Court makes light of *Winship* by suggesting that, in the absence of its new habeas

procedure, the result of that case is simply "a trial ritual." *Ante* at 316-317. Far more likely, in my view, is that the Court's difficult-to-apply but largely unnecessary rule will itself result in a "collateral-attack ritual" that will undermine the integrity of both the state and federal judiciaries. *See infra* at 336-339.

[8] So far as I can determine, this standard first appeared in our jurisprudence in MR. JUSTICE STEWART's opinion dissenting from the Court's denial of certiorari in *Freeman v. Zahradnick,* 429 U.S. 1111, 1112, 1113, 1114, 1116. At that time, it gave the impression of being somewhat narrower than -- if only because it was stated quite differently from -- the test used by the Courts of Appeals in reviewing federal convictions on direct appeal. *See Curley v. United States,* 81 U.S.App.D.C. 389, 392393, 160 F.2d 229, 232-233 (1947). Although the Court twice repeats the *Freeman* test, *see ante* at 313, 319, it now appears either to equate that standard with the -- in my view -- broader federal direct review standard, or to endorse both standards despite their differences. *See ante* at 318, and nn. 11, 12.

[9] In the past, collateral review of state proceedings has been justified largely on the grounds (1) that federal judges have special expertise in the federal issues that regularly arise in habeas corpus proceeding, and (2) that they are less susceptible than state judges to political pressures against applying constitutional rules to overturn convictions. *See, e.g.,* Bartels, Avoiding a Comity of Errors, 29 Stan.L.Rev. 27, 30 n. 9 (1976). *Cf. Steffel v. Thompson*, 415 U.S. 452, 464; *Mitchum v. Foster*, 407 U.S. 225, 242. But neither of these justifications has any force in the present context. State judges are more familiar with the elements of state offenses than are federal judges, and should be better able to evaluate sufficiency claims. Moreover, of all decisions overturning convictions, the least likely to be unpopular, and thus to distort state decisionmaking processes, are ones based on the inadequacy of the evidence. Indeed, once federal courts were divested of authority to second-guess state courts on Fourth Amendment issues, which are far more likely to generate politically motivated state court decisions, *see Stone v. Powell*, 428 U.S. 465, a like result in this case would seem to be *a fortiori.*

[10] For example, the heavy federal workload has required the 13 regular and 7 senior judges on the Ninth Circuit to hire 30 staff attorneys and 33 law clerks to assist them in their labors.

[11] Additional burdens will also be imposed if the Court's rule is extended to federal habeas proceedings reviewing federal criminal trials, as well as to ones reviewing state civil commitment proceedings in which we have recently required at least the "clear and convincing" test to be applied as a matter of federal constitutional law. *Addington v. Texas*, 441 U.S. 418.

This Court's workload will also increase, of course, when its certiorari docket expands to accommodate the challenges generated by the Court's new rule. The effect will be even greater if the Court's opinion is read to require state appellate courts to apply the reasonable doubt test on direct review and to require this Court to apply it when reviewing the decisions of those courts on certiorari.

[12] Professor Bator has persuasively explained how the law of diminishing returns inevitably makes it unwise to have duplicative review processes on the "merits" in criminal cases:

*[I]f* a criminal judgment is ever to be final, the notion of legality must at some point include the assignment of final competences to determine legality. But, it may be asked, why should we seek

a point at which such a judgment becomes final? Conceding that no process can assure ultimate truth, will not repetition of inquiry stand a better chance of approximating it? In view of the awesomeness of the consequences of conviction, shouldn't we allow redetermination of the merits in an attempt to make sure that no error has occurred?

Surely the answer runs, in the first place, in terms of conservation of resources -- and I mean not only simple economic resources, but all of the intellectual, moral, and political resources involved in the legal system. The presumption must be, it seems to me, that, if a job can be well done once, it should not be done twice. If one set of institutions is as capable of performing the task at hand as another, we should not ask both to do it. The challenge really runs the other way: if a proceeding is held to determine the facts and law in a case, and the processes used in that proceeding are fitted to the task in a manner not inferior to those which would be used in a second proceeding, so that one cannot demonstrate that relitigation would not merely consist of repetition and second-guessing, why should not the first proceeding "count"? Why should we duplicate effort? After all, it is the very purpose of the first go-around to decide the case. Neither it nor any subsequent go-around can assure ultimate truth. If, then, the previous determination is to be ignored, we must have some reasoned institutional justification why this should be so.

Mere iteration of process can do other kinds of damage. I could imagine nothing more subversive of a judge's sense of responsibility, of the inner subjective conscientiousness which is so essential a part of the difficult and subtle art of judging well, than an indiscriminate acceptance of the notion that all the shots will always be called by someone else. Of course this does not mean that we should not have appeals. As we shall see, important functional and ethical purposes are served by allowing recourse to an appellate court in a unitary system, and to a federal supreme court in a federal system. The acute question is the effect it will have on a trial judge if we then allow still further recourse where these purposes may no longer be relevant. What seems so objectionable is second-guessing merely for the sake of second-guessing, in the service of the illusory notion that, if we only try hard enough, we will find the "truth."

Bator, Finality in Criminal Law and Federal Habeas Corpus for State Prisoners, 76 Harv.L.Rev. 441, 450-451 (1963). *See also* F. James, Civil Procedure 518 (1965).

[13] The testimony of Griffin Bell at his confirmation hearings for Attorney General is particularly relevant. When asked by Senator Scott of Virginia why he had earlier resigned from his seat on the Court of Appeals for the Fifth Circuit, Judge Bell responded:

I found it not to be a rewarding experience any longer. Whether it was because there was no more excitement after the 1906's, or whether it was because the case load changed, but the work load was oppressive. I would not have minded the work load, but the character of the cases changed. It was almost like serving on a criminal court. I did not want to do that any longer.

Hearings on the Prospective Nomination of Griffin B. Bell, of Georgia, to be Attorney General, before the Senate Committee on the Judiciary, 95th Cong., 1st Sess., 27 (1977).

---------